UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
MAY 27 2014
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Case No. 1:14MJ266 |
| v. | ) **(Under Seal)** |
| ITZHAK LOZ, (a/k/a Ari, a/k/a Avi) | ) |
| RONEN FAKIRO, | ) |
| ARKADIY BANGIYEV, (a/k/a Alex) | ) |
| EDUARD BANGIYEV, (a/k/a Eddie) | ) |
| JOHNNY LEE, (a/k/a Ramel, a/k/a Ra, a/k/a Jason Carter) | ) |
| TARELL JOHNSON, (a/k/a Nu Nu, a/k/a Nu) | ) |
| CRAIG JOHNSON, (a/k/a Uncle Bill) | ) |
| SHANNON LAMONT SMITH, | ) |
| FREDERICK BARRETT, | ) |
| RAMEL EPPS, | ) |
| BRATTIE GUERRA, | ) |
| Defendants. | ) |

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Adam Gaab, Special Agent of the United States Secret Service (USSS), Washington Field Office, Washington, D.C., being duly sworn, do depose and state that:

1. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I have been a Special Agent with the USSS for over four years. I am currently assigned to a squad which investigates counterfeit United States (U.S.) currency out of the Washington (D.C.) Field Office, and I have been assigned to this squad since July 2011. Since July 2012, I have also been assigned to an Alcohol Tobacco and Firearms (ATF) violent crime task force in Falls Church, Virginia. Prior to these assignments, I investigated financial crimes in the USSS Washington Field Office for approximately a year and a half.

3. As a Special Agent of the USSS, I received training in investigating violations of federal statutes including those regarding conspiracy, wire fraud, money laundering, and the manufacture and possession of counterfeit U.S. currency. I have participated in numerous counterfeit U.S. currency, criminal enterprise and financial investigations. More specifically, I have conducted physical surveillance, executed arrest and search warrants, analyzed phone and text records, operated confidential sources, obtained and reviewed financial documents and records of fraudulent activity. I have also spoken to suspects, defendants, witnesses, and other experienced investigators concerning the methods and practices of criminal enterprise groups, especially those involved in counterfeiting. For four years, I investigated a variety of white collar crime cases, including bank fraud schemes, large check fraud and identity theft cases and extensive wire fraud. Most recently, I have investigated the manufacturing and possession of counterfeit U.S. currency cases and I have had training and experience in the detection of counterfeit U.S. currency.

4. The facts set forth in this affidavit are based on my investigation, personal observations, training and experience, as well as information conveyed to me by other law enforcement officials. During this investigation, I have learned information regarding the facts set forth in this affidavit from cooperating sources and from my review of documents and computer records related to this investigation. Because this affidavit is submitted for the purpose of establishing probable cause, it does not include all facts known by me or all facts known by law enforcement authorities concerning this investigation.

## Purpose of the Affidavit

5. This affidavit is submitted in support of a criminal complaint and arrest warrants for defendants ITZHAK LOZ (a/k/a Ari, a/k/a Avi), RONEN FAKIRO, ARKADIY BANGIYEV (a/k/a Alex), EDUARD BANGIYEV (a/k/a Eddie), JOHNNY LEE (a/k/a Ramel, a/k/a Ra), TARELL JOHNSON (a/k/a Nu Nu, a/k/a Nu), CRAIG JOHNSON (a/k/a Uncle Bill), SHANNON SMITH, FREDERICK BARRETT, RAMEL EPPS and BRATTIE GUERRA. I submit that there is probable cause to believe that beginning in or about October 2011 and continuing until at least May 26, 2014, in Prince William County, Virginia, within the Eastern District of Virginia and elsewhere, that the above captioned defendants did unlawfully, knowingly and intentionally combine, conspire, confederate and agree with each other and with other persons to defraud the United States, and any agency thereof in any manner and for any purpose, namely:

(a) with intent to defraud, did falsely make, forge and counterfeit any obligation of the United States, that is, Federal Reserve Notes in the denomination of one hundred dollars, in violation of Title 18, United States Code, Section 471;

(b) with intent to defraud, did pass, utter, publish and sell, or attempt to pass, utter publish and sell, or with like intent bring into the United States, or keep in possession or conceal any falsely made, forged and counterfeited obligation of the United States, that is, Federal Reserve Notes in the denomination of one hundred dollars, which the defendants then and there knew to be falsely made, forged and counterfeited, in violation of Title 18, United States Code, Section 472; and

(c) did buy, sell, exchange, transfer, receive, and delivers any false, forged, counterfeited and altered obligation of the United States, that is, Federal Reserve Notes in the denomination of one hundred dollars, with the intent that the same be passed, published and used as true and genuine, in violation of Title 18, United States Code, Section 473; and that one or more of such persons did any act to effect the objects of the conspiracy, all in violation of Title 18, United States Code Section 371.

The Investigation

6. Beginning in and around 1999, the USSS first detected a high-quality counterfeit $100 Federal Reserve Note (hereinafter note, counterfeit currency or counterfeit note) in New York, New York. These counterfeit notes have many security features that closely resemble genuine U.S. currency notes, including a watermark and security thread. This particular note is believed to be manufactured in the Euro-Asia area and produced through the use of off-set printing. The USSS estimates that from 1999 until the present, approximately $75 million of this particular type of counterfeit note was passed or seized by law enforcement. The USSS estimates that in 2013 alone, approximately $10.8 million worth of this particular $100 counterfeit note was passed or seized by law enforcement.

7. During this multi-year investigation, the USSS has investigated a number of subjects in numerous jurisdictions involved in a conspiracy to make, utter and deal in counterfeit U.S. currency, believed to be manufactured in Eastern Europe and imported into New York for distribution throughout the eastern part of the United States. On or about October 8, 2013, the United States Federal Reserve Board issued a re-designed $100 note which contained new and additional security features, including a portrait watermark of Benjamin Franklin, a 3-D blue security thread, an image of a liberty bell in the inkwell, color shifting "100," raised printing, gold ink "100" and microprinting.

Facts Supporting Probable Cause

8. On or about March 17, 2012, in Woodbridge, Virginia, within the Eastern District of Virginia, an unindicted co-conspirator (UCC-1) passed $400 in counterfeit $100 Federal Reserve Notes at Loan Max. Thereafter, UCC-1 and/or a second unindicted co-conspirator (UCC-2) passed approximately $1,100 at various retail locations in Virginia and Maryland, including Wal-Mart, Sam's Club and Loan Max.

9. These counterfeit $100 Federal Reserve Notes (as set forth in paragraph 8 above) have been seized as evidence and I have obtained and reviewed them. These counterfeit notes reveal common image characteristics or defects which indicate these notes were produced and manufactured using the same type of printing process: the off-set lithographic printing process. Some of the common image characteristics for these counterfeit notes are the front plate and back plate images, including the U.S. Treasury seal that is located on the counterfeit currency. These particular images identify what printing plates were used in the manufacturing and printing process when the notes were produced on the printing press.

10. On or about February 7, 2013, in Dale City, Virginia, law enforcement executed a state search warrant for evidence of counterfeit U.S. currency at the residence of UCC-1 and UCC-2. No counterfeit U.S. currency was found during the execution of the warrant. However, UCC-1 and UCC-2 both gave voluntary, consensual statements to the USSS. Prior to the interview, I advised UCC-1 that he/she was a target of the investigation, but was not under arrest and that he did not have to cooperate with law enforcement. UCC-1 agreed to speak and voluntarily provided information to law enforcement during an interview at his home and on subsequent occasions.

TARELL JOHNSON and JOHNNY LEE

11. During this consensual, non-custodial interview, UCC-1 indicated that beginning in and around October 2011, he/she began buying counterfeit U.S. currency from Tarrell JOHNSON in New York and that JOHNSON obtained it from JOHNNY LEE, his cousin. UCC-1 further stated that he/she typically traveled to Queens or Hempstead, New York to meet up with JOHNSON to buy the counterfeit Federal Reserve Notes and that the deals typically occurred on a Saturday morning approximately once per month or when JOHNSON has the counterfeit notes available. UCC-1 further stated that LEE obtained the counterfeit notes from "an Arab" in New York. UCC-1 also stated that since October 2011, UCC-1 had purchased approximately $30,000 to $40,000 in counterfeit U.S. currency from JOHNSON. UCC-1 stated that he/she recently bought $10,000 in counterfeit U.S. currency from JOHNSON for $4,500 in genuine U.S. currency. UCC-1 stated that he/she has met JOHNSON multiple times and has gradually increased the amount of counterfeit U.S. currency that he purchased from $2,000 up to $10,000. UCC-1 admitted that UCC-2 also passed counterfeit currency at local retail stores and estimated that UCC-2 had passed approximately $10,000 in counterfeit bills that UCC-1 had

purchased from JOHNSON. UCC-1 confirmed that UCC-2 accompanied him to New York to purchase the counterfeit currency from JOHNSON on multiple occasions but not every occasion. Based on the fact that UCC-1 admitted to purchasing up to $40,000 in counterfeit currency from JOHNSON, and that UCC-2 knowingly participated with UCC-1 in this criminal activity, I suspect that UCC-2 may have been minimizing UCC-2's involvement by stating that UCC-2 only passed about $10,000 worth of counterfeit money in an effort to protect UCC-2.

12. On or about February 7, 2013, UCC-1 agreed to continue his/her cooperation with law enforcement. On February 7, 2013, and at the direction and under the supervision of law enforcement, UCC-1 placed a consensually monitored and recorded telephone call to TARELL JOHNSON (to whom he referred as "Nu Nu") at 7:15 p.m. I was present and observed as UCC-1 hit a button on his/her Apple Iphone which said "call Nu." I also noted by personal observation that the telephone number that was associated with the name "Nu" on UCC-1s phone was JOHNSON'S telephone number. I have reviewed historical toll records for JOHNSON's telephone number which confirmed the receipt of an incoming telephone call from UCC-1's phone number at the time UCC-1 placed this call in my presence. During the consensually monitored and recorded telephone conversation, UCC-1 told JOHNSON: "I need a 10 stack Saturday we good?" JOHNSON replied: "Hell no that's crazy, cause what's her name just hit me." UCC-1 asked "oh, that shit is dead?" JOHNSON replied "yeah." At the end of the phone call, JOHNSON stated: "I will definitely hit you and keep you in touch with that." I understand this exchange to mean that UCC-1 wanted to purchase $10,000 (a 10 stack) of counterfeit currency but that JOHNSON had just sold or promised it to an unknown female buyer ("what's her name") who had just contacted him. UCC-1 confirmed that the deal could not take place because JOHNSON no longer had the $10,000 when UCC-1 asked "oh, that shit is dead" and

JOHNSON confirmed that was the case. However, JOHNSON promised to contact UCC-1 when he had more counterfeit currency to sell.

13. I know that UCC-1 has felony drug convictions from New York in 1988 for attempted sale of a controlled substance (crack cocaine) and 1990 related to the distribution of a controlled substance (crack cocaine). However, the information provided by UCC-1 during his cooperation has been corroborated by a review of subpoenaed cellphone toll records, an interview of UCC-2, physical and electronic surveillance, including pen registers and later, as detailed below, by a controlled purchase of counterfeit money from JOHNSON in May 2013 and September 2013. UCC-1 has also positively identified known photographs of defendants TARELL JOHNSON and JOHNNY LEE. In a recent interview in May 2014, UCC-1 revised a previous estimate of the amount of counterfeit currency UCC-1 bought from JOHNSON to be $50,000 to $60,000. While I believe that UCC-1 may have minimized the amount of counterfeit currency UCC-1 and UCC-2 obtained from JOHNSON, I have no way of knowing the actual amount of currency UCC-1 and UCC-2 passed. For all of these reasons, I believe that UCC-1 is reliable and credible.

14. During the execution of the search warrant on February 7, 2013, law enforcement also approached UCC-2 for a voluntary, non-custodial interview. Law enforcement advised UCC-2 that UCC-2 was a target of the investigation but was not under arrest and did not have to cooperate with law enforcement. UCC-2 voluntarily stated that UCC-1 began buying counterfeit U.S. currency from TARELL JOHNSON in October 2011. UCC-2 also provided investigators with a written statement on February 7, 2013, confessing to his/her involvement in the conspiracy to obtain and pass counterfeit U.S. currency with UCC-1.

15. To date, UCC-2 has not been arrested by state or federal law enforcement nor has UCC-2 been promised any form of immunity for his/her cooperation in this investigation. UCC-2 has previously voiced concern to investigators about going to jail and is seeking consideration, such as a reduced sentence, for substantial assistance to law enforcement in this investigation. UCC-2 has not been paid any money for his/her cooperation nor for any expenses incurred during his/her cooperation in this case. The information provided by UCC-2 has been corroborated by a review of subpoenaed cellphone toll records, interviews of UCC-1, physical and electronic surveillance, such as pen registers, and controlled purchases of counterfeit currency by UCC-1 from JOHNSON. Although UCC-2 initially denied to the cashier and a deputy Sheriff to knowingly passing a counterfeit $100 note at Walmart, I believe that UCC-2's subsequent confession implicating UCC-2 and UCC-1 in this conspiracy is reliable and credible as it is corroborated by other reliable information. For these reasons, I consider UCC-2 to be reliable and credible.

16. On May 20, 2013, in Freeport, New York, UCC-1, working at the direction and under the supervision of the United States Secret Service purchased $10,000 worth of counterfeit U.S. currency from Tarrell JOHNSON for $4,300 in genuine U.S. currency that had been provided by the USSS. This deal was monitored and recorded. Approximately ten minutes later, surveillance units observed JOHNSON meet with JOHNNY LEE and do a hand-to-hand transaction. JOHNSON was driving a white 2003 Infiniti SUV with Georgia tags, registered to Derwin Lee of Lithonia, Georgia. While law enforcement officers were not able to see what was transferred between the two, USSS agents believe that JOHNSON paid LEE some portion of the money that law enforcement gave to UCC-1 for this controlled purchase. I have inspected a sample of the counterfeit $100 notes from this purchase and have concluded, based on my

training and experience, that these notes were counterfeit. In addition, these counterfeit notes have been forensically linked to the $100 counterfeit notes passed by UCC-1 and UCC-2 in 2012 and 2013 in Virginia, as well as to the first counterfeit $100 notes first detected by the USSS in 1999.

17. Beginning in and around the end of June 2013 and continuing through the end of April 2014, the USSS obtained a series of court orders from the United States District Court for the Eastern District of Virginia authorizing the interception of wire and electronic communications to and from cellular telephones used by JOHNSON, LEE and later, by their suppliers of counterfeit currency, EDUARD BANGIYEV and ARKADIY BANGIYEV. Also intercepted during these court authorized wiretaps were ITZHAK LOZ and CRAIG JOHNSON. The telephone call summaries for intercepted telephone calls in this affidavit are based on preliminary summaries of calls prepared by wiretap monitors. Some of the intercepted calls are, in whole or in part, in a foreign language or multiple foreign languages. Those calls have been summarized by foreign language translators and preliminary translations have been made by the translators into English. To the extent quotations are used in the descriptions below, the quoted segments are based on "linesheets" (line by line summaries of the content of the calls) and reviews of recordings and are not final or certified transcripts. In addition, all dates and times are approximate and based on the monitoring equipment at the time the call was intercepted. Not all relevant calls are described and not all relevant portions of the mentioned calls are described herein.

18. On September 2, 2013, in Queens, New York, the USSS observed JOHNSON and LEE drive together to an intersection near the residence of EDUARD BANGIYEV. Pen register data show that LEE's phone contacted BANGIYEV's cellphone approximately 13 times prior to

this meeting, including via text messaging. On September 2, 2013, during a court authorized wiretap, LEE was intercepted talking to JOHNSON about a previous communication he had with EDUARD BANGIYEV about being under surveillance by federal law enforcement and engaging in a high speed chase with the "feds."

19. On September 5, 2013, the USSS conducted another controlled purchase of $10,000 in counterfeit U.S. currency with UCC-1from Tarrell JOHNSON in New York. On September 2, 2013, the pen register for LEE's phone sent two outgoing text messages to and received three incoming text messages from EDUARD BANGIYEV's cellphone from 9:03 p.m. until 9:35 p.m. During that time, and beginning at approximately 9:18 p.m., USSS agents conducting surveillance of LEE and JOHNSON saw them arrive at the intersection of 65th Avenue between 108th and 110th Streets in Forest Hills, New York (the vicinity of the BANGIYEV residences). After engaging in a very high speed chase, agents continued surveillance up until about 9:50 p.m. Pen register data for LEE's phone also showed that on September 2, 2013, LEE made contact with EDUARD BANGIYEV's phone approximately thirteen (13) times before USSS began surveillance, including two outgoing text messages referenced above. Data indicates that on September 2, 2013, JOHNSON and LEE met EDUARD BANGIYEV to obtain counterfeit U.S. currency and that Johnson sold that counterfeit currency to UCC-1 on September 5, 2013.

20. On October 28, 2013, and during an intercepted call on his cellphone, LEE told JOHNSON, "yo, listen, I called, I talked to my people." In response, JOHNSON said "oh word?" LEE explained, "yeah, they was in the UK man . . . yeah, what's that Urainian, Ukrainian? What do you call? No, Ukrainian, like the Russian . . . You know, Nu, I, I kept dialing the number wrong. . ." Agents believe that during this conversation, LEE explained to

JOHNSON that he had recently talked to EDUARD BANGIYEV (his "people") and that a quantity of counterfeit U.S. currency would soon be available for them. Agents further believe that LEE told JOHNSON that EDUARD BANGIYEV ("they" and "my people") was recently in the Ukraine and that LEE had also been dialing the incorrect number to contact BANGIYEV in an attempt to explain the reason for the delay in contacting him.

21. On September 5, 2013, in Freeport, New York, UCC-1 met JOHNSON in a laundromat parking lot under the supervision and direction of the USSS. This meeting was monitored and recorded by the USSS. At approximately 10:28 p.m., JOHNSON arrived in a white Acura sedan and entered UCC-1's car. During the meeting, JOHNSON sold UCC-1 $10,000 in counterfeit $100 notes in exchange for $4,200 in genuine U.S. currency that had been provided by the USSS. During this meeting, JOHNSON stated "I didn't even know you was coming man, I was like 'what the fuck?'" UCC-1 replied "What's going on?" JOHNSON responded "Chillin man, same shit." UCC-1 then asked: "Damn, what's going on man? Those niggas ain't giving you a lot no more?" JOHNSON replied "who? Yeah, I thought yous goin. I thought you weren't coming no, so niggas fucking me up today, I was like God damn." UCC-1replied "livin good, ha? JOHNSON responded "he just started this shit, he was on his bullshit again, I yeah was over here I was I was talking to 'Uncle' again, I need to find another hustle, I can't be doing this shit with him man, but he gave me." UCC-1 then asked JOHNSON "he holding out on you all or something? Is it his people or him?" JOHNSON replied "It's him. It's him, I am ready to just go into another loop. I can't really fuck with him no more." UCC-1 responded: "he don't like money, but he just holding other motherfuckers up from making money." JOHNSON replied "that's what he doing, he was think he putting himself in jeopardy, I was like 'whatever man.'" UCC-1responded: "he find something else to do, fuck him, I will

holla at you. Be good." JOHNSON replied "I got ya." I believe that JOHNSON told UCC-1 that LEE was not providing JOHNSON all the counterfeit U.S. currency he had, and that JOHNSON told his "Uncle" (CRAIG JOHNSON) that he might have to find another person who could provide him counterfeit U.S. currency. At approximately 10:29 p.m. on September 5, 2013, the counterfeit currency transaction was concluded. UCC-1 later relinquished to the USSS the $10,000 in counterfeit currency that he purchased from JOHNSON. I have inspected a sample of the $100 notes from this controlled purchase and have concluded, based on my training and experience, that these notes were counterfeit and were forensically related to the counterfeit $100 notes previously sold by JOHNSON to UCC-1.

22. On September 5, 2013, at approximately 10:46 p.m., an outgoing call from JOHNSON to LEE was intercepted. During this call, JOHNSON stated: "Yo, I'm at your door." LEE replied "hold on one minute, man." At the same time, agents conducting surveillance using a pole camera at LEE's residence were able to see JOHNSON arrive in a white Acura sedan and wait outside for LEE to allow him into his residence. Based on the nature of the conversation and the timing of the meeting, I believe that JOHNSON went over to LEE's residence to give LEE his share of the proceeds that he just received from UCC-1 for the sale of the counterfeit U.S. currency.

BRATTIE GUERRA, FREDERICK BARRETT, and RAMEL EPPS

23. From March 13, 2014, through March 23, 2014, BRATTIE GUERRA passed approximately 40 counterfeit $100 notes at various CVS pharmacies in New York. According to multiple CVS employees, RAMEL EPPS and FREDERICK BARRETT were present with GUERRA on March 23, 2014, when she passed five $100 counterfeit notes in Rockville Center, New York. Shortly thereafter, just after midnight on March 24, 2014, EPPS and BARRETT

returned to that same CVS pharmacy. Employees recognized EPPS and BARRETT from the previous transaction on March 23, 2014 and contacted the Rockville Centre Police Department. The police arrested EPPS and BARRETT and during a search incident to arrest, law enforcement seized 30 counterfeit $100 notes from EPPS and approximately 19 counterfeit $100 notes from BARRETT.

24. On March 24, 2014, in Nassau County, New York, the USSS and local law enforcement interviewed FREDERICK BARRETT. Det. Rispoli of the Nassau County Police Department advised BARRETT of his *Miranda* rights. BARRETT indicated that he understood his rights before agreeing to speak without counsel present. During this interview, BARRETT admitted to possessing counterfeit $100 notes at the CVS pharmacy. BARRETT stated that he and EPPS attempted to contact "Nu Nu," who he knew as "Tyrell Timmons" to purchase counterfeit $100 notes. BARRETT stated that he and EPPS were unable to reach "Nu Nu" and went their separate ways. BARRETT stated that EPPS eventually heard from "Nu Nu," who had a supply of counterfeit $100 notes. BARRETT stated that he and EPPS brought the counterfeit currency from Tyrell Timmons (a/k/a "NuNu"). BARRETT also stated that they then drove to the CVS pharmacy where EPPS felt that they could pass the counterfeit $100 notes successfully. BARRETT stated that he and EPPS met "Nu Nu" at the corner of Thoma and Westfield in Roosevelt, New York to purchase the counterfeit currency. BARRETT admitted that on March 23, 2004, he made two separate transactions to buy counterfeit $100 notes from "NuNu" for a total of $1,400. BARRETT provided telephone number (516) 444-1496 for Tyrell Timmons (a/k/a "NuNu") but did not identify a known photograph of TARELL JOHNSON shown to him by law enforcement. According to UCC-1, telephone number 516-444-1496 is the most recent telephone number for TARELL JOHNSON who also goes by the nickname "Nu

Nu."

25. On March 24, 2014, in Nassau County, New York, the USSS and local law enforcement interviewed RAMEL EPPS. Det. Rispoli of the Nassau County Police Department advised EPPS of his *Miranda* rights. EPPS indicated that he understood his rights before agreeing to speak without counsel present. During this interview, EPPS stated that BRATTIE GUERRA was part of a scheme with BARRETT and himself to purchase and pass counterfeit $100 notes in the New York area. EPPS further stated that TARELL JOHNSON was the supplier of the counterfeit $100 notes he had on his possession. EPPS further stated that telephone number (516) 444-1496 belongs to TARELL JOHNSON. EPPS stated that he has purchased counterfeit $100 notes from TARELL JOHNSON in the past, but couldn't remember how much he paid for them. During the interview, EPPS positively identified a known photograph of TARELL JOHNSON. The USSS examined the counterfeit $100 notes passed by GUERRA at the CVS pharmacy in Rockville Center, New York, on March 23, 2014, and seized from BARRETT and EPPS on March 24, 2014. The USSS has determined that these $100 notes were, in fact, counterfeit and forensically related to the counterfeit $100 notes passed by UCC-1.

<u>CRAIG JOHNSON and SHANNON LAMONT SMITH</u>

26. On September 10, 2013, TARELL JOHNSON received an incoming call from (516) 770-0681 and spoke with an adult male he called "Unc" and "Uncle." I believe that this individual is CRAIG JOHNSON, the uncle of TARELL JOHNSON. During this intercepted call, "Uncle" said to JOHNSON "text me everything all over again. I gotta get to the post office. Hey, you, you give me the old number though, right?" "Uncle" continued "you give me the old number on it, like the 4250." JOHNSON said "that, ah, shit, I thought we was still at that (inaudible)." "Uncle" replied "god damn, I need a quick move. I just let my dude just grab it for

nine real quick just so I could get rid of it." JOHNSON later asked "Uncle" "what's in there?" and "Uncle" replied "it's a two piece, right?" JOHNSON affirmed "yeah." "Uncle" said "yeah, yeah, cause I thought it was like 85 for the 2 piece at 42.50." JOHNSON said "oh, no. I couldn't do that right now." "Uncle" continued "I just let it go for nine. I just grab it for the nine just to do it real quick." JOHNSON said "yeah." "Uncle" asked "you know what I'm saying? Pay to ah, like, to send it." JOHNSON answered "so, boom, next trip, I gotcha. Cause this right here would have completed everything what I had, like everything." "Uncle" offered "alright, so how about how about at least two you what what I'm saying at least two and out of th two hundred, I'll I'll pay for it to send it, out of my two hundred."

27. Based on my knowledge of this investigation, I believe that during the conversation summarized above, TARELL JOHNSON and his uncle, CRAIG JOHNSON, discussed the mailing of $20,000 worth of counterfeit currency (a "two piece" for $4,250 per $10,000 in counterfeit $100 notes) in coded language. Further, I believe that CRAIG JOHNSON agreed to pay for the cost of sending a Federal Express package containing genuine U.S. currency to TARELL JOHNSON to buy the $20,000 in counterfeit currency. Federal Express records show that on September 11, 2013, a package was sent by "CRAIG JOHNSON of Douglass, Georgia," to TARELL JOHNSON in New York, and that the package was signed for by TARELL JOHNSON.

28. During a recent consensual interview, UCC-1 confirmed that CRAIG JOHNSON gave him $4,500 in genuine U.S. currency on five separate occasions to purchase counterfeit currency from TARELL JOHNSON. According to UCC-1, the first time, CRAIG JOHNSON mailed the cash to him. For the remaining transactions, CRAIG JOHNSON structured cash deposits in Georgia into a bank account held by UCC-1 and UCC-2. Thereafter, UCC-1

withdrew the money from his account in Virginia to purchase counterfeit currency from TARELL JOHNSON on behalf of CRAIG JOHNSON. A review of bank records show that four cash deposits, in amounts of $4,500 each, were made into UCC-1's BB&T bank account on December 27, 2012; December 28, 2012; January 2, 2013 and January 3, 2013 in two different branches located in Lithia Springs, Georgia and Woodstock, Georgia.

29. Bank surveillance photos from those dates of the structured cash deposits into UCC-1's BB&T bank account depict a black male, who I believe is SHANNON SMITH, at the drive-in window. SMITH appears in the driver's seat of a red Acura accompanied by an unknown black male in the passenger seat. During surveillance at the residence of one of CRAIG JOHNSON's daughters in Georgia, agents saw this same red Acura parked outside. I believe that CRAIG JOHNSON is the passenger depicted in the surveillance photos at the drive-in teller transaction because CRAIG JOHNSON is legally blind and is driven around by others. However, CRAIG JOHNSON's face is completely obscured in the surveillance photos.

30. On or about March 14, 2014, in Baldwin County, Georgia, the USSS made contact with an individual (UCC-3), a convicted felon, suspected of dealing in counterfeit U.S. currency. The agents indicated to UCC-3 that they were aware he had passed counterfeit currency while on probation and that they wanted to speak to him about that. UCC-3 expressed concern that his probation officer would be notified of his criminal activity. Although he was not under arrest, the agents advised UCC-3 of his *Miranda* rights. UCC-3 indicated he understood his rights and agreed to speak to law enforcement without counsel. During the consensual, non-custodial interview, UCC-3 admitted that he had been selling counterfeit currency to various people in the metropolitan Atlanta area since December 2013 and that he obtained the counterfeit from a black male known to him as "Cuz-O." UCC-3 said that "Cuz-O"

had previously been arrested by the police for passing counterfeit money and had just purchased a Ford Excursion. UCC-3 also provided a written statement indicating that he paid "Cuz-O" three hundred dollars in genuine U.S. currency in exchange for six hundred dollars in counterfeit currency during the first week of December 2013. UCC-3 said that after the first transaction, he paid five hundred dollars in genuine U.S. currency to "Cuz-O" in exchange for one thousand in counterfeit currency on four separate occasions. UCC-3 agreed to continue to cooperate with law enforcement and showed them the residence of "Cuz-O" in Woodstock, Georgia, where agents observed a 2002 black Ford Excursion registered to SHANNON LAMONT SMITH. As set forth below, agents believe that the information provided by UCC-3 was not intentionally misleading and was corroborated by other reliable information obtained during the investigation. Therefore, I believe UCC-3's information to be reliable and credible.

31. A subsequent review of records from the Woodstock, Georgia Police Department confirmed that SHANNON LAMONT SMITH had been questioned on January 2, 2014 after passing a counterfeit $100 note at a McDonald's restaurant and was arrested on February 17, 2014, for passing a counterfeit $100 note at Express Car Wash. On or about February 17, 2014, SMITH consented to a search of his Ford Excursion. During the search, law enforcement seized multiple retail receipts for transactions made within the last month showing numerous purchases for which $100 cash was tendered. One receipt documented a transaction at Lowe's in Canton, Georgia. The USSS subsequently obtained and reviewed surveillance video of SMITH at Lowe's tendering a $100 note at that store. The USSS examined the counterfeit $100 notes passed by SMITH on January 2, 2014, and February 17, 2014, and determined that there were, in fact, counterfeit and forensically related to the counterfeit $100 notes passed by UCC-1.

32. On March 27, 2014, in Woodstock, Georgia, the USS and local law enforcement

interviewed SMITH at his residence. Although he was not in custody and not under arrest, the USSS advised SMITH of his *Miranda* rights. SMITH indicated that he understood his rights before agreeing to speak without counsel present. During the consensual, non-custodial interview, SMITH admitted that he began selling counterfeit U.S. currency to various people in the area beginning in December 2013. SMITH stated that he bought the counterfeit currency from CRAIG JOHNSON who got it from his nephew "Nu Nu" in New York. SMITH stated that he did not know "Nu Nu"'s real name but knew that he was the son of CRAIG JOHNSON's sister. SMITH explained that he met CRAIG JOHNSON in high school in New York years ago and they have been friends ever since. SMITH described CRAIG JOHNSON as a black male in his 40's or 50's who is legally blind. SMITH stated that when he needed counterfeit currency, he would call CRAIG JOHNSON and ask if he had any "Nu Nu's he could bust." CRAIG JOHNSON would tell him the amount he had available and they would meet and exchange genuine U.S. currency for the counterfeit. SMITH stated that CRAIG JOHNSON obtained the counterfeit currency from New York through Federal Express packages and that JOHNSON would send genuine U.S. currency back to "Nu Nu" in New York via Federal Express. SMITH stated that he paid .50 on the dollar for the counterfeit currency and estimated that he had purchased at least $30,000 from CRAIG JOHNSON in the past. SMITH also gave a short written statement to law enforcement admitting his involvement in the conspiracy.

33. During subsequent post-*Miranda* interviews, SMITH admitted to buying $100 in counterfeit U.S. currency from CRAIG JOHNSON beginning in July 2012 and said that he began getting "stacks" (10 counterfeit $100 notes or $1,000 in counterfeit currency) from JOHNSON in exchange for $650.00 in genuine U.S. currency. SMITH identified code words used by him and CRAIG JOHNSON, such as "on deck," to refer to the availability of counterfeit

currency. SMITH also explained that the counterfeit money was shipped from New York to Georgia via Federal Express and it concealed in cd/dvd holders wrapped in cellophane. SMITH also admitted to stealing one of CRAIG JOHNSON's Federal Express packages containing counterfeit currency on one occasion and to passing approximately $40,000 worth of counterfeit currency at retail stores in Georgia, Virginia, South Carolina, North Carolina and Tennessee. SMITH also said that CRAIG JOHNSON explained that they were expecting their supplier to start making the newly issued counterfeit $100 bill. On April 1, 2014, SMITH positively identified a known photograph of CRAIG JOHNSON during a photo array.

<u>ITZHAK LOZ, RONEN FAKIRO</u>

<u>ARKADIY BANGIYEVand EDUARD BANGIYEV</u>

34. On November 18, 2013, an incoming call from (972) 544-8433~10 was intercepted over Arkaidy BANGIYEV's cellphone during court authorized wiretaps. The conversation was in English and Russian. During this call, ARKADIY BANGIYEV greeted the caller as follows: "Ah, Alik (or Arik), how are things?" During this call, the unknown male identified as "Alik" or "Arik" replied, "fine, everything ok?" Then, "Alik"/"Arik" asked: "what's going on with our guest? Is he enjoying himself or what?" ARKADIY BANGIYEV's reply was inaudible. "Alik"/"Arik" then stated, "ah, he went to Uzi. In another week, he will owe another twenty thousand to thirty thousand." ARKADIY BANGIYEV replied, "Ah, who gives a shit? Ah, tomorrow he is leaving already." Shortly thereafter, ARKADIY BANGIYEV stated: "I will help him out tomorrow and that's it." "Alik"/"Arik" replied "ok," and then asked "maybe to send the money with Ambal is dangerous too, no?" ARKADIY BANGIYEV replied, "it is very risky…you know, they always fucking…" "Alik"/"Arik" countered: "No, no, no, they always stop and ask questions as well," and then asked, "did you find somebody?" ARKADIY

BANGIYEV answered: "to tell you the truth, found my old phone where I have the numbers, I put it to charge, I did not get a chance to call him. I know that I have the phone number there I will call him. I know the phone number is there I will call him up. I will call him up. I will let you know." "Alik"/"Arik" replied: "ok, because I have didn't tell him any solution yet. I'm busy…[inaudiable]…no solution yet." ARKADIY BANGIYEV responded: "we will come up with something, don't worry." "Alik"/"Arik" then stated "tell me something? If I need to wire to the United Kingdom like seventy G's, can you send it to a bank but wire it to an account? Is it a problem? Is the amount too big? To send like to the UK seventy seven thousand dollars to wire it? To the account, is it possible? Is it possible for you to wire it? To the UK?" ARKADIY BANGIYEV replied "no. Oh, this is a problem Alik (or Arik)." ARKADIY BANGIYEV further stated, "the paper work, it is a headache, you don't need that." "Alik"/"Arik" replied "yeah. Ok, ok, so try to find somebody I'm trying to…" ARKADIY BANGIYEV replied "maybe I can find somebody on 47th, maybe they will need something." "Alik"/"Arik" answered back: "yeah, look and see, because this is a problem and I don't know what to do." ARKADIY BANGIYEV said: "don't worry, we will find, everything has a way out. We will figure it out." The agents believe that during this call, ARKADIY BANGIYEV and "Alik"/"Arik" discussed the presence of an unknown co-conspirator ("our guest") whose identity was known to both of them. They further discussed how to illegally send money out of the United States by concealing the identity of the true owner of the criminal proceeds. First, they discussed sending the money with "Ambal" and whether that would be risky because he would be subject to questioning . Based on information gathered during this investigation, agents believe that during this call, "Alik"/"Arik" expressed his opinion that having "Ambal" transport genuine U.S. currency out of the United States through the airport to facilitate the purchase of

counterfeit U.S. currency overseas would be dangerous as he could be interrogated about the money at the airport by U.S. Customs and Border Patrol officers. Agents further believe that ARKADIY BANGIYEV suggested that he could find a third party to send money for "Alik"/"Arik" in response to his question about whether he (BANGIYEV) could deposit $70,000 ("70 g's") into a bank account and then wire the money to the United Kingdom ("UK") for him ("Alik"/"Arik"). The agents believe that during this conversation, ARKADIY BANGIYEV expressed his understanding that to deposit cash into a bank account and then to wire the money to a foreign bank account required paperwork, which was a "headache," and that to avoid that process, BANGIYEV would attempt to find another method for moving the money that would not require paperwork, such as a human courier.

35. On November 21, 2013, at 11:09 a.m., an outgoing call to (718) 907-5070 011972544331010 was intercepted over a phone used by ARKADIY BANGIYEV during court authorized wiretaps. Agents believe that this was an international call based on the numbers dialed, including "011" and "972," the international country code for Israel. During this call, Arkaidy BANGIYEV spoke to an unidentified male who answered in the affirmative when addressed as "Avi." This call was in English and Russian. Agents have listened to the voice of this speaker and believe it to be the same voice as the speaker previously identified as "Alik"/"Arik" from November 18, 2013. During this call, "Avi" said ""the guy with the 'payots' (side curls) from yesterday. He told me 'is it good? I called you yesterday, you told me tomorrow. I could come pick it up in 40 minutes.' I don't know what to tell him. I wanna make sure, so you know." In response, "Avi" said "yeah, yeah, yeah. I know, I know. I got an hour ago phone call and they told me they will pick it up and they set up with you. So, I assume you will call when you be reached by them. It's o.k. Everything o.k." ARKADIY BANGIYEV

asked "so, give it to him, right?" "Avi" answered, "yeah, yeah, everything is good to do." Then, ARKADIY BANGIYEV said, "Alik, bye, I will call you later." Based on the fact that ARKADIY BANGIYEV also referred to the speaker in this call as "Alik," agents further believe that this is the same caller who previously called on November 18, 2013. As set forth later in this affidavit, on January 14, 2014, agents identified this telephone number as belonging to ITZHAK LOZ. Then, "Avi"/"Alik" stated, "so, call me up. Let me know after it's been done." ARKADIY BANGIYEV confirmed, "100, yes?" "Avi"/"Alik" said, "yeah, yeah, yea, give him 100, call me up when it will be done" and ARKADIY BANGIYEV said "ok." During this call, agents believe that ARKADIY BANGIYEV called "Avi"/"Alik" in Israel and confirmed that ARKADIY BANGIYEV was expected to give the courier, with whom he just spoke, $100,000 in genuine U.S. currency to facilitate the purchase of a quantity of counterfeit currency. Agents also believe that "Avi"/"Alik" confirmed that ARKADIY BANGIYEV should give the courier the $100,000 and advised him to call him after it was done.

36. On December 14, 2013, an incoming call from (516) 589-4503 was intercepted over a cellphone used by ARKADIY BANGIYEV during a court authorized wiretap. During this call, ARKADIY BANGYIEV answered the phone, "yes, Ari." Agents have listened to the voice of the speaker identified in this call as "Ari" and believe it to be the same voice of the speakers previously identified as "Alik"/"Arik" and "Avi" on November 18, 2013 and November 21, 2013. For the reasons to be set forth later in this affidavit, agents believe that this speaker is ITZHAK LOZ. During this call, LOZ said "that's ok, buddy, but what happened? Here's only ten?" ARKADIY BANGIYEV explained "Yes, he promised to get me but brought only this. Excusing himself, 'I'm sorry; I'm sorry.'" Then, LOZ asked "ok, tell me something. You know our balance for or you do not know?" ARKADIY BANGIYEV replied "total, I think I paid you,

I paid so far 145." Later, during the conversation, LOZ said "ok, you know that I gave you a few packs and I am calculating. You know it." When ARKADIY BANGIYEV said "what?" LOZ re-iterated "I have given you a few packs in fives." ARKADIY BANGIYEV corrected him, "A few times? Only one time." LOZ told ARKADIY BANGIYEV "I will not be here by the end of the month and start of January. Can you organize me 200?" ARKADIY BANGIYEV asked "Can't you bring them with again?" LOZ explained "I need, I need them for . . . no, I need them to fetch the machine." ARKADIY BANGIYEV re-assured LOZ: "Good then, do not worry. I will prepare something. You won't go empty." LOZ continued "No, I need to know because I need to pay them 130 towards something else and I will need 160 over here." ARKADIY BANGIYEV protested "No. How I can get you so much in three weeks? 100 is possible." After some back and forth, LOZ said "I need to know for sure because I cannot bring them with me." ARKADIY BANGIYEV said "No problem. Fly to Israel. We will be in touch." Later, ARKADIY BANGIYEV re-iterated, "when you be in Israel, give me a call." Agents believe that during this conversation, ARKADIY BANGIYEV discussed with LOZ the collection of quantities of genuine U.S. currency and monies owed to one another in connection with their counterfeiting activities. Agents also believe that during this call, LOZ asked ARKADIY BANGIYEV to collect additional money ("can you organize me 200?") in furtherance of their counterfeiting activities and ARKADIY BANGIYEV confirmed "I will prepare something. You won't go empty." Agents further believe that when LOZ said "I need them to fetch the machine" that LOZ indicated that he needed the requested $200,000 to purchase a machine or machine parts used to print counterfeit U.S. currency, such as an offset printing press. Based on information learned during this investigation, that the cost of an offset printing press could be anywhere from $10,000 to $100,000.

37. On December 14, 2013, in Forest Hills, New York, USSS agents monitoring the wiretap and a video monitor of footage from a pole camera trained on the BANGYIEV residence on 65th Road observed a white male drive up in a sedan. Agents could not observe the tags on the car. Agents observed ARKADIY BANGIYEV come out of the residence and talk with the white male for approximately five minutes. Then, the white male went to the trunk of his vehicle and removed a black duffel bag, which he gave to ARKADIY BANGIYEV. ARKADIY BANGIYEV then returned to his residence carrying the black bag and the white male drove away. Agents believe, based on the content of the intercepted calls, that this unidentified male was ITZHAK LOZ. However, agents were unable to positively identify LOZ from the surveillance footage.

38. On or about January 3, 2014, ITZHAK LOZ and RONEN FAKIRO purchased a warehouse unit (#18) at 620 Deer Road in Cherry Hill, New Jersey for approximately $147,683. The records from the sale and purchase of the warehouse reveal that LOZ and FAKIRO jointly own the warehouse unit outright and that there is no mortgage on the property

39. On January 12, 2014, an incoming call from (972) 544-8433~10 (used by LOZ) was intercepted over a phone used by ARKADIY BANGIYEV. During this call, LOZ stated "yeah, everything is ok. I'll be there in a day after tomorrow. I am coming basically to work with the machine, to check everything." ARKADIY BANGIYEV asked "day after tomorrow?" LOZ replied "yeah, the thing is, I will need some money for payment....consideration, I go through you...for pick up the money." ARKADIY BANGIYEV replied: "I have told you that I am going to give you a hundred." LOZ asked "can you give better? 120-130? Something like?" ARKADIY BANGIYEV said "I have got 100, and I will try to give 20,000 more." Shortly thereafter, LOZ replied "day after flying back to [unclear, but possibly Romania] starting the

project. Meantime, my guys will start to glue it, so it should be ready when I come back." ARKADIY BANGIYEV asked "they are starting to glue it?" LOZ answered "yes, they will start, I think this week or (inaudible)....I prepared everything for them." Again, agents have listened to the voices of the speakers from the November 18, 2013, November 21, 2013, and December 14, 2013 telephone calls and compared it to this caller. The agents believe that they are all the same speaker and that the speaker is ITZHAK LOZ. The agents believe that during this call, LOZ explained that he (LOZ) was coming to the United States to "basically to work with the machine, to check everything." Previously, on December 14, 2013, LOZ told ARKADIY BANGIYEV that he needed "200" to "fetch the machine." Agents also believe that, during this call, LOZ told Arkaidy BANGIYEV that he was coming to the United States in connection with the purchase of a machine, or machine parts, used to manufacture and print counterfeit U.S. currency. Agents also believe that LOZ asked ARKADIY BANGIYEV to give him a quantity of genuine U.S. currency ("I will need some money for payment . . . I go through you for pick up the money") either in connection with the purchase of an off-set printing press and other machines and equipment used to manufacture counterfeit U.S. currency. Agents also believe that ARKADIY BANGIYEV was willing to give LOZ $100,000 or more to facilitate the printing and manufacturing of counterfeit U.S. currency and re-iterated his previous promise from December 14, 2013 to pay LOZ a sum of genuine U.S. currency ("I have told you that I am going to give you 100.") Agents further believe that in this call, when LOZ said "meantime, my guys will start to glue it," he was referring to one of the steps used in a process to manufacture counterfeit U.S. currency: gluing two pieces of paper together. Agents have spoken with a USSS counterfeit specialist who examined the counterfeit U.S. currency which has been seized as evidence and forensically linked in this case. The counterfeit specialist has determined that

the counterfeit U.S. currency was glued together during the production process. According to the counterfeit specialist, the seized counterfeit U.S. currency that has been distributed during this investigation was also glued together during the production process. Agents further believe that this intercepted conversation between LOZ and ARKADIY BANGIYEV concerned the production of a quantity of counterfeit U.S. currency overseas and the start-up of a production process to produce and manufacture counterfeit U.S. currency in the United States.

40. On January 14, 2014, and according to U.S. Customs and Border Protection (CBP) records, ITZHAK LOZ, a citizen of Israel born on August 19, 1967, entered the United States from Canada at LaGuardia Airport in New York, along with RONEN FAKIRO, also a citizen of Israel born on July 25, 1968. A subsequent review of a law enforcement database showed that on November 26, 2013, the United States Department of State issued a B1/B2 (business/pleasure) visa to LOZ and on May 11, 2009, the State Department issued FAKIRO a B1/B2 (business/pleasure) visa.

41. On January 14, 2014, an online search on the "Facebook" website for telephone number 011 972 544 8433 revealed that this number was displayed on the "Facebook" profile for ITZHAK LOZ. A further review of LOZ's "Facebook" profile page showed that he was "friends" with Eddie BANGIYEV. A photograph of EDUARD BANGIYEV (a/k/a Eddie) and his wife was displayed on LOZ's profile page. I am familiar with known photographs of EDUARD BANGIYEV, including his driver's license photo, and I believe this person depicted on LOZ's "Facebook" profile page is EDUARD BANGIYEV.

42. On February 3, 2014, USSS agents obtained a pen register and a search warrant from the United States District Court for the Eastern District of Virginia to obtain location based services information for (516) 384-4013 (the new cellphone number bearing the same IMEI

number as (516) 589-4503, the cellphone number previously used by LOZ). After reviewing the location based services data for (516) 384-4013, the USSS determined that LOZ's new cellphone was located in or around Cherry Hill, New Jersey. Thereafter, USSS agents began to conduct surveillance in the Cherry Hill area in an attempt to locate LOZ.

43. On or about February 5, 2014, and during an intercepted call on EDUARD BANGIYEV's cellphone, JOHNNY LEE said "yeah, don't forget I'm going. I told somebody I'm going away this weekend but I told them I am going to work, you know what I mean?" EDUARD BANGIYEV asked "oh, for me?" LEE affirmed "yeah, I'm going to work for you. You known what I mean?" EDUARD BANGIYEV said "no problem. Where you going?" In response, LEE said "going to Tennessee." EDUARD BANGIYEV replied, "oh, you clever." LEE continued "I'm going there for you, though." EDUARD BANGIYEV laughed and said "I understand. I wish you didn't tell me this."

44. On February 7, 2014, in Nashville, Tennessee, the USSS conducted surveillance of JOHNNY LEE as he drove to an outlet mall with a female companion. Agents observed LEE give the female a $100 note, which she passed at a Gap store. Thereafter, LEE and the female went to Ruby Tuesday's restaurant and agents observed as LEE passed two $100 notes to pay for their tab. Agents continued to observe LEE as he passed a $100 note at Fresh Market, then a $100 note at Babies R Us. All five of the $100 notes have been seized from the retailers as evidence and visually inspected by the USSS. I believe, based on my training and experience, that all of these notes are counterfeit Federal Reserve Notes and that they are forensically linked to the other counterfeit Federal Reserve Notes seized as evidence in this case.

45. On or about February 6, 2014, in New York, New York, a local Fox 5 News station in New York broadcast a televised news report that the U.S. Secret Service in New York

was warning banks, merchants and consumers to be on the lookout for counterfeit $100 notes currently in circulation. The broadcast referred to a warning notice issued by the Secret Service which explained that if the number "77" was located on the back bottom corner of the bill, it was a sign that the bills could be counterfeit.

46. On February 14, 2014, in Mt. Laurel, New Jersey, I, along with other USSS agents saw a brown 2013 Ford Edge with New York tags GJA 2229 leave the parking lot of the Candlewood Suites Hotel around 8:20 a.m. I also observed two white males inside the Ford Edge who agents positively identified them as ITZHAK LOZ and RONEN FAKIRO. I followed the Ford Edge to a warehouse located at 620 Deer Road in Cherry Hill, New Jersey (hereinafter, the warehouse) where LOZ and FAKIRO entered Suite #18 (the suite number is displayed on the outside wall of the warehouse). The warehouse is located in an industrial park with multiple adjoining suites. At approximately 6:00 p.m., agents saw LOZ and FAKIRO return to the Ford Edge and leave the warehouse. LOZ and FAKIRO later drove the Ford EDGE back to the Candlewood Suites Hotel, which they entered around 7:25 p.m. Later, that same evening, agents returned to the warehouse and peered inside the windows of Suite #18. Through the windows, the agents observed and photographed the following items inside: (a) a Vastech V14 Film Processor; (b) a Challenge Industrial Paper Cutter or Printer; and (3) a stand up air compressor. Based on my training and experience and my conversations with a USSS counterfeit specialist, I believe that these pieces of equipment could be used to manufacture counterfeit U.S. currency using an off-set printing process.

47. On February 15, 2014 an incoming call from (516) 610-4440, a phone used by JOHNNY LEE, was intercepted over the cellphone used by EDUARD BANGIYEV. During this intercepted conversation, EDUARD BANGIYEV stated "remember while ago you texted me

something?" LEE replied "yeah, I know what you are talking about. I remember that." EDUARD BANGIYEV replied "alright, it's going to be the same thing." LEE asked "the baby, it's going to be born the same year?" EDUARD BANGIYEV replied "yeah." LEE replied "that shit might be....that's going to be difficult, man." Shortly thereafter EDUARD BANGIYEV stated "that's all it is going to be." LEE replied "yeah, I don't know how in the world I'm going to do now. That shit is going to be difficult, word. That shit - it's going to be real difficult." EDUARD BANGIYEV replied "you better let me know. If you say so, we can ask to say good-bye." LEE replied "we might have to say good-bye, man unless....got to be some...." Shortly thereafter, LEE stated "yo, listen. You got to keep me posted cause, the the temperature got to be little lower because it's already fired." EDUARD BANGIYEV replied "look, I am telling you what it is." Agents believe that during this call, EDUARD BANGIYEV and LEE discussed a text message that LEE sent EDUARD BANGIYEV concerning the USSS flyer. Agents further believe that EDUARD BANGIYEV explained to LEE that the back plate number of "77" would be on the current shipment of counterfeit U.S. currency, when LEE asked "the baby, it's going to be born the same year?" Agents further believe that when LEE stated "the temperature got to be lower because it's already fired" he told EDUARD BANGIYEV that if he was going to agree to receive this shipment, then the price of the counterfeit U.S. currency would have to be lower since there was a greater chance of getting caught passing the counterfeit U.S. currency because of the USSS warning flyers.

48. On February 16, 2014, an outgoing call to (718) 887-0970-011972544843310, a phone used by ITZHAK LOZ, was intercepted over the cellular telephone used by EDUARD BANGIYEV. Monitors were able to determine from voice recognition that this telephone was used by LOZ. During this intercepted conversation, monitors familiar with their voices

determined that ARKADIY BANGIYEV was using his brother EDUARD BANGIYEV's cellphone. During this call, ARKADIY BANGIYEV asked "everything alright. Working?" LOZ replied "yes yes, starting now." ARKADIY BANGIYEV then stated: "Listen to me. There is a big problem, Avi. I told you about the two sevens." LOZ replied "yes. Look to change them now, it would be a big problem, I don't have many left." ARKADIY BANGIYEV explained "here on the news, everywhere broadcasted, if you have seven call this that." LOZ replied "I don't have many left. All that's left in day two, I have a new one coming. New material, you know, it's different. You know all that's left, 20 percent for checking, to see how it will be or won't be. Fifteen I'll charge." Shortly thereafter, ARKADIY BANGIYEV asked "did you get your product? New machine?" LOZ replied "Yes, yes. Now need to release from Customs." Agents believe that during this call, when LOZ said "yes, starting now," he was referring to assembling the printing equipment to produce counterfeit U.S. currency. Agents further believe that when LOZ and ARKADIY BANGIYEV discussed the "two sevens" (77) that they referring to the serial numbers on the reverse side of the counterfeit $100 bill that they distributed. Agents also believe that during this call, ARKADIY BANGIYEV discussed with LOZ the recent news broadcast of the USSS warning about the existence of counterfeit U.S. currency with "77" on them. LOZ's response that he did not have many of "that kind" left was a reference to the older style $100 bill with "77" on the back plate and his statement that he had a "new one" coming was a reference to the fact that he (LOZ) was working on counterfeiting the newly issued $100 note. Agents further believe that because of LOZ's statement that he was waiting for his new machine to be released from Customs, that LOZ was in the process of setting up a printing operation, most likely to produce and counterfeit the newly issued $100 note.

49. At approximately 4:23 p.m. on February 16, 2014, an incoming call from (972) 732-444700, a phone used by LOZ was intercepted over the cellphone used by EDUARD BANGIYEV. Monitors were able to determine from voice recognition that this telephone number was used by LOZ. During this call, EDUARD BANGIYEV stated "what's up? What's going on?" LOZ replied "nothing much, because, ah, it's setup for somebody to pick up the money, you understand. So, I called Alex and he told me to speak with you, so I want to speak with you over VIBER, not over the phone." Agents believe that LOZ called EDUARD BANGIYEV at the request of ARKADIY BANGIYEV and that they discussed the fact that money (either genuine or counterfeit U.S. currency) was available to pick up. Agents further believe that LOZ wanted to speak to EDUARD BANGIYEV over a VIBER account (Voice over Internet Protocol (IP) address) instead of a telephone in order to make it difficult for law enforcement to monitor and record their verbal communications.

50. On February 16, 2014, at approximately 6:00 p.m., a suspicious activity call was reported to the Cherry Hill, New Jersey Police Department (CHPD) at the vicinity of an industrial warehouse on Deer Road, which is a mixed residential and commercial area. The complainant stated that he/she saw movement inside of a brown Ford Edge and it appeared suspicious. The responding officer noticed on arrival at Deer Road that the vehicle was unoccupied. The officer walked across the parking lot to the warehouse unit to investigate further. After entering, the officer saw men working inside and spoke with a white male who identified himself as ITZHAK LOZ, the "owner of the warehouse." LOZ further confirmed to the officer that the car in question was his rental car and he had been in and out of it all day. The officer took no further action after speaking with LOZ inside the warehouse unit. While inside the warehouse unit, the officer believed that he saw construction material inside.

51. On February 25, 2014, in Cherry Hill, New Jersey, USSS agents observed the delivery of a tractor trailer with a shipping container to the warehouse unit and observed LOZ and FAKIRO unload several unknown, medium-sized heavy items enclosed in shrink wrap from the truck into the unit.

52. On February 27, 2014, U.S. CBP records confirmed that the same shipping container delivered to the warehouse unit on February 25, 2014, was loaded in Israel on January 7, 2014, and arrived in New York on January 26, 2014. U.S. Customs officials inspected the container and released it from Customs on February 12, 2014. According to the CBP, the shipping container weighed approximately 55,000 pounds and contained at least one off-set printing press, hand tools and miscellaneous equipment.

53. On March 13, 2014, in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind the warehouse unit. While searching the trash bags in the container, a shipping receipt addressed to "Marker Systems, Customer name RONEN, 620 Deer Rd" was discovered. Also inside that trash bag, were work orders dated October of 2006 from Dot Works, a printing company from New York. On the work order, the customer name was listed as "AVI LOV," and the shipping address was Elegant Jewelers, a jewelry store owned by EDUARD BANGIYEV in 2006. Also inside the same trash bag were various types of printing plates with wet ink and images of the new $100 bill 3-D security ribbon (bearing a liberty bell and "100s'"), used latex gloves, and film sheets. Three other bags found in that container were filled with shredded materials. Further inspection of the shredded materials revealed that the shred was replications of the new $100 bill 3-D security ribbon. Also in the shred were some small pieces of counterfeit $100 bills (the series prior to new $100 bill).

54. On March 26, 2014, in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind the warehouse unit. While searching the trash bags found in the container, agents discovered a statement from Bank of America for an account held in the names of ITZHAK LOZ and RONEN FAKIRO with an address of 620 Deer Rd, Suite 18. Also inside that trash bag was what appears to be a template for the placement of the 3-D security ribbon on the newly issued $100 bill, along with printing plates, and other items consistent with the use of an offset printing process.

55. A review of records from Bank of America reveal that on January 14, 2014, in Cherry Hill, New Jersey, ITZHAK LOZ and RONEN FAKIRO opened a joint personal checking account at Bank of America and that on that same day, FAKIRO also opened a personal checking account at Bank of America. The bank records further reveal structured cash deposits, in amounts under the $10,000 reporting requirement, into bank accounts held in the names of LOZ and/or FAKIRO in January 2014, February 2014 and April 2014. According to Bank of America records both LOZ and FAKIRO reported to be employed or associated with Marker Systems.

56. On April 4, 2014, in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind the warehouse located at the warehouse unit. While searching the trash bags found in the container, agents seized what appears to be a template for the placement of the 3-D security ribbon on the newly issued $100 Federal Reserve Note; a piece of paper with a 3-D security ribbon; a piece of paper with blue 3-D security ribbon, a security strip with "USA 100," and a watermark of the portrait of Benjamin Franklin. Also inside that trash bag were, printing plates and other items consistent with the use of an offset printing process.

Based on my training and experience, I believe that these items could be used to counterfeit the newly issued $100 Federal Reserve Note.

57. On April 16, 2014, in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind the warehouse unit. While searching the trash bags in the container, what appears to be a template for the placement of the 3-D security ribbon on the newly issued $100 note. Based on my training and experience, I believe that this item could be used to counterfeit the newly issued $100 Federal Reserve Note.

58. On April 23, 2014, in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind the warehouse unit. While searching the trash bags found in the container, agents seized what appears to be a roll of several hundred templates for the placement of the 3-D security ribbon on the new $100 bill; a water bill in the name of "Ipzhak Loz addressed to 620 Deer Rd 18, Cherry Hill, NJ"; several cups filled with blue ink and several shreds of plastic strips with blue liberty bells and "100" symbols. Based on my training and experience, I believe that these items could be used to counterfeit the newly issued $100 Federal Reserve Note.

59. On May 7, 2014, in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind the warehouse unit. While searching the trash bags found in the container, agents seized what appeared to be several pieces of paper and plastic plate cleaning sheets with blue and red ink on them. Agents also found a container of printing ink from the Royal Dutch Printing Ink Factories. Based on my training and experience, I believe that these items could be used to counterfeit the newly issued $100 Federal Reserve Note.

60. On May 7, 2014, in Philadelphia, Pennsylvania, the USSS conducted surveillance of LOZ and FAKIRO. During this surveillance, and at approximately 10:36 a.m., USSS agents

observed LOZ and FAKIRO exit Photo Process Screen Manufacturing Company, a printing supply company. Agents observed LOZ carrying a rectangular box and FAKIRO carrying a cylindrical cardboard container carrying packages from the store. USSS agents followed LOZ and FAKIRO directly to the warehouse unit and observed LOZ take a rectangular box from his vehicle into the warehouse unit.

61. On or about May 21, 2014, in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind the warehouse unit. While searching the trash bags found in the container, agents seized a metal printing plate with an image of the Federal Reserve Seal and the image "100," along with sheets of paper with a black and white image of three front plate images of the older, $100 Federal Reserve Note bearing the portrait of Benjamin Franklin, the Federal Reserve Seal, "100," and quadrant numbers and letters on the front plate of the notes that are linked to this investigation, as well as the words "The United States of America" and other identifying features found on genuine U.S. currency. Based on my training and experience, I believe that these items found in the trash, such as the metal printing plate with the Federal Reserve Seal, could be used to counterfeit the older version of the $100 Federal Reserve Note which were sold, passed and seized during this investigation.

<u>Conclusion</u>

62. Based on the foregoing, there is probable cause to believe that beginning in and around October 2011, and continuing until on or about May 27, 2014, in Prince William County, Virginia, within the Eastern District of Virginia and elsewhere, defendants ITZHAK LOZ (a/k/a Ari, a/k/a Avi), RONEN FAKIRO, ARKADIY BANGIYEV (a/k/a Alex), EDUARD BANGIYEV (a/k/a Eddie), JOHNNY LEE (a/k/a Ramel, a/k/a Ra), TARELL JOHNSON (a/k/a Nu Nu, a/k/a Nu), CRAIG JOHNSON (a/k/a Uncle Bill), SHANNON LAMONT SMITH,

FREDERICK BARRETT, RAMEL EPPS and BRATTIE GUERRA did unlawfully, knowingly and intentionally combine, conspire, confederate and agree with each other and with other persons to defraud the United States, and any agency thereof in any manner and for any purpose, namely:

(a) with intent to defraud, did falsely make, forge and counterfeit any obligation of the United States, that is, Federal Reserve Notes in the denomination of one hundred dollars, in violation of Title 18, United States Code, Section 471;

(b) with intent to defraud, did pass, utter, publish and sell, or attempt to pass, utter publish and sell, or with like intent bring into the United States, or keep in possession or conceal any falsely made, forged and counterfeited obligation of the United States, that is, Federal Reserve Notes in the denomination of one hundred dollars, which the defendants then and there knew to be falsely made, forged and counterfeited, in violation of Title 18, United States Code, Section 472; and

( c) did buy, sell, exchange, transfer, receive, and delivers any false, forged, counterfeited and altered obligation of the United States, that is, Federal Reserve Notes in the denomination of one hundred dollars, with the intent that the same be passed, published and used as true and genuine, in violation of Title 18, United States Code, Section 473; and that one or more of such persons did any act to effect the objects of the conspiracy, all in violation of Title 18, United States Code, Section 371.

Adam Gaab
Special Agent
United States Secret Service

Sworn and subscribed to me this 27th day of May, 2014, at Alexandria, Virginia

/s/

John F. Anderson

~~United States Magistrate Judge~~

JOHN F. ANDERSON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF VIRGINIA