IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No: 1:14cr206 |
| v. | ) | |
| | ) | Judge O'Grady |
| ITZHAK LOZ | ) | |
| | ) | Hearing: May 28, 2015 |
| Defendant. | ) | |

MEMORANDUM OF THE UNITED STATES WITH RESPECT TO LOSS AMOUNT

In accordance with Title 18, United States Code, Section 3553(a), Rule 32 of the Federal Rules of Criminal Procedure, and Section 6A1.2 of the United States Sentencing Commission, Guidelines Manual (Nov. 2007) ("U.S.S.G." or "Guidelines"), the United States of America files this Memorandum with Respect to Loss Amount in the instant case.

I. Background

Defendants Itzhak Loz, Ronen Fakiro, Boaz Borohov, Ofra Borohov, Arkadiy Bangiyev (a/k/a "Alex"), Eduard Bangiyev and Johnny Lee are currently pending sentencing before this court after having pleaded guilty to one count of RICO conspiracy, in violation of 18 U.S.C. § 1962(d), for their respective roles in a criminal enterprise involving the counterfeiting of United States currency and money structuring.

On May 28, 2014 the United States Secret Service arrested the defendants[1] and executed a number of search warrants, including one at 620 Deer Road, Unit #18, Cherry Hill, New Jersey

[1]Defendant Johnny Lee was arrested on June 1, 2014.

(the New Jersey warehouse) resulting in the seizure of numerous printing presses, printing machines, printing supplies and two computers used to manufacture counterfeit United States currency and one at a Self-Storage facility leased by Itzhak Loz in Rockville Centre, New York (the New York storage unit) resulting in the seizure of approximately $2.56 million in counterfeit $100 notes.

A. The Presentence Report (PSR)

The United States Sentencing Guidelines Manual provides that an offense involving racketeering conspiracy has a base offense level of 19 or the offense level for the underlying criminal activity, whichever is greater. In this case, because the underlying racketeering activity includes offenses involving counterfeit bearer obligations (i.e., counterfeit United States currency), the base offense level for counterfeiting is 9. See U.S.S.G. § 2B5.1. That base offense level is to be adjusted upward if the "face value of the counterfeit items" exceeds $2,000.

If, as is the case here, the face value of the counterfeit items exceed $5,000, then the offense level is increased by the corresponding levels set forth in the table for theft, property destruction and fraud, as set forth in U.S.S.G. § 2B1.1, and commonly referred to as the loss chart or the loss table. In addition, there are other Specific Offense Characteristics that may be applicable to the defendant, as set forth in U.S.S.G. § 2B5.1 which also adjusts the applicable sentencing range.

B. The PSR Calculations Are Amply Supported by the Record

At the entry of his guilty plea, defendant Loz did not enter into any written agreement with the United States; thus, there was no agreement at all concerning the amount of the face value of the counterfeit currency applicable in his case. The USPO has calculated the loss amount for Loz at between $50,000,000 and $100,000,000. The amount of the face value of the counterfeit United

States currency attributable to the defendant in the PSR is more than amply supported by the data, statements of co-conspirators and other physical evidence obtained during this investigation, including the May 28, 2014 seizure of approximately $2.56 million worth of counterfeit $100 bills concealed in a cardboard box inside a storage unit in New York rented by defendant Loz.

In support of the calculations of the face value of the counterfeit United States currency in this case, the United States provided the USPO and the defendants with the data made and kept by the United States Secret Service (USSS) for the counterfeit currency involved in this case, as set forth and summarized in the declarations of Special Agent Adam Gaab (docket #601-1) and Heidi A. Burghardt, Counterfeit Systems Specialist (Attachment B). The USSS data clearly establish that the total amount of counterfeit United States currency passed and seized in the United States for all of the counterfeit associated with this case was in excess of $70 million dollars.

This memo is submitted to summarize the government's evidence and data. The memo includes an Attachment A which has visual depictions of the forensic analysis of the counterfeit currency and other evidence by Counterfeit Specialist Dellibovi to illustrate the forensic associations between the evidence in this case.[2]

II. The Defendant Bears the Burden of Proof at the Hearing

The USPO has properly calculated the amount of counterfeit currency attributable to the defendant in this case. The defendant has not presented any reasons for his objections. The argument that the United States should be required to prove the amount of the loss under

[2]The United States previously filed a copy of a powerpoint presentation by USSS Counterfeit Specialist Dellibovi in support of its opposition to the defendant's motion to exclude expert testimony (document 3495). Attachment A is similar to but differs from that previous submission in its scope and focus.

U.S.S.G. § 2B1.1, overlooks a basic principle of *Guidelines* sentencing: the burden is on the defendant to show inaccuracy or unreliability of factual information in a pre-sentence report. *United States v. Aramony*, 166 F.3d 655, 662 (4th Cir. 1999), *citing United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990).

As the Fourth Circuit recently explained upon considering a defendant's argument that the government failed to provide sufficient evidence to support the loss calculation in the Pre-Sentence Report:

> But we must reject Anderson's contention at the outset, because the government is not required to present evidence demonstrating the accuracy of facts in a PSR. *See United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990). When challenging a PSR, a defendant "has an affirmative duty to make a showing that the information in the [document] is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate." *Id.* "Without an affirmative showing the information is inaccurate, the court is 'free to adopt the findings of the [PSR] without more specific inquiry or explanation.' " *Id*. (*quoting United States v. Mueller*, 902 F.2d 336, 346 (5th Cir.1990)).

*United States v. Anderson*, 532 Fed.Appx. 373, 379-80 (4th Cir. 2013).

In this case, the Probation Office already has calculated the amount of counterfeit currency attributable to Loz in a range that is more than amply supported by the USSS data and other evidence.

Under these circumstances, it is not the burden of the United States to prove the amount of the loss under U.S.S.G. § 2B1.1; instead, it is the burden of the defendant to show why the probation officer's information is untrue or inaccurate.

## III. The Facts Amply Support the Probation Officer's Conclusions

As noted above, it is the defendant's burden to demonstrate why the probation officer's information is untrue or inaccurate. In this case, he cannot do so. After all, Special Agent Gaab's declaration in support of the government's motion for entry of a forfeiture order (incorporated herein by reference) establishes that the USSS has identified far more than $70,000,000 in counterfeit currency bearing characteristics in common with the various printing plates, plastic transparencies, metal dies and computer images used by Itzhak Loz to manufacture the counterfeit currency that he sold to the Bangiyevs during the RICO conspiracy and which was seized during this same time period, including the $2.56 million seized from Loz's storage unit in New York[3] - - and *inconsistent* with the thousands of other examples of counterfeit currency collected by the USSS over the years.

Further, Attachment A by Counterfeit Specialist Dellibovi briefly summarizes the process by which the USSS classifies counterfeit currency, and the particular nature of the singularities used by the USSS to identify counterfeit currency manufactured during this conspiracy with its common characteristics and printing methods. In particular, Attachment A illustrates some of the defects found in the three most prolific circulars in this case: C-22272 ($100 note); C-23201 ($50 note) and C-23332 ($100 note) and compares them to the other evidence in this case.

[3]The data collected and maintained by the USSS show that from 2004 through 2015, there was more than $70 million in counterfeit United States currency passed in the United States or seized by law enforcement in the United States that are consistent with the counterfeit notes, printing plates, digital images and plastic transparencies possessed and used by Loz to manufacture the counterfeit U.S. currency in this case. Attachment A illustrates how the counterfeit currency passed or seized by law enforcement in this case is forensically associated with each other and to the digital images found in defendant Loz's computers and the physical evidence (transparencies, metal dies, printing plates) found in the New Jersey warehouse on May 28, 2014.

Attachment B is a declaration by Heidi A. Burghardt, USSS Counterfeit Systems Specialist, which provides an explanation of how the USSS makes and maintains data on the amount of counterfeit United States currency passed and seized in the United States. The declaration includes three different charts interpreting this data, one of which shows the amount of counterfeit currency passed and seized from 2004 through 2014 for the three most prolific notes in this case and highlighted in Attachment A: C-22272 ($100), C-23201 ($50) and C-23332 ($100). According to the USSS data, during this time period, there was approximately $35.5 million worth of counterfeit currency of C-23332, which is the $100 note purchased by Eric Buchanan during two controlled buys in May and September of 2013 and the $2.5 million seized from the New York warehouse. See Attachment B, p. 7 of chart.

Together, Special Agent Gaab's declaration, Attachment A and the declaration of Heidi A. Burghardt (Attachment B), as well as the materials previously submitted in connection with the earlier *Daubert* challenge, easily support the Probation Officer's calculations in this case.

A. The Statements of Johnny Lee

But the evidence from Special Agent Gaab and Counterfeit Specialist Dellibovi is only a small part of the totality of the evidence supporting the probation officer's calculations! For example, co-defendant Johnny Lee has admitted to purchasing tens of thousands of dollars worth of counterfeit currency, per transaction, directly from Eduard Bangiyev starting around 2004. See Memorandum of Interviews (MOI) of Lee dated January 14, 2015 and April 30, 2015.

In the beginning, Lee purchased $10,000 to $30,000 worth of counterfeit currency directly from Eduard Bangiyev, including at Westbury Jewelery at 1083 Old Country Road, Westbury, New York. See MOI of Lee dated April 30, 2015. Johnny Lee then distributed the

counterfeit $100 notes that he purchased from Eduard Bangiyev to others, including Maurice Hazel, who distributed the counterfeit in Richmond, Virginia, New Jersey and other locations. Declaration of SA Gaab at ¶ 14; MOI of Lee dated September 30, 2014.

The USSS seized some of these counterfeit $100 notes in 2004, leading to the arrest and conviction of Johnny Lee for counterfeiting in September 2005. Declaration of SA Gaab at ¶ 14; MOI of Lee dated September 30, 2014. This type of counterfeit $100 note was analyzed and classified by the USSS as C-22272. See Attachment A at pp. 3-10; Declaration of SA Gaab at ¶¶ 13-14.

According to USSS data, approximately $12.5 million worth of C-22272 has been passed (found in circulation or received at a financial institution) or seized by law enforcement (found at the point of production or seized by law enforcement before it arrived at a financial institution) since 2004. Affidavit of Heidi A. Burghardt, p. 1 and chart at p. 7.

Johnny Lee said that Arkadiy ("Alex") Bangiyev visited him in the Nasau County jail on May 19, 2005 after Lee's arrest by the USSS. See MOI of Lee dated September 30, 2014. While Lee pleaded guilty to counterfeiting in September 2005, Lee did not disclose that the source for his counterfeit currency was Eduard Bangiyev[4]. See MOI of Lee dated September 30, 2014. While incarcerated at the Bureau of Prisons, Johnny Lee continued to stay in touch with Eduard Bangiyev, who provided nominal amounts of money to Lee, through Lee's

[4]In fact, Lee told the arresting officers that he never sold, purchased or possessed counterfeit currency and he did not know anyone that had ever done so. In his September 30, 2014, interview with USSS, Lee admitted that these statements were not true because when Hazel was arrested, Lee was getting counterfeit currency from Eduard Bangiyev and selling it to Hazel.

girlfriend, that she deposited in Lee's canteen account at Ft. Dix. See MOI of Lee dated September 30, 2014.

Upon his release from federal prison approximately two years later, Johnny Lee continued to obtain counterfeit $100 from Eduard Bangiyev for distribution to others until their arrest in this case in May and June 2014. See MOI of Lee dated June 19, 2014. Lee stated that on two occasions when Eduard Bangiyev was unavailable, Alex Bangiyev gave him counterfeit currency, including $10,000 at Westbury Jewelry. See MOIs of Lee dated January 6, 2015 and January 13, 2015.

According to Lee, from 2011 (when he first began selling to Tarell Johnson) until his arrest in June 2014, Lee obtained larger quantities of counterfeit from Eduard Bangiyev. MOI of Lee dated April 30, 2015. Lee estimated the range to be between $250,000 to $350,000 per quarter (every three to four months). MOI of Lee dated April 30, 2015. Lee said on most occasions, he received $50,000 worth of counterfeit currency per transaction. See MOI of Lee dated April 30, 2015. According to Lee's estimates, from 2011 through his arrest in June 2014, Lee received between $625,000 to $1,050,000 per year or between at least $1.25 million to $3.1 million.

Lee also advised that he knew that an unindicted co-conspirator (UCC-1) obtained counterfeit from Eduard Bangiyev. See MOIs of Lee dated June 19, 2014; August 19, 2014; January 13, 2015. Lee said that UCC-1 introduced him to Eduard Bangiyev to get counterfeit currency back in 2004[5]. MOI of Lee dated April 30, 2015. According to Lee, UCC-1 sold counterfeit currency to an associate (UCC-2) who obtained about the same quantities that Lee

[5]Initially, Lee stated that another individual introduced him to Eduard Bangiyev to get counterfeit currency. MOIs of Lee dated June 19, 2014 and August 19, 2014.

sold to Tarell Johnson. MOI of Lee dated January 13, 2015. Lee identified UCC-1, UCC-2, Devon Bost, and himself as the main distributors he knew who had received counterfeit currency from Eduard and Alex Bangiyev. See MOI of Lee dated January 14, 2015. Assuming that UCC-1 obtained a similar amount of counterfeit currency from the Bangiyevs as Johnny Lee, then the amount of counterfeit currency distributed to UCC-1 would be around $2.5 to $6.2 million.

1. The Counterfeit $100 Notes (C-22272) from 2004 are Linked to the Evidence Seized from Loz's New Jersey Warehouse and NewYork Storage Unit in 2014

The defects noted on the front plate of Johnny Lee's counterfeit $100 notes from 2004 (C-22272) are seen in the phrase "the United States of America." See Attachment A at pp. 3-10. These same defects were also found on computer files from two separate computers belonging to Itzhak Loz (a black tower and a Mac) and seized from the New Jersey warehouse on May 28, 2014[6]. See Attachment A at pp. 5-7.

On the back plate of this counterfeit $100 note (C-22272), a common defect noted in the word "Hundred" (see Attachment A at p. 9) was also noted on a computer file from Loz's black tower computer. See Attachment A at pp. 9-10.

2. The Counterfeit $100 Notes from 2011 (C-23332) Are Forensically Linked to the Evidence Seized from Loz's New Jersey Warehouse and New York Storage Unit

In 2011, Tarell Johnson began to purchase tens of thousands of dollars worth of counterfeit $100 notes from Johnny Lee for sale to others, including Eric Buchanan who passed it at retailers in Northern Virginia. See Declaration of SA Gaab at ¶ 46. The instant

[6]These computers contained over 3,0000 digital images of various parts of counterfeit United States currency that are forensically associated with 12 known circular notes, including the most prolific notes in this case: C-22272 ($100 note from 2004); C-23201 ($50 note) and C-23332 ($100 note). See Declaration of Special Agent Adam Gaab at ¶¶ 60, 78.

investigation began in the Eastern District of Virginia when the USSS obtained the counterfeit notes that Buchanan passed at Wal-Mart, Loan Max and other stores in Woodbridge, Virginia and elsewhere. See Declaration of SA Gaab at ¶ 46. These $100 notes were classified by the USSS as C-23332. See Declaration of SA Gaab at ¶ 46.

According to USSS data, approximately $35.5 million worth of C-23332 has been passed (found in circulation or received at a financial institution) or seized by law enforcement (found at the point of production or seized by law enforcement before it arrives at a financial institution). Affidavit of Heidi A. Burghardt, p. 1 and chart at p. 7.

On May 20, 2013, and September 5, 2013, the USSS conducted surveillance and monitored Tarell Johnson as he sold a total of $20,000 in counterfeit $100 notes to Buchanan. See Declaration of SA Gaab at ¶ 47. These $100 notes were seized and also classfied by the USSS as C-23332. See Attachment A, at p. 19; See Declaration of SA Gaab at ¶ 47.

These counterfeit $100 notes (C-23332) have a defect noted in the top upper right corner of the front plate in the phrase "The United States of America." See Attachment A, at p. 19 which is the same defect found on the $2.56 million worth of counterfeit $100 notes seized by the USSS from Loz's storage unit in New York on May 28, 2014. See Attachment A, at p. 20 and Declaration of SA Gaab, ¶ 59).

The same defect on the front plate of these $100 counterfeit notes are also seen on the offset lithographic plates and plastic transparencies seized from the New Jersey warehouse on May 28, 2014. See Attachment A at p. 22-23. In addition, the two computers seized from the warehouse contained computer files with electronic images of these same defects from the front plate on the counterfeit $100 notes. See Attachment A at pp. 22-23.

Similarly, a common defect noted in the word "The" from the phrase "The United States of America" located on the back plate of these counterfeit $100 notes (C-23332) can also be seen on the $100 notes Buchanan purchased from Tarell Johnson on May 20, 2013 (see Attachment A at p. 28) and the $2.56 million seized from the New York storage unit. See Attachment A at pp. 29-30.

The offset lithographic plates and plastic transparencies seized from the New Jersey warehouse (see Attachment A at pp. 31-33) and the digital images found on the two computers found in the New Jersey warehouse all contain this same defect. See Attachment A at pp. 34-36.

The Sale of Counterfeit $50 Notes (C-23201) in 2006-2007

Starting in 2007, the USSS seized thousands of counterfeit $50 bills during the investigations of Alvin Wren, Devon Bost and others that led to the arrest of Alex Bangiyev on March 20, 2007. MOI of Loz dated January 22, 2015; Declaration of SA Gaab ¶¶ 30-32. The USSS classified these counterfeit $50 notes as C-23201. See Declaration of SA Gaab at ¶¶ 30, 31, 32.

According to USSS data, approximately $7.7 million worth of C-23201 has been passed (found in circulation or received at a financial institution) or seized by law enforcement (found at the point of production or seized by law enforcement before it arrives at a financial institution). Affidavit of Heidi A. Burghardt, p. 1 and chart at p. 7.

Prior to his arrest in March 2007, Bost had sold 400 counterfeit $50 bills to Alvin Wren. After Bost's arrest, he agreed to make consensually recorded telephone calls to Alex and Eduard Bangiyev to arrange to purchase $100,000 of counterfeit currency (GX 13-11); See Declaration of SA Gaab at ¶¶ 30, 31, 32. A review of phone records from March 19, 2007, show that Alex Bangiyev had been in contact with the following individuals: Eduard Bangiyev,

Devon Bost, Itzhak Loz and Yakub Yusupov leading up to the controlled purchase of the counterfeit $50 notes by Bost. (GX 20-8).

A review of the transcript of the recorded calls made leading up to Alex's arrest revealed that when Bost could not reach Alex by telephone, he called Eduard Bangiyev. During a recorded call around 9:00 p.m., Eduard Bangiyev asked Bost "what's the big order. Tell me." Bost explained "[t]he carat. The carats, brother, the 10 carats. I told your brother already." Eddie said "Alright, man. When, today?" and advised Bost "[n]o problem, get in touch with me I'll hook you up. Don't worry about it." (GX 13-11, p.2).

Later, Bost spoke with Alex and said "I told your brother my peoples is here with the . . . with the . . . with the 10 carat situation." When Alex asked "ok. When and what time," Bost said "I've been talking to your brother. They been, they been waiting." (GX 13-11, p. 4). Around midnight on March 19, 2007, the USSS monitored and recorded the meeting between Alex Bangiyev and Bost and seized $100,000 in counterfeit $50 bills from Bost. Declaration of SA Gaab, ¶ 32. The USSS arrested Alex Bangiyev immediately thereafter and seized the counterfeit $50 notes that Bost bought from him. Declaration of SA Gaab, ¶ 32.

1. <u>The Forensic Association of the Counterfeit $50 (C-23201) to the Evidence Seized from Loz's New Jersey Warehouse and New York Storage Unit</u>

The counterfeit $50 notes that Alvin Wren bought from Devon Bost and seized by the USSS on March 6, 2007 were classified as C-23201, as were the $50 notes that Alex Bangiyev sold to Devon Bost around midnight on March 19, 2007 (Attachment A, p. 16), Declaration of SA Gaab, ¶¶ 31-32. A common defect on the front plate of both of these notes can be seen in the word "Federal" in the phrase "Federal Reserve Note." (Attachment A, p.11). This same defect is seen on the front plate of a digital image of a counterfeit $50 from a computer file on

Loz's black tower computer and seized from the New Jersey warehouse on May 28, 2014. (Attachment A, p. 13).

Similarly, the back plate of the counterfeit $50 seized from Alvin Wren and sold by Alex Bangiyev have a common defect noted in the word "God" from the phrase "In God We Trust." (Attachment A, p. 15). Those defects are both seen in a digital image from the black tower computer seized from the New Jersey warehouse (Attachment A, p. 17).

2. <u>The Fingerprints of Loz and Alex Bangiyev Are Found On the Counterfeit $50 (C-23201)</u>

In addition to the controlled purchase of $100,000 worth of counterfeit $50 notes from Alex Bangiyev, a forensic examination by USSS Lead Fingerprint Specialist Shelly Brazelle of the notes seized from Alvin Wren revealed that two of the notes had detectable or latent fingerprints: one fingerprint belonged to Alex Bangiyev and another fingerprint belonged to Loz (GX 13-301). In addition, three of Alex Bangiyev's fingerprints were found on two separate counterfeit $50 notes that Bost bought from him the night of Bangiyev's arrest (GX 13-301); See Declaration of SA Gaab, ¶ 30.

C. An Independent Witness Corroborates the Use of 13 <u>Sylvester Street to Manufacture the Counterfeit $50 (C-233201)</u>

Recently, SA Gaab located and interviewed Thomas Thompson who stated that he owns and operates "TJ Kustoms," which was located at 11 Sylvester Street back in 2006 and 2007. MOI of Thompson dated April 16, 2015. Thompson stated that he recalled the former occupants at 13 Sylvester, who were there for only a short period of time. MOI of Thompson dated April 16, 2015. Thompson said that something just didn't seem right to him because they did not run a business and did not have a store front. MOI of Thompson dated April 16, 2015. However, Thompson said the occupants he met told him that they

were in the printing business. MOI of Thompson dated April 16, 2015. Thompson also recalled that the occupants at 13 Sylvester were two or three foreigners who spoke with a "Russian twang" and came and went from there during the day. MOI of Thompson dated April 16, 2015.

Thompson stated that one of the occupants made him a prototype design of an image he himself had designed of a cartoon drawing of a bug with wheels and the words "Boss Bug" written on it. MOI of Thompson dated April 16, 2015. Thompson explained that one of the occupants explained to him that he was going to use an acid process on a magnesium machine to create a metal template. MOI of Thompson dated April 16, 2015. Thompson sent an email to SA Gaab with a link to the image he designed of the "Boss Bug." MOI of Thompson dated April 16, 2015.

A search of Loz's computers revealed a template with "Boss Bug" and a cartoon drawing of what appears to be a bug or beetle and large wheels. SA Gaab viewed the image and confirmed that this was the same image he found in Loz's computer. MOI of Thompson dated April 16, 2015. Thompson said he had wanted this design to be made into metal badges for his car business but he never got the final product as the occupants of the business disappeared unexpectedly. MOI of Thompson dated April 16, 2015.

Thompson positively identified a photograph of Alex Bangiyev as one of the occupants of 13 Sylvester. MOI of Thompson dated April 23, 2015. Thompson clarified that he never went inside 13 Sylvester while its occupants were there and did not see any equipment inside while they occupied that space. MOI of Thompson dated April 23, 2015. However, Thompson explained that after they moved out, he did see the warehouse had

been partitioned into multiple rooms and there was "heavy wiring" hanging from the ceiling. MOI of Thompson dated April 23, 2015.

D. The Statements of Alex Bangiyev

Alex Bangiyev said in 2004, Yakub Yusupov supplied him with counterfeit currency, which he began to sell to UCC-1, a friend of his brother, Eduard Bangiyev. See MOI of Alex Bangiyev dated February 3, 2015. According to Alex Bangiyev, UCC-1 introduced him to Devon Bost and Johnny Lee and that Alex got counterfeit from Yusupov and then gave it to Eduard Bangiyev to sell to UCC-1 and Lee in 2004 and 2005. MOI of Alex Bangiyev dated February 3, 2015.

Alex Bangiyev said that in 2006, he got a lease for 13 Sylvester Street and that Loz and UCC-3 planned to cut diamonds there. MOI of Alex Bangiyev dated February 3, 2015. Loz and his family came to the United States after the lease was signed. MOI of Alex Bangiyev dated February 3, 2015. According to Alex Bangiyev, after Loz and his family arrived in the United States, Bangiyev began to buy counterfeit $50 bills from Yakub Yusupov. MOI of Alex Bangiyev dated February 3, 2015. Alex Bangiyev also said that Loz agreed to provide counterfeit directly to Alex but told Alex not to tell UCC-3 and advised Alex to continue to buy counterfeit from UCC-3. MOI of Alex Bangiyev dated February 3, 2015.

Alex Bangiyev said that the $100,000 in counterfeit $50 that he sold to Devon Bost 0n March 19-20, 2007, came from Yakub Yusupov. MOI of Alex Bangiyev dated February 3, 2015. According to Alex Bangiyev, "we" gave counterfeit $50 bills to UCC-1, Johnny Lee and Devon Bost. MOI of Alex Bangiyev dated February 3, 2015. Alex Bangiyev denied being involved in the distribution of counterfeit currency after his 2007 arrest until 2009. MOI of Alex Bangiyev dated February 3, 2015. In 2009, according to Alex Bangiyev, Loz and

Bangiyev drove to the cargo area at JFK airport and picked up a wooden crate the size of a table and put it in a rental van. MOI of Alex Bangiyev dated February 3, 2015. Inside the crate was a metal steel box concealing $100,000 in counterfeit currency, which was shrink wrapped. MOI of Alex Bangiyev dated February 3, 2015. Loz gave the counterfeit to Alex Bangiyev, which he and Eduard Bangiyev sold to UCC-1 and Johnny Lee. MOI of Alex Bangiyev dated February 3, 2015.

Alex Bangiyev explained that Loz came to the United States every three months after that to sell him counterfeit. MOI of Alex Bangiyev dated February 3, 2015. Eduard Bangiyev typically sold $250,000 to Johnny Lee and Alex Bangiyev typically sold $150,000 to UCC-1. MOI of Alex Bangiyev dated February 3, 2015. The largest amount of counterfeit that Loz gave Bangiyev during this time was $400,000, which was around September 2013. MOI of Alex Bangiyev dated February 3, 2015. Alex Bangiyev said that the last time he got counterfeit from Loz was December 2013 and Johnny Lee got $70,000 and UCC-1 got $30,000. MOI of Alex Bangiyev dated February 3, 2015.

According to Alex Bangiyev, every time Loz came to the United States, he got counterfeit from him. MOI of Alex Bangiyev dated February 3, 2015. Alex Bangiyev also stated that he talked to his brother while in jail on this case and they calculated that from 2004 through 2014, they "gave" $2 million worth of counterfeit to UCC-1 and $2 million worth to Johnny Lee. MOI of Alex Bangiyev dated February 3, 2015. This calculation was also based on a calculation that they got counterfeit approximately three times per year from Loz in amounts ranging from $100,000 to $200,00. MOI of Alex Bangiyev dated February 3, 2015.

In his second interview, Alex Bangiyev said that in 2008 or 2009, UCC-3 told him that Loz was manufacturing the counterfeit he purchased. MOI of Alex Bangiyev dated April 6,

2015. According to Alex Bangiyev, in 2007, Yakub Yusupov told him that Loz could sell him counterfeit $50 bills. MOI of Alex Bangiyev dated April 6, 2015. Alex Bangiyev also admitted that in 2004, he knew UCC-3 was involved in counterfeiting because when they visited Yusupov's house, Yusupov showed them counterfeit $100 bills. MOI of Alex Bangiyev dated April 6, 2015. Alex Bangiyev said he took those sample bills and showed them to UCC-1 who wanted to buy them. MOI of Alex Bangiyev dated April 6, 2015. Alex then contacted UCC-3 to get the counterfeit bills but UCC-3 told himto contact Yusupov. MOI of Alex Bangiyev dated April 6, 2015.

E. <u>The Statements of Eduard Bangiyev</u>

Eduard Bangiyev said that in 2004, his brother Alex showed him a counterfeit $100 bill and said he got it from Yakub Yusupov. MOI of Eduard Bangiyev dated February 10, 2015. Eduard Bangiyev said that the took the counterfeit $100 bill to UCC-1 who said he was interested in buying counterfeit money. MOI of Eduard Bangiyev dated February 10, 2015. Eduard Bangiyev explained that he and Alex showed UCC-1 the counterfeit in the back room of Westbury Jewelry in 2004. MOI of Eduard Bangiyev dated February 10, 2015. Eduard Bangiyev said that UCC-1 bought $5,000 worth of counterfeit initially and then the same amount a few weeks later. MOI of Eduard Bangiyev dated February 10, 2015.

According to Eduard Bangiyev, he sold counterfeit currency to UCC-1 until his arrest in May 2014. MOI of Eduard Bangiyev dated February 10, 2015. Eduard Bangiyev said that the most he ever sold UCC-1 at any one time was $100,000 but estimated that he sold him approximately $2 million worth since 2004. MOI of Eduard Bangiyev dated February 10, 2015.

Eduard Bangiyev stated that UCC-1 introduced Johnny Lee, Devon Bost and another individual to him for the purpose of selling them counterfeit currency. MOI of Eduard Bangiyev

dated February 10, 2015. Eduard Bangiyev said he met Lee a few months after selling counterfeit to UCC-1 and sold counterfeit to Lee until his arrest in May 2014. MOI of Eduard Bangiyev dated February 10, 2015. Eduard Bangiyev admitted that he sold the counterfeit to Lee in 2004-2005 for which Lee was arrested but that he did not resume again until around 2008. MOI of Eduard Bangiyev dated February 10, 2015.

According to Eduard Bangiyev he would order between $200,000 to $250,000 in counterfeit (per order) from Alex Bangiyev about every three to four months. MOI of Eduard Bangiyev dated February 10, 2015. Eduard Bangiyev said that he sold counterfeit currency to UCC-1 every two to three months, typicaly in increments of $100,000. MOI of Eduard Bangiyev dated March 26, 2015. Eduard Bangiyev knew that Alex was going through Loz to make the arrangements. MOI of Eduard Bangiyev dated February 10, 2015.

Eduard Bangiyev said that the day before his arrest on May 28, 2014, he met Loz in an alley between 65th and 64th Street in Queens and took a suitcase from Loz that was in Loz's trunk. MOI of Eduard Bangiyev dated February 10, 2015. Eduard Bangieyv believed the suitcase contained $1.8 million worth of counterfeit money but he did not count it before putting it in his car. MOI of Eduard Bangiyev dated February 10, 2015. Eduard Bangiyev said he took the suitcase and put it in the garage of UCC-1, who had agreed to distribute the counterfeit. MOI of Eduard Bangiyev dated February 10, 2015. According to Eduard Bangiyev, $1 million was intended for Johnny Lee; $500,000 for UCC-1 and $500,00 for UCC-4. MOI of Eduard Bangiyev dated February 10, 2015.

4. The Forensic Association Between All of the Counterfeit Currency and the Physical Evidence is the Common Defects in the Treasury Seal

In addition to all of the foregoing, the common link or association between all of the counterfeit currency manufactured by Loz, Fakiro and the Borohovs and distributed by the Bangiyevs to Johnny Lee and others between 2004 and 2014 is the Treasury Seal. See Attachment A, p. 37-39.

The three defects in the Treasury Seal are seen on the front plates of the following counterfeit notes: the $100 bills Johnny Lee gave to Maurice Hazel in 2004 (C-22272); the $50 bills sold by Alex Bangiyev to Devin Bost to Alvin Wren in 2007 (C-23201); the $100 bills sold by Eduard Bangiyev to Johnny Lee to Tarell Johnson to Eric Buchanan starting in 2011 and the $100 bills seized from Loz's New York warehouse in May 2014 (C-23332).

The three same defects on these three different types of counterfeit bills are the same as the defects found on the Treasury Seals from the offset lithographic plates, the plastic transparencies, the black tower computer and the Mac computer seized from the New Jersey warehouse on May 28, 2014. See Attachment A, pp. 38-39. Not to mention, the watermark portrait of Benjamin Franklin found on a metal die in the New Jersey warehouse on May 28, 2014, matches the two computer files found in Loz's black tower computer and Mac computer at the warehouse that day. See Attachment A, p. 41.

Over a ten year period, the Treasury Seals found in the digital images in the computer files on both of Loz's computers at the New Jersey warehouse, the transparencies used to make the offset printing plates, the offset lithographic printing plates and the various $50 and $100 manufactured by Loz are all the same with the same three defects. Again, the total amount of counterfeit currency belonging to C-22272, C-23201 and C-23332 (all of which have the same

Treasy seal) and which have been documented by the USSS data totals in excess of $50 million. The calculations for the C-23332 note (found in the New York warehouse, purchased by Eric Buchanan and found in the printing plates, transparencies and digital images in the New Jersey warehouse), by itself, is over $35 million.

Conclusion

In short, the evidence in this case to support the calculations in the PSR of the amount of counterfeit currency involved in this case, is simply overwhelming. The defendant's objection should be overruled.

Respectfully submitted,
DANA J. BOENTE
United States Attorney

_/s/________________________
Kimberly Riley Pedersen
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: 703-299-3700
Kimberly.Riley.Pedersen@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on this 22nd day of May 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to counsel of record.

/s/

Kimberly Riley Pedersen
Assistant United States Attorney
United States Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 837-8242
Kimberly.Riley.Pedersen@usdoj.gov