UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA

-vs-

RONEN FAKIRO
&
BOAZ BOROHOV
&
OFRA BOROHOV
&
ARKADIY BANGIYEV
&
EDUARD BANGIYEV
Defendants.

Case No. 1:14-cr-206

MOTIONS HEARING

May 28, 2015

Before: Liam O'Grady, USDC Judge

APPEARANCES:

Kimberly R. Pedersen and Gordon D. Kromberg,
Counsel for the United States

Christopher Amolsch, Counsel for Defendant Fakiro

Leo R. Andrews, Jr., Counsel for Defendant B. Borohov

Alan H. Yamamoto, Counsel for Defendant O. Borohov

Peter D. Greenspun, Marc Agnifilo, and Mikhail N. Lopez,
Counsel for Defendant A. Bangiyev

Nina J. Ginsberg and Andrea L. Moseley,
Counsel for Defendant E. Bangiyev

The Defendants, R. Fakiro, B. Borohov, O. Borohov, A. Bangiyev, and E. Bangiyev, in person

# INDEX


## OPENING STATEMENTS BY:

| | |
|---|---|
| MS. PEDERSEN | 7 |
| MR. AMOLSCH | 10 |
| MS. GINSBERG | 14 |
| MR. GREENSPUN | 24 |
| MR. AGNIFILO | 27 |
| MR. YAMAMOTO | 29 |
| MR. ANDREWS | 32 |

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| MARYBETH DELLIBOVI | | |
| | DIRECT | 36 |
| | CROSS | 48 |
| | REDIRECT | 62 |
| | RECROSS | 66 |
| ADAM GAAB | | |
| | DIRECT | 68 |
| | CROSS | 121 |
| | REDIRECT | 130 |

## CLOSING ARGUMENTS BY:

| | |
|---|---|
| MS. PEDERSEN | 143 |
| MR. AGNIFILO | 149 |
| MS. GINSBERG | 151 |
| MR. AMOLSCH | 152 |

## COURT'S RULINGS

| | |
|---|---|
| THE COURT | 154 |

THE CLERK: Criminal case number 1:14-cr-206, the United States of America versus Ronen Fakiro, Boaz Borohov, Ofra Borohov, Arkadiy Bangiyev, and Eduard Bangiyev.

MS. PEDERSEN: Good morning, Your Honor. Kim Pedersen and Gordon Kromberg, along with Special Agent Adam Gaab on behalf of the United States.

THE COURT: All right. Good morning to each of you.

MR. GREENSPUN: Good morning, Judge O'Grady. Peter Greenspun, Marc Agnifilo, and Mikhail Lopez on behalf of Arkadiy Bangiyev.

THE COURT: All right, good morning.

MS. GINSBERG: Good morning, Your Honor. Nina Ginsberg and Andrea Moseley on behalf of Eduard Bangiyev.

THE COURT: All right. Good morning to you.

MR. YAMAMOTO: Good morning, Your Honor. Alan Yamamoto for Mrs. Borohov.

THE COURT: Good morning.

MR. ANDREWS: Good morning, Judge. Leo Andrews for Boaz Borohov.

THE COURT: All right. Good morning to you.

MR. AMOLSCH: Good morning, Your Honor. Christopher Amolsch for Mr. Fakiro, who is present.

THE COURT: All right. Good morning to each of you.

And I received orders from Mr. Lee's counsel and Mr. Loz' counsel indicating that they had resolved their matters

with the Government and would not be appearing today. And Mr. Smith entered an order that he would not have to appear as well.

So we're here on -- let's swear our interpreter, please. Thank you.

Where is our interpreter? Good morning.

THE INTERPRETER: Good morning, Your Honor.

NOTE: The interpreter duly affirms.

THE COURT: All right, good morning, and thank you again for serving with us.

THE INTERPRETER: Thank you, Your Honor.

THE COURT: All right. This comes on for a hearing to establish loss as to each of the defendants for purpose of the Guideline calculation, and beyond I'm sure.

There are a couple of preliminary matters I wanted to discuss. First, the Government has indicated initially that they believe that I should rely on the Probation Office's calculation. And I don't believe that's correct. I don't believe that that is sufficient evidence for me to find by a preponderance that the loss is correct.

The Probation Office, in some districts the Probation Office may do an independent investigation altogether. In this case they took information from the Government's file. And I don't know what they did, or how they evaluated it, or how they weighed it, but it is not sufficient for purposes of

establishing the loss amount given the objections of counsel.

And so, I don't believe that that flips the burden to the defendants.

Secondly, I'm -- troubled is not the word. I have never had a situation where the defendants have all come together and pled guilty at the last minute, that there have been reservations about -- or at least for most of the defendants, where there have been reservations about the loss amount where then the Government has used statements of one defendant's cooperation against another defendant in cooperation -- another defendant in establishing loss, and then flipped the parties as necessary to demonstrate that each is culpable in at least the 7 to $20 million range, which is what we are fighting about.

I couldn't find any law that said it wasn't legal to do it. It just is -- and I also -- you know, we have the flip side of the coin where each of these folks has agreed to cooperate, is cooperating, and should be honest in the levels of culpability in terms of the amount of counterfeit currency that they were responsible for generating.

And they certainly do not want to be held not -- to be determined not to have been cooperative because they weren't honest about that amount.

So it really is a difficult scenario to come to grips with, as I understand, the tension between the cooperation, the

admissions, the Government's burden and how they go about proving their case. So I just would put that out there. I would like comment on it.

I think, frankly, that if we go back to January when the pleadings were filed after the motion to suppress was filed by the defendants, one or more of the defendants, and the affidavit of Ms. Dellibovi and the focussed review that she did of her analysis and the manner that she used, and the method that she used, especially as to the plates which have generated the counterfeit bills -- and the two largest, of course, are the 22272 bill and the 23332 bill. And the methodology that she used, which was subject to attack before that hearing, demonstrates certainly prima facie evidence that in fact the loss was greater than $7 million.

And I'm not sure where we're going today on the hearing, but having opened with those comments, Ms. Pedersen or Mr. Kromberg, what would you like to, if anything, say at this time?

MS. PEDERSEN: Your Honor, the Probation Office took information that the Government had in its files from reports of interviews of cooperating individuals, and also relied on data that was provided to it from the Secret Service.

We believe both that the data that's made and kept by the Secret Service pursuant to their legal duties is valid and reliable, and that provides one basis, an independent basis for

the Court to look at in terms of determining the loss amount.

And in terms of using the statements, the Government went through and in an individualized assessment for each defendant relied upon the statements of others, not the defendants, in order to establish the loss amount.

That is done typically here in complex drug conspiracies all the time. It is permitted by the plea agreements. And I'm not aware of any legal precedent or case which would suggest otherwise.

I mean, a sentencing hearing is different from a trial. The rules of evidence are a little bit different. The standard is preponderance, not beyond a reasonable doubt.

And that's information I think the Court can rely upon in whole or in part to come to the factual conclusion about the amount of loss.

THE COURT: In looking at your submissions, it appears clear to me that there were multiple interviews with each of the defendants that you identified, the Bangiyevs and Mr. Loz in particular. Of course, Mr. Lee's cooperation testimony was significantly before that.

Is the Government satisfied that you had sufficient time where you believe that the statements that you identified in your pleadings are accurate?

I mean, Mr. Loz moved from his positions on certain matters after the initial debriefing and changed his position.

Where are you there?

MS. PEDERSEN: And the Government disclosed that both in making the reports of interviews available to defense counsel and we disclosed that in our written submissions to make it clear to the Court that this is the genesis of the statements when they were provided and how his statements changed over the course of time.

So in terms of disclosing what we know and we believe happened during those interviews, we feel confident that the information is accurately contained in the reports.

THE COURT: Okay. Now, Ms. Ginsberg had raised several issues that she believed were important to evaluating the loss number. They principally dealt with the methodology used by the Secret Service agent in establishing the amount of currency counterfeited in particular for those two numbered plates that I identified earlier.

How is the Government going to deal with that this morning?

MS. PEDERSEN: In discovery back in January when we were litigating the issue of the counterfeit specialist, the Government provided the protocols that are used by the Secret Service internally for determining whether or not a suspected counterfeit bill is genuine or counterfeit.

In addition, in our Government's response we explained how the Secret Service does its work. The fact that

they have been doing this since the late 1800s. They have a library of specimens that they keep that they catalog. There is a database.

There is an affidavit that we submitted from Heidi Burghardt, who is the database administrator who has been there for 30 years, and it explains how the agency collects specimens, identifies them, classifies them, and maintains those records so they can report to Congress and the Federal Reserve Board and those types of entities who rely on the accuracy of this data.

So that information was provided in discovery. We have copies here for the Court and counsel.

Ms. Dellibovi is present in the courtroom and she is certainly available to the Court or counsel if there are questions concerning how she conducts her examinations and reaches the conclusions. And she is available. She is here if the Court would like to question her or have any particular questions.

But we believe that the whole process has been set forth both in our pleading in January and the submissions by the case agent and Ms. Burghardt to explain the process.

THE COURT: All right. Thank you, Ms. Pedersen.

Counsel want to be heard? Mr. Amolsch, I understand you may have a witness for Mr. Fakiro?

MR. AMOLSCH: It actually goes directly to your

point, Your Honor, your two points.

One, I believe you are correct in terms that the Government is not able to just simply rely on the presentence report in terms of the loss.

And as it relates to specifically Mr. Loz, Mr. Loz did give two statements or multiple statements to the Government with multiple different versions of how his role in the conspiracy originated, and specifically how Mr. Fakiro's role in the conspiracy -- when it started and what it actually was.

I don't have any particular qualms about the forensics involved in the loss calculation as it relates to the dollar bills.

As the Government's pleading points out, they believe Mr. Fakiro entered the conspiracy in 2011, and they rely heavily on Mr. Loz' statements to that effect as to why that is believable.

In Mr. Fakiro's loss amount, while capped at 20 million, I have maintained that he is responsible for less than the 7. That his range is actually 2.5 to 7. If his involvement in the conspiracy happens later, then that is the appropriate range for him. And if his involvement in the conspiracy happened earlier, then the 7 to $20 million range is appropriate.

The Government's evidence as it relates to Mr.

Fakiro's involvement in the conspiracy, based on their pleading, entirely relies on the statements of Mr. Loz, who has given multiple statements involving Mr. Fakiro. His latest versions of what he says happened I believe are demonstrably false or so incredible as to not be believable.

And that when Your Honor is making a determination about when Mr. Fakiro entered the conspiracy, it is the statements Mr. Loz gives regarding Mr. Fakiro's involvement that will be dispositive.

I believe, based on what the Government has given me in terms of documentary evidence, that I can show that much of what he says is demonstrably false in the later versions. I could be confused about that, Your Honor, but that's what I believe the documents show. I have some questions for Agent Gaab just to make sure that I understand them.

But if the Court finds Mr. Loz to be incredible or not believable, and I believe the Court already has ample reasons to do so, then I believe the loss amount for Mr. Fakiro is lower than the 7 to $20 million.

THE COURT: Mr. Loz is incredible just based on the fact that he initially said A and then later said B?

MR. AMOLSCH: Well, I believe --

THE COURT: His first statement was rather incredible. Mr. Fakiro did all this stuff early on without knowing that he was involved in a counterfeit operation. If

anything is incredible, that's incredible.

MR. AMOLSCH: Well, I understand Your Honor has had some concerns about that from the beginning. But as it relates to Mr. Loz' credibility, I think the Government and everybody has amply demonstrated that he is a pathological liar at least from the very beginning. He lied in Israel about the diamond, he lied to the Secret Service up here. Mr. Loz tends say whatever Mr. Loz wants to say at any particular moment. So how do you tell when he is telling the truth?

I believe my point in this hearing, Judge, at this point is just take what Mr. Loz says as it relates to Mr. Fakiro's involvement beginning in 2011, again referencing a 2013 meeting. Which would put his involvement in the 7 to $20 million range. And I think I can demonstrate to the Court about why his statements are not true. Like, one, it could not have happened. And two, it doesn't make sense what he says happened in that Mr. Loz is not believable as it relates to that.

And the Court --

THE COURT: I will give you the opportunity to do that in a more specific fashion.

MR. AMOLSCH: I have a series of questions for the agent, but I don't have any issue about the forensics as it relates to the serial numbers and all of that. It is more about Mr. Fakiro's involvement and when it started.

THE COURT: All right. I will give you an opportunity to call the agent and discuss those matters.

MR. AMOLSCH: Thank you, Judge.

THE COURT: All right. Thank you, Mr. Amolsch.

Ms. Ginsberg.

MS. GINSBERG: Thank you, Judge. You raised a lot of the questions that we were going to address with the Court.

THE COURT: I am not surprised.

MS. GINSBERG: You are prescient. I think the easiest, the easiest area to address is the Secret Service database and the methodology that was used.

I have no doubt that the affidavit that was submitted by Counterfeit Specialist Burghardt is almost entirely sufficient as far as it goes. And the problem is what she is trained and qualified to do is to manage, report, assemble, collect data that is in this database once it already has been inputted.

And there is one statement in her affidavit to which I take -- with which I take issue. And she says, based on my training and experience, I know that the CTA system accurately records, tracks, and manages electronic records of counterfeiting currency received and maintained by the Secret Service.

I think that she is certainly qualified to make that statement with respect to everything except how the information

is initially recorded. And what she says and what Agent Dellibovi has said from the very beginning is that with respect to the largest amount of counterfeit currency, not the counterfeit currency that Agent Dellibovi has herself personally analyzed and examined, but with the largest portion of this counterfeit currency, it enters the database through individuals all over the country whose training is totally unknown to us. We don't know who these individuals are. We don't know what they do in order to make their assessments that some piece of counterfeit currency fits into a particular circular.

What they do is they have examples in the computer database --

THE COURT: This is from the protocol that you received?

MS. GINSBERG: Yes, this is the protocol. So they have examples, they have circular numbers, and they categorize. But essentially the system, as I understand it, that is in place is that these individuals all over the country look into a microscope, and based on their own visual examination say, I think this tiny little squiggle looks likes this tiny little squiggle, which when you have three of them together they call circular 23332.

And in order for the Government to offer, essentially, an expert opinion that all of these different

notes are categorized into these circulars --

THE COURT: Consistent.

MS. GINSBERG: Consistent. Well, the language changes. It is consistent, linked, forensically linked. We are relying on people who are looking through a microscope who have no protocol, for whom we have no information about their training, and saying, I think that this fits into this. And I just don't think that's enough.

THE COURT: I don't think I have the protocol, but maybe I just missed it from the January submissions.

But what I'm looking at to determine the reliability is the protocol. How many consistencies are required for each of these bills. And I think that they certainly have been highlighted in Ms. Dellibovi's reports and in her slide show.

And also, you know, error rates, I didn't see anything about error rates. I am curious about what portions of the country these bills were recovered from. I am curious about how many collectors -- how many different agents reviewed and logged what they believed to be counterfeit money into the system. I don't know whether that's three, whether that is 300.

Those are some of the questions that I think, just as you are, would be important to determining the reliability of the methodology.

But tell me where you think the protocols faulty as

far as --

MS. GINSBERG: I think the protocol you're talking about seeing I think is there. What there is no -- what I keep coming back to is that this whole system that does have some protocols is totally based on the initial observation. All we're talking about is people looking in a microscope and then everything else flows from that. And we don't know how well trained these people are. We don't know how many times they make mistakes. They certify their own -- the correctness of their own work. Some supervisor comes in and says, yes, you have certified, so I am going to sign off.

The very foundation of the pyramid is just someone looking in a microscope. And it is like the hair microscopy problem that the FBI is having now. They now come into court and even the FBI has admitted that they overstated the degree of reliability in those conclusions.

And I just -- we recognize that there is a lower standard for sentencing, and that the Court's determination for this purpose is not the same as would be made in a trial, but there is still a fundamental lack of reliability at the very base of --

THE COURT: But aren't you really arguing against yourself in part because you've previously said Ms. Dellibovi is not an expert, and what she does does not require expert knowledge. In fact, it is somebody who has to look into a

microscope and do comparisons. And I agree with you that that is what has been done here, but I don't think that that takes somebody specialized. It certainly takes somebody who has been trained in where to look.

But once that has occurred, aren't we talking about somebody who is -- the reliability factor is more easily established because of the nature of the investigation?

MS. GINSBERG: I think that's true. However, there may be 300 people around the country doing this. They are not here for -- had we gone to trial, they are not here to be cross-examined.

Your Honor, I went through the PowerPoint presentation, and I don't intend to do this, but was prepared to highlight places on those bills that look -- where there are dissimilarities. They pick the points of similarities, but you compare the bills and there are points, there are numerous points of dissimilarities. And we don't know why are those being ignored and why does that lead to the conclusion that these all belong in the same category.

So I don't know that -- ultimately I do think this is a lay opinion. I don't know that we have enough information to say that the lay individuals who are inputting the data are sufficiently reliable. But I think that's where we are.

THE COURT: Well, why don't we put the agent on the stand to answer some of those questions? And if you have

questions about the reliability of some of the bills that have been introduced into evidence here as to how they could be identified as counterfeit, I am happy to hear that testimony.

MS. GINSBERG: We could do that. I don't want to prolong this beyond what needs to be done. But our problem is not with the examinations that Ms. Dellibovi made. She can't possibly tell you how somebody sitting in Utah looked at something and made the same --

THE COURT: I agree with that. She might be able to say whether there is three people who input this data or 30, and that might be important.

MS. GINSBERG: That might be helpful for the Court to know.

THE COURT: And also what protocol is in place to determine error rates, and whether she has an error rate established.

I mean, there is a significant amount of publications that were introduced into evidence back in January about error rates, or lack of error rates, or the reliability of the counterfeit analysis program at Secret Service, which are all part of the record, and focus really on error rates as to determining probability of accuracy.

So, you know, this is your opportunity to tell me what you want to tell me. And if it comes in through witness testimony or argument, today is when I want to hear it.

MS. GINSBERG: There were a couple of other points before we were to do that that I would really like to get to. This is one of the reasons why I think the overall information in the database may or may not be as important to those of us who are in the 7 -- the Probation Office found were in the 7 million to $20 million range.

That is, the database goes up to 70-something million. So clearly some of that counterfeit currency is not being attributable to our clients.

And in fact, there is -- I think I cited in the pleading I filed last week the recent Fourth Circuit case, United States versus Florez-Alvarado, which really makes the distinction in terms of determining loss amount between what is reasonably -- it said very clearly that the Court has to look at two things in determining loss amount: The reasonable foreseeability of the amount at issue; and separately, totally separately, the scope of the criminal activity that the particular defendant agreed to jointly undertake.

So there could be $70 million, that could be accurate. The issue for the Court is still the scope of the criminal activity the particular defendant jointly agreed to undertake.

And I think the opinion is fairly read to say that even if the defendant knew that there was a larger amount, if that's not part of what he planned to do, that's not part of

his relevant conduct.

And that that certainly is what is intended by the proposed amendments to the fraud Guidelines that will go into effect if Congress doesn't do anything to reject them.

I'll be honest with the Court, as far as both Mr. Bangiyevs are concerned, we had discussed whether we thought we would be in a position to convince -- given the evidence that was in Ms. Pedersen's pleadings, that we would be able to convince the Court that the amount was below 7 million. And we don't want to detract from what really is significant.

I think we believe that the real amount for both of those individuals is somewhere below that or somewhere slightly above that, but we certainly do not concede that it is closer to the $20 million range.

And there is, we perceive, a major problem in the Court being provided with all of these different pleadings which include statements from the various defendants as applied to other people but not as applied to themselves. So the Court is basically being told what our clients have said during their cooperation, not in the pleading on their case, but the Court now has all of that information. And this relates to Your Honor's initial comments, we think that it's not fair.

I did look to see if there was any case law on that. I couldn't find any. But my sense is there is just something wrong about it and unfair about it. And particularly -- well,

in view of the fact that we disagree with a lot of what has been said in some of those other -- the statements of the other people.

And until yesterday I thought Johnny Lee and Itzhak Loz would be here in court, and we had anticipated possibly cross-examining them. The Government has provided us with copies of the reports of investigation for Johnny Lee and I think one or two other people.

THE COURT: Bost?

MS. GINSBERG: Not Bost, but a third-party witness. We actually have copies of the MOIs for Johnny Lee's interviews. And Ms. Pedersen has made available copies of the MOIs for Mr. Loz' interviews, but has not given us copies --

THE COURT: I am sorry, we have a hand up.

Yes, ma'am.

THE INTERPRETER: A question, MOI?

MS. GINSBERG: Memorandum of investigation.

THE COURT: Thank you.

MS. GINSBERG: And I have a pad over there of my notes which had we decided to try and cross-examine these witnesses, I was going to tell the Court it's just not possible. I can't cross-examine somebody from my notes of somebody else's notes.

THE COURT: Yeah.

MS. GINSBERG: However, to the extent that we have

had access to this information, I will represent to the Court that I think the information in the Government's pleadings does not give a full representation of the inconsistencies in the individual statements. I think it admits that there have been inconsistencies, but what the Court is provided with is the worst case scenario, ultimately after interview and interview.

And I have prepared a series of notes from my notes about points which I think are inaccurate as to Mr. Arkadiy Bangiyev and partially Eduard Bangiyev from Mr. Loz' statements, which indicate that he -- suggests to me that he is trying to put more weight on them than what is accurate.

And also, that there are other suppliers, other people to whom he is distributing who are distributing counterfeit currency in the United States, which would explain some of the additional moneys that are in the database. So --

THE COURT: Okay.

MS. GINSBERG: We sort of came here, we sort of came here to say to the Court, well, we're not really sure -- the burden is not as high as we would like it to be. We think that there are more important issues. We take issue about the involvement in the Sylvester Street $50 bill manufacturing. We don't believe what Mr. Loz has said about that is accurate.

But we think that there is evidence from which this Court could reasonably conclude that the amount is under 7 million or somewhat over $7 million. And I'm not sure at this

point that we're ready to concede that it's over 7 million, but we certainly are cognizant that there are facts that the Court could rely on to make that finding.

I think at some point I would like to make some representations to the Court from my review of the notes about what I perceive is inaccuracies in the amounts that Mr. Loz has attributed to the Bangiyevs. But I think other than that, those are the issues that I think that we would want to address.

THE COURT: All right, thank you.

Mr. Greenspun.

MR. GREENSPUN: May I just add to that a little bit.

THE COURT: Yes, sir.

MR. GREENSPUN: First, we would on behalf of Arkadiy, Alex Bangiyev adopt what Ms. Ginsberg has just said.

Judge, part of the problem is -- we received the Government's many pages of pleadings on Friday. Is that really it's sort of like litigation in state court divorce cases, it's almost all done by stipulation these days. Sort of, Judge, here it is and this is what our position is and that position is.

And so, the Government now has a series of motivated witnesses and, just as the Court pointed out and Ms. Ginsberg pointed out, where they are really not subject to cross-examination. They have put everything before the Court

through these various pleadings about what cooperators are saying, including our own clients. And so, it becomes very awkward.

There is obviously a lot of counterfeit money floating around, and we really don't want to, despite what some prosecutors say, want to waste the Court's time on this. Really, I think the way that coming into this today is we were thinking that while we think that there is arguments that it's practically speaking less than 7 million, that we're really not opposing the 7 to $20 million range. That there are other sentencing issues that are far more significant down the road to be addressed.

Now, I'm not conceding that two levels for any of these folks is not significant. They are the one in jeopardy, not me. But that there is a context as far as the money is concerned.

But in light of what the Court raised and what Ms. Ginsberg raised, and Ms. Pedersen's fairly limited response to the Court, this is a bit like reverse extrapolation as far as the database and so on in a DUI case where you have a blood alcohol level at the time of the accident and then they bring in an expert to work it backwards to the time of the driving and that kind of thing. And you have got to do that by proving it up with scientific reliability as opposed to somebody just saying, we can back it up.

And that's the problem that we've always had as far as the database calculation is concerned. We understand they have a methodology, they have a formula, but they've never provided the basis for the formula to be reliable, and still haven't.

And then it's the same thing as far as Loz' is concerned, who makes all these statements about the Bangiyevs and other people's involvement, and he's like a moving target in his statements. It's not just that he had one flaw here or another flaw there. I mean, he is changing his story as it goes. And the Government has provided the Court, candidly, with that information. But we don't think that he's reliable in that regard.

All that said, there is still a fair and reasonable likelihood we think that the Court could find or would find that the loss amount for Guideline loss purposes only is at or roughly somewhat above $7 million as far as the Bangiyevs are concerned.

But we want to be clear, and I think that's what Ms. Ginsberg is getting to as far as the list of other specifics, is that for sentencing purposes we're just talking about a loss range as far as that is concerned, but we are not at all accepting what Mr. Loz or perhaps others say about the Bangiyevs and what they did or didn't do in any particular way.

Loz, I just counted it up from Government's Exhibit

C, came into the United States 26 or 27 times. And so, he was clearly the top dog as far as this is concerned. And despite that, he is this moving target as far as what he says.

So you should be prepared from a sentencing point of view, to the extent that the Government is relying on Loz or others in that regard to paint a different picture than what the Bangiyevs actually did, to hear contest in that regard.

So we're not conceding the substance of what Loz said. We are conceding that the loss range is reasonably in the $7 million-plus figure.

THE COURT: All right, thank you, Mr. Greenspun.

MR. AGNIFILO: Can I just add 30 seconds to what my colleague said?

THE COURT: Yes, sir.

MR. AGNIFILO: Thank you. Since my colleague ended with Mr. Loz, I just wanted to do very quickly on that.

I think Your Honor has enough before Your Honor to essentially find that given the totality of the circumstances given this one witness, that what he says is unreliable. And I say that because I think on its face we have major inconsistencies.

The fact that we can't cross-examine him and he still has a Fifth Amendment right, obviously, until sentencing, but he is not cross-examinable, is very significant given the specifics.

I think at the end of the day, Loz' statements create more problems than they solve. I think that is from our perspective. Because we agonized over how we were going to deal with today because we didn't want to have a full-blown hearing because we think Your Honor is probably going to find that it is over $7 million anyway, but we were very concerned that if we don't and if we forego a hearing, that somehow we will have waived all of our objections to what Loz says about my client, Arkadiy Bangiyev, because it's very damaging, not only from a loss perspective, but really from a role perspective, not necessarily legal role in a sentencing sense, but from what he did.

So I think that there is much more reliable information in the record. And I think Your Honor has a basis, just on what we see -- I mean, I think it's not coincidental that every lawyer who has gotten up here today says, I think Loz is most respectfully lying. And I don't think we all say that lightly.

That Your Honor has enough before Your Honor to decide as a matter of Your Honor's own discretion in terms of deciding what facts you want to credit and what facts you don't want to credit to not credit anything that Loz says in these statements.

Thank you, Your Honor.

THE COURT: All right, thank you.

Mr. Yamamoto.

MR. YAMAMOTO: Your Honor, I apologize to the Court, I'm confused, as always. I was sort of distracted here the last few days. I was under the impression that this was just about the total loss amount and what was being attributable per the Secret Service with respect to the various methodologies and protocols.

THE COURT: Right.

MR. YAMAMOTO: If the Court is -- and then I hear that we are talking about individual loss amounts. And so, I thought that was more of a sentencing issue.

THE COURT: We are here to talk about what was the loss amount that was reasonably foreseeable for each individual individually and how to demonstrate that or not demonstrate that.

So you are absolutely correct. And the Borohovs and Mr. Fakiro, all three who came into this conspiracy, from the law enforcement perspective, at the very end of the investigation, you know, have very different, unique facts to be focussed on.

So that's what I hoped that we would achieve today. And the Bangiyevs have their positions. Mr. Amolsch we have heard from with Mr. Fakiro. And I am interested in what you have to say about Mrs. Borohov and Mr. Andrews for Mr. Borohov.

MR. YAMAMOTO: With respect to the Borohovs, Your

Honor, just looking at the presentence report and taking that alone, we would disagree with the analysis of the Probation Office.

In the various presentence reports, the Probation Office has attributed 50 to 100 million to Mr. Loz, and he does not object to that loss amount.

The Probation Office attributed 7 to $20 million to Mr. Fakiro. They dispute that. The U.S. Attorney's Office says it is somewhere less than $20 million.

With respect to the Bangiyevs, the Probation Office has also attributed 7 to $20 million. The plea agreements for them indicate it's less than 20. The Government indicates it is more than 7. The defense says it's less than 7.

But for the Borohovs, the Probation Office has attributed 20 million to 70 million. Now, these are the people at the bottom of the totem pole and have the least to do with this. The Borohovs didn't make any money. And the Probation Office acknowledges that. The Borohovs received no benefit from the enterprise.

So just based on the Probation Office's analysis, we would contend that the Borohovs are guilty or should be held responsible for the 2.5 to 7 million, which is in the range of what was found in the warehouse.

THE COURT: I'm sorry, say that again. You agree that 7 to 20 million --

MR. YAMAMOTO: No. I am contending that they are going to be held responsible for at least 2.5 to 7, because 2.5 was --

THE COURT: 2.6 was found in the warehouse.

MR. YAMAMOTO: Right, there was 2.5 or 2.6 in the warehouse. And then there was some found in the storage facility to bring it up to 5.3 or something in that range.

At worst it is 7 to 20. I don't know how they get attributed with more than $20 million when the principals, Mr. Fakiro, who is supposed to be an equal partner with Mr. Loz, is attributed with less than 20.

THE COURT: Well, I think that the Probation Office felt they had unfettered discretion because of the plea agreement, and because in previous sentencings I have made it pretty clear that when the parties reach an agreement as to a Guideline range, I feel bound by it, or I believe the agreement can be rescinded if I choose not to agree.

So that may have had something to do with the range they found there, but they clearly looked at other information to come up with that.

But I understand your position. And we'll discuss that further in a minute.

MR. YAMAMOTO: Thank you, Your Honor.

THE COURT: All right, thank you.

Mr. Andrews.

MR. ANDREWS: Thank you, Your Honor. I agree with Alan's recitation of the fact situation as far as the loss amount, Your Honor.

Simply stated, and I will be very brief, the Borohovs appeared before you and entered a plea admitting and accepting responsibility for the actions that they did during their time at the warehouse. They should be held accountable for whatever counterfeit money was generated at that warehouse and presented.

And it's like Alan indicated, it was 2.5 I believe actually found, and also the amount that was transferred to a storage locker, under $7 million. They are willing to accept responsibility for that. They did accept responsibility for that.

Based upon the credibility problems of Loz, anything that he indicated that happened in Israel should be discounted and you should set the loss amount as far as the Borohovs are concerned only at what was generated at the warehouse.

THE COURT: Thank you, Mr. Andrews.

All right. Here is where I am. You know, I looked very carefully at the agent's prior statements and the statements made in the latest submission by the Government, as well as that of Ms. Burghardt.

And when you look at that information, which is not really -- at a macro level is not objected to. Then we add in

evidence of the printing press. Of course, the analysis that Ms. Dellibovi did about the multiple similarities in defects on the currency that was found to be counterfeit, and I focussed on 22272 and 23332. Also, the recovery of the plates. Also, the computer-generated discovery located. The evidence that was recovered from the search warrant at the warehouse. The evidence that was recovered from Mr. Bangiyev in Pennsylvania.

I am not sure, where is the black tower computer -- where was that recovered?

MS. PEDERSEN: That was inside the New Jersey warehouse. We may have a photo that we attached. I can show the Court if we have it.

THE COURT: I don't need to see it. I just was confused as to what was recovered from Mr. Bangiyev in --

MS. GINSBERG: Judge, I don't believe anything was recovered. There was a counterfeit note that was recovered from someone who was with him, one counterfeit note, but there was nothing recovered from Mr. Bangiyev.

THE COURT: Okay. So everything was recovered at the warehouse, the physical evidence, the plates, the computer, all that came out of the warehouse. Okay. Thank you.

And to me, absent evidence that it is unreliable -- and I also looked at the evidence from Bost and Wren. I may have -- well, I'm not sure, I think Mr. Lee's cooperation and statements are certainly consistent with the earlier activities

of Mr. Bangiyev, or perhaps both Bangiyevs back in the 2006/'7 range. But that's the primary focus that I had in determining loss.

And obviously we have the $2.6 million that came out of the warehouse, but also evidence of the longstanding operation from either Israel or the activities of principally the Bangiyevs, but also Mr. Loz, in acquiring the manufacturing materials necessary to make the counterfeit money.

What I would like to hear for my own purposes is I would like to call Agent Dellibovi and explore some of the issues that I have just raised where she has been involved with this database for a long-standing period of time. And I'm interested in error rates, how they identify error rates, if there have been errors, the locations, the number of agents who are inputting this information, and what testing they do to determine accuracy.

So I can ask the questions -- you indicated she was present?

MS. PEDERSEN: Yes. I just want to correct, Your Honor, she is not a special agent with the Secret Service.

THE COURT: I'm sorry.

MR. PEDERSEN: She is a counterfeit specialist. She is here in the courtroom, and the Court is free to ask her whatever questions.

THE COURT: Right.

MS. PEDERSEN: The Court may be, based on your proffer of the questions, you may be conflating her knowledge with the information set forth by Heidi Burghardt in her affidavit. But we will leave it to Ms. Dellibovi to answer the questions that she is capable and competent to answer.

THE COURT: Okay, that's great.

MS. PEDERSEN: We will defer to the Court to ask those.

THE COURT: Thank you. Please come forward and be sworn.

I'm sorry?

THE INTERPRETER: I'm sorry, can the interpreter have a two-minute break before we go on?

THE COURT: Certainly. Do you need a quick break?

THE INTERPRETER: That would be lovely.

THE COURT: All right. How much time would you like?

THE INTERPRETER: Two minutes will be fine.

THE COURT: All right. We will take five minutes and we will come back and we will hear testimony.

We are in recess.

NOTE: At this point a recess is taken; at the conclusion of which the case continues as follows:

THE COURT: All right, let's swear Ms. Dellibovi, please.

NOTE: The witness is sworn.

MS. PEDERSEN: Your Honor, before you begin, I just wanted to advise the Court that during the break I provided to counsel and provided a copy to the Court something that I have identified as Government's Exhibit 1 for purposes of the hearing. And it's a multipage document which was previously provided in discovery, but it may give the Court some terminology, at least on the first couple of pages. So if the witness testifies about certain things, the terminology is there.

But I think what may be more important to the Court would be the final two pages, the final three pages, which are printouts from the CTA, the database that the Secret Service uses. And this example may be something useful for the Court to ask the witness about to explain in terms of how she performs her job.

THE COURT: All right, thank you.

MARYBETH DELLIBOVI, called by counsel for the United States, first being duly sworn, testifies and states:

DIRECT EXAMINATION

BY THE COURT:

Q. Well, good morning.
A. Good morning.
Q. You have been here and listening to the hearing so far and, I am sure you heard my questions. And really what I'm focused on is determining the reliability of the information in

your and also Ms. Burghardt's affidavits.

And as you are well aware in determining whether evidence should be accepted as reliable, we look at the methodology that is used, the protocol. So I am interested in not only how you determined -- and let's focus on the two bills, the 72 and the 3332 bills, how -- and I believe that your testimony that you've given before in written form has focused on the consistencies and the circumstantial evidence that demonstrate that the consistencies are sufficient for you to be able to rely on them.

One, how does the Secret Service go about determining error rates when they are categorizing counterfeit money say here in the 72 and the 32 bills that are the main focus of our hearing today?

A. Well, as referred to with that document, so when a counterfeit bill first comes into the Secret Service, it is received through one of our 160 field offices worldwide. The first person is usually an agent or an investigative assistant, a counterfeit technician. Someone that is working in the field office full-time, examines the bill, determines if it is counterfeit or genuine.

And then if they determine it is counterfeit, they will input a series of identifying numbers into our CTA system.

Q. What's the qualification of that person?

A. The qualification of that person? I am not aware. I

believe perhaps a Bachelor's degree, but I am not certain.
Q. Are they special agents or are they --
A. No. Sometimes it is a special agent that inputs into the system -- or, sorry, inputs into the system or queries the system, but sometimes it is an administrative staff member.
Q. And are you aware of what training they may have had so that they are able to do the comparison?
A. Yes. So as part of my job, I train all of new special agent classes, my colleagues or I, someone of the counterfeit specialist ranking, we train the new agents. They receive a day-and-a-half of training on counterfeit and genuine examination. Typically the 23332 circular is one of the notes used in our counterfeit training just because it was so prolific.

And as part of that, the agents receive training on identifying printing processes, the characteristics used to determine if it is genuine, meaning that it contains Intaglio and typographic printing, or if, as in this case, it is printed using offset.

So that simple determination of counterfeit versus genuine is taught to them.

They also receive additional training on the CTA system in subsequent classes in which they input notes, they receive some sample notes to input into the system and to search to see if the note in their possession matches something

in the database based upon the descriptions.

So the way they do that is in one of the last three pages, I'm not sure which page exactly, it provides a printout sheet of -- I believe it says Technical Data at the top. That is a description that the counterfeit specialist, myself or the other counterfeit specialists, input when we classify -- thank you. So --

Q. If you would identify it by Bates number on the bottom right-hand corner, that would be helpful.

A. The last three pages. So 12, 13, and 14, are the examples in this case.

So when a new counterfeit bill comes into the Secret Service headquarters, the counterfeit specialists classify them. And we look for these defects or characteristics that are present on all of the bills we examine for that circular.

Q. So these are bills that have been found preliminarily to be suspicious, and then they are transferred to the headquarters?

A. Correct.

Q. All right. And then --

A. So this is at their first passing. If they are deemed to be counterfeit, they are submitted to Secret Service headquarters, which is in Washington, D.C., where I work. And my colleagues and I will take the bill, compare it to the 25,800 samples in our library -- that's just the minimum,

that's one of each. So there is approximately four times that amount, if not more. And we will try to recognize if it has been seen and is just a new formulation with perhaps new identification numbers, or if it is a brand new counterfeit altogether.

Q. All right. Do you have a minimum number of similarities that are necessary before you would classify it in the training that you have received?

A. No. There is no real minimum number because the presence or absence in itself is further conclusion that two bank notes are related or not related.

So, for example, it's very common for Treasury seals to have misspellings on them in counterfeit notes. If a bill that I'm examining has it spelled correctly, it further strengthens the conclusion that those two are not associated with each other, but perhaps further associated with a different bill.

Q. All right. And if you look at a bill that, as I understand it, is a sophisticated counterfeit bill and there are similarities, but there also may be dissimilarities, what do you do in categorizing it?

A. I am not sure if you're referring to comparing to other counterfeit bills or comparing to a genuine?

Q. Well, both. One, you compare it to the genuine to determine if it's counterfeit. And then you classify it as to

whether it's a 3332 bill or 2272 bill, and how do you do that?
A. So the typical procedure is to pull a previously circularized note from our specimen library and then compare the two bills side by side.
I would look that the printing processes used are the same on the front plate, which is the black image area on the front of the bill; the back plate, which is the green image area on the back side of the bill; and the Treasury seal, which is green seal on the right side of the front.
So I would look for those printing processes, they have the same characteristics. And then I would examine the entire bill, not just focusing on the specific defects in the database, but rather the holistic view, and make sure that in all regions the two bank notes appear consistent with each other.
Q. Okay. What use, if any, do you make of the actual plates if you have recovered -- if those have been recovered by the Secret Service?
A. A plate is the material that is used to generate a printed document. So the characteristics present on the plate should then carry forward onto the printed note itself.
So in the same way that I would examine two counterfeit bills and compare them, I can also compare to a plate and look for those same consistent areas.
Q. Did you have occasion to do so in this case with either of

these bills?
A. Yes. In this case I examined all of the above. I examined bank notes, plates, plastic transparencies, which are used to create the offset printing plates, as well as some files that were seen on the computers.
Q. All right. The work, after the special agents -- I'm sorry. After the specialists in headquarters have made their conclusions -- how many of you are there at headquarters?
A. It varies. At most we have had seven examiners, at one time seven counterfeit specialists at one time. Presently there are three of us. So we are drastically in reduced numbers.
Q. All right. And what review of the work that you have done occurs?
A. So the Secret Service receives what are known as additional specimens. The first counterfeit note is submitted for classification. So that's the first time that we populate the database with defects that we see.
So we will describe what we see on the bank notes. Areas that the field office with limited training should be able to refer back to these specific regions.
After that first pass, we request that four to ten samples be submitted to the Secret Service headquarters to confirm that those defects or characteristics we describe in the database are consistent between different bank notes.

After that time, if a new variation is submitted, meaning that it is determined to be the same printing plates -- or printing plate images. Sorry for the correction. Printing plate images, but different identifying numbers -- for example, the front plate number may be changed. If those new specimens are submitted, they receive a variation letter after the circular number.

So we confirm that the same characteristics as classified in C 23332 are the same that were seen on C 23332 variation M, which was one of the counterfeit notes seized from the storage unit, I believe.

Q. Okay. And do you have a supervisor who reviews the work that you have done and the conclusions and the reports that you have generated?

A. All of our reports go through a peer review from another counterfeit specialist. As well as one from our counterfeit, supervisory counterfeit specialist.

Q. What does that peer review consist of?

A. It consists of basically looking at our case notes and agreeing with the conclusions that are presented, that they are described in a complete fashion.

In some cases, if something needs to be further expressed, we will print out our case notes. In this case I submitted several images from the computers, I provided those to my colleagues, and they verified that the same

characteristics were present on the computer files as were seen on the counterfeit notes in our specimen library.
Q. Okay. All right. Is there any way to determine from either these last three pages of the exhibit, Government's Exhibit 1, where this currency came from in the United States?
A. Not from these pages, no. Each entry into the Counterfeit Tracking Application has its own Secret Service Form 1604 associated with it, which is the submission from a bank or a police department, a business. So that information is entered into the database for each entry of a counterfeit bank note.
These three sheets here just describe all of the counterfeit notes from a forensic basis.
Q. All right. And did you do any investigation as to where these counterfeit notes that you had determined were counterfeit and identified as either the 72 or the 32 numbers, where they came from in the United States?
A. That's more of an agent responsibility. I'm not a special agent. I rely solely on what's present on the SFS 1544 form, which is an inventory of the evidence that I examine.
So occasionally that will state on there seized from a purchase from a suspect. And that's the only information that is presented to me.
Q. Okay. And these last three pages, is this your report? Or is this -- this is --
A. These are printouts of sheets that appear in the database.

So when a field office receives a counterfeit bill, they would enter the identifying numbers into the database, and then they would rely upon this input that I provided.

So, for example, on page 12 you can see that it says at the top, circ'd by M. Dellibovi, that is my user name. So I circularized this counterfeit note, input it into the database, and provided this information.

Now any time a field office receives a counterfeit bill in, they are to confirm that each of these nine characteristics -- I believe there is ten characteristics listed here, each of these ten characteristics are present on the counterfeit note before they classify it as 23 -- this is 23332 variation M.

There is also an attached file, which is the Treasury seal image. And by clicking the downward arrow on the right side, in the field office they can view an image that I have scanned of the Treasury seal on that bill to further confirm that what they're looking at is the same.

Q. Okay. And if they confirm that, then they send it to you or one of your colleagues in Washington to be analyzed --

A. Only if it is still within the four to ten range. Otherwise they maintain it at their field offices, and destroy it after two years if it is not associated with a case.

Q. Okay. So once they have gone -- they have identified ten different counterfeit bills under this parent number, then if

they categorize one out in the field, unless for some reason you call for it, it does not come into headquarters?

A. The Counterfeit Tracking Application has a flag or a red text associated with it that will pop up when they enter a bill up until that tenth note.

So when the field office enters number nine, for example, the message will pop up asking them to submit it to headquarters. And then we will maintain it in our records at the Secret Service headquarters.

After that, they are stored locally in the field offices just because there is not a large enough facility to store millions of dollars worth of counterfeit.

Q. Okay. How many, if you can estimate, different suspected counterfeit bills did you analyze yourself, or your colleagues in Washington, D.C., with regard to the 72 and the 32 bills for this case?

A. I believe for this case alone I examined over 10,000. I'm not positive, but I think that's the calculation that I did at one time.

Q. 10,000 different suspected counterfeit bills?

A. I can't recall if it was bills or dollars. I cannot recall at this time, I'm sorry.

Q. Well, these are 50 and $100 bills, right?

A. Yeah.

Q. Okay. So it would have been some form --

A. I could refer back to my reports. On my reports I always inventory the quantity of bank notes that I have examined.
Q. Okay.
A. So that was just associated with the evidence in this case.
Q. In this case?
A. Correct.
Q. And what analysis did you do to those bills?
A. I conducted a microscopic examination. I confirmed that they were in fact counterfeit. So I looked for the printing processes used. In this case they were printed with offset lithography. Offset lithography has a distinctive characteristic of clean, even ink distribution, very crisp issues, which is easy to distinguish between that and the Intaglio printing that occurs on genuine, which is much thicker, it sits on the surface. It creates feathered edges where excess ink is pushed outwards. And there is also typographic printing on genuine, which creates a darker border around the serial numbers and Treasury seal.
So those characteristics were not present on these bills that I examined.
Then to classify the bills, I then pulled a reference note from our specimen library, I examined the entirety of the bank note and looked for consistencies and any dissimilarities that might be present. And overall I considered them to be

consistent, that there were no unexplainable differences between the bank notes. They appeared to be produced or at some point have originated from the same image.

And then I classified them as the respective circular number.

THE COURT: Okay. All right. Thank you.

Does counsel have questions?

MS. GINSBERG: A few.

THE COURT: Yes.

CROSS-EXAMINATION

BY MS. GINSBERG:

Q. Ms. Dellibovi, out of the, I don't know how many, the $70 million of counterfeit currency that you have associated with this case, what percentage of the bills would have been sent to headquarters to have someone with your experience examine them?

A. I am not sure of a percentage in this case. We could query any cases that may have existed in the past for any other cases that are related to the Russian/Israeli family or parent note 21158.

I know I personally have completed at least three other cases, two or three other cases associated with this, and have examined all of those bank notes.

Q. But would that be included in the four to ten that get sent from the field --

A. No.
Q. -- office to headquarters?
A. So those are just what we call NIE, or not in evidence. So any bank notes maintained at the field office level, they cannot be necessarily attributed to an individual. They're maintained at the field offices in case an investigation is conducted later on. And then those are attributed to the individual in that region, they could be sent for fingerprint examines. So they are maintained at the local level.
If a case is established regarding a defendant or a suspect, then all cases are submitted to Secret Service headquarters and all of the bills are examined.
Q. So in this case you were the individual who was examining the bills?
A. For this case, correct, I examined all of the counterfeit bank notes.
Q. Okay. And of the two circulars, the 72 and the 32 that the judge has asked you about --
A. As well as there were circular 23201, which were counterfeit 50s, I also examined those. And there were in total 12 circular numbers associated with images on the computer.
Q. All right. And you said in connection with the examination you did, you either examined $10,000 worth of --
A. I cannot recall.

Q. 10,000 bills or 10,000 --
A. I can't recall which. I didn't refresh my memory on that for today's hearing, I'm sorry.
Q. So if these were $100 bills, if it was $10,000 worth, that means you would have examined approximately 100 bills?
A. Quantity, I believe it was a quantity of $10,000 bank notes because I know I examined over 2,000 $50 bills at one time. So I believe the quantity I assessed was 10,000 bank notes.
Q. Once you start your process -- I believe in one of your reports you described the process that you go through for examining each bill, and I think you said that in order to do a proper examination, each bill, you would have to look at each bill, the examination would take at least 30 minutes?
A. I don't believe I ever stated that.
Q. Well, how long, from the time you have to go and retrieve the bill, go through your analysis of the printing -- whether the paper is the same, whether the printing processes are the same, your examination of the entirety of the bank note, how long would it take someone or how long does it generally take you to complete that process?
A. I don't think I've ever timed it, I'm sorry.
Q. It's certainly not something you do quickly?
A. The determination of counterfeit versus genuine is a rather quick one because typically the correct printing

processes are not used.

So, for example, if I observe offset lithographic printing, as in this case, immediately I was able to determine that it was a counterfeit bank note.

Then I would look through the other elements. I would look for the consistent printing characteristics. I would look to see that the paper was assembled using two sheets of paper with a water mark and a thread simulation between the two papers.

So it's different steps. And it depends on if I went through a whole stack of looking for the front plate defects, then looking for the back plate defects, and then the Treasury seal defects.

Q. Well, you said with respect to each of these circulars there is -- a 23332 has ten defects, 72 has 11 defects.

So you would have to look at -- you have to look carefully at each of these?

A. Yeah.

Q. And then you have to look at all of the other portions of the note, the front and the back, to see if there aren't dissimilarities in each of those?

A. Correct.

Q. So after having done this 10,000 times, you must be able to tell us approximately how long your examination of each bill takes to do it properly?

A. If I were to do one bill holistically, look for all of the characteristics, I might be able to determine that. But typically they are presented as a stack. And it's usually easier to layer them and examine all the fronts, and then all of the backs, and then all the Treasury seals, for example, rather than look at the first note as a whole.

It would be much longer and much more tedious to do it that way.

Q. So this is a tedious process?

A. It is a tedious process.

Q. And, honestly, after all these years of you performing this task, I can't believe that you can't tell us how long an average it takes you to examine one of these notes?

A. I've never had a reason to clock myself, sorry.

THE COURT: In this case, did you typically use the stack methodology that you just stated?

THE WITNESS: Yes, I did. Or as with images on the computer, opening one file, examining that file. Opening another file, examining that file.

So there was no -- between evidence there is going to be differences between the printing plates, the transparencies. It's not a one-size-fits-all examination.

THE COURT: Okay.

BY MS. GINSBERG: (Continuing)

Q. So what you are examining is whether each of these

separate notes matches the defects or characteristics on other notes that you have categorized in the database, correct?
A. Depending on the type of evidence, yes.
Q. And you said that a printing plate would produce -- one printing plate would produce the same the same types of defects on each of the notes, is that right?
A. On each of the notes produced with that particular printing plate, correct.
Q. And each printing plate would have -- the same would apply for each printing plate that was created from a digital image, is that correct?
A. Yes, I would be able to trace those same consistent regions back between the printing plate to the original.
Q. In fact, is that right, that a printer would start with a digital image, and then create a plate, create the transparencies that you've testified to?
A. Typically it begins with image acquisition in some form, either photographing or scanning a genuine bank note or obtaining the image from the Internet perhaps. Then that person would touch up or separate out any colors.
In order to print with the offset lithographic method, they would need a plate for each color. So in this case or in all bank notes, the Treasury seal interferes with black printing, the number 100, for example, and the green Treasury seal, they cover each other visually.

So an individual would need to edit the image in order to create the file that would be used to then create a transparency or a film of sorts.

That film would then be placed over a coated plate, exposed to light, which would develop the plate. And then that plate would be used to produce currency.

Those plates may wear out in time, but typically the same file or transparency is used in those. That's what we're referring to with the consistent characteristics.

Q. And the file, the digital file, that you said that can be acquired either on the Internet or on a CD presumably?

A. Possibly, yes.

Q. So you don't know how many copies of this original file exist?

A. No.

Q. So 20 different people could be starting with the same original digital file and creating plates and transparencies and essentially creating the same --

A. It's possible.

Q. -- the same counterfeit notes? And there is nothing that in your --

A. It's possible. And we would continue to associate them as being the same because they would have those same characteristics.

Q. So there is nothing about what you do in your examination

that makes it possible to know how many other people may have the same digital image to start with?

A. No. My examinations are not intended to point a finger at any particular person, but rather state that the images are compared to each other.

Q. Okay. And you wouldn't know how many people have copies of the same plates either?

A. No, I would not.

MS. GINSBERG: I think that's all the questions I have.

THE COURT: All right, thank you.

Any other counsel have questions for Ms. Dellibovi?

MR. AMOLSCH: Can I consult with Ms. Ginsberg for a moment, Your Honor?

THE COURT: Sure.

MR. AMOLSCH: I have one question, Judge, but I don't need to go first.

MR. GREENSPUN: Just a couple, please.

THE COURT: Oh, certainly.

BY MR. GREENSPUN:

Q. So you said that you're not -- your examination does not point to any particular person, is that correct?

A. Correct.

Q. All right. And the counterfeit notes or suspected counterfeit notes that you received from the 160 field offices

around the country -- and around the world actually, right?
A. Yeah.
Q. They could be sourced from 50 or 100 different counterfeiters who are unrelated to each other, couldn't they?
A. Sorry, can you repeat that?
Q. Sure. Those notes that are coming to headquarters to be checked as suspected counterfeit bills from field offices, they could come from 20 or 30 or 50 different counterfeiters who are unrelated to other, couldn't they?
A. Yes, as long as they had the same materials, the same equipment, correct.
Q. All right. And so, there is nothing in this case, since you didn't do the background investigation, that would allow you to know how many contributing counterfeiters there were in the bills that you examined, right?
A. No.
Q. Okay. And whether or not there were one or more separate -- just one conspiracy or multiple separate conspiracies?
MS. PEDERSEN: I am going to object. It calls for a legal conclusion by the witness.
THE COURT: She has already answered she can't answer that question. But answer it if you can, the best you can.
A. My job is to conduct forensic examinations, not investigative.

BY MR. GREENSPUN: (Continuing)
Q. All right. So you don't know how many distribution conspiracies Mr. Loz had from his same parent images, correct?
MS. PEDERSEN: Objection, the same objection.
A. No, I do not.
THE COURT: Overruled.
BY MR. GREENSPUN: (Continuing)
Q. Isn't that right?
A. No, I do not have any --
Q. Okay. I was a little unclear, and I'm often unclear.
If you had a stack of 1,000 suspected counterfeit notes, literally in a stack of $100 bills, do you look at each one of them?
A. Yes, I do.
Q. Okay. So you have number 1 through 1,000. Do you literally number them?
A. Yes.
Q. Okay. And you look at the front, you go through the front. Then you turn over the stack, figuratively speaking, and you look at the back. And then you turn it back over and you look at whatever the third category is, is that correct?
A. In varying orders, but, yes, all of those --
Q. But basically?
A. All of those regions are examined, correct.
Q. Okay. So if you can't say how long it takes you to look

at one bill, to look at a thousand on the front, a thousand on the back, in whatever order you do it in, is that taking you a day, a week, two weeks?

How long is that going to take you?

A. I would say over a week, but I do not --

Q. Okay.

A. I conducted my examination several months ago, so I don't know --

Q. I understand. But you would expect that to go through the 1,000 suspected $100 counterfeit bills, that it would take you a week, give or take, a work week, five, six, seven days, something like that?

A. I would say over that.

Q. Over that. All right. And the two-and-a-half or $2.6 million seized at the warehouse in this case, did you examine those?

A. Yes, I did.

Q. And were they in cut bills or sheets?

A. There were cut bills.

Q. Okay. And did you examine all of those?

A. I'm sorry, I've examined sheets as well as cut bills.

Q. As far as cut bills, there were a lot of cut bills, right?

A. Yes.

Q. Did you examine every one of those?

A. Yes, I did.

Q. Okay. And how many -- was that included in the 10,000?
A. Yes.
Q. Is there any quality assurance, to your knowledge, of the field special agents, or I think you said administrative assistants, who are doing the preliminary examines at the field offices?
Other than their day-and-a-half of training and then their training on how to input the information into the computer, so somebody does that in 2010, do you know if there is any quality assurance or retraining --
A. I know there are -- well, I have provided further continual training to the field offices, as well we've conducted VTC trainings --
Q. What is that?
A. Sorry, video teleconference trainings. We have conducted some conference calls. Whenever we create new PowerPoints or training tutorials, we provide those via a shared drive on the computer system that the field offices can refer back to.
Typically there are e-mails sent out via a router that provide any images or additional training tutorial materials that we might have.
Q. Okay. So that is information that comes out from headquarters?
A. Correct.
Q. But is there anything to determine how well or how

competently the information is received and whether or not the agents or administrative assistants who are examining the suspected bills locally, how well they're doing it?
A. I know that field offices goes through inspections. I'm not sure what an inspection entails.
Q. You're not part of that?
A. Because I'm not the field offices, correct.
Q. Okay. And just so I'm clear, so when it gets to be nine or ten bills, they are sent to headquarters, and basically you're doing a more detailed and true forensic check of those bills, is that correct?
A. Yes.
Q. But if there were 100 bills back at the field office in Boise, then bills 11 through 100, they stay in Boise?
A. Correct.
Q. All right. And if those are different from bills one through ten, there is no way for you to know that? If there is defects that are different --
A. The field office, in order to classify it, is to go through these criteria in the database and make sure that it meets all of those requirements.
If it does not, then they have a realm of -- they can submit it to us for further examination and then we would classify that bill --
Q. But that relies --

A. -- if it does not meet these requirements.
Q. Sorry, I didn't mean to overspeak you. That relies on what they're doing there? You wouldn't be part of that?
A. Correct.
Q. And you look for similarities, but you don't necessarily look for and compare dissimilarities, do you?
A. Yes, I do.
Q. Some of these --
A. That is grounds for me not to classify something.
Q. Some of these bills had dissimilarities, didn't they?
A. Between different circulars, correct.
Q. Yes.
A. They do. A circular contains all the same characteristics. Two different circulars would have different characteristics, so they would be dissimilar.

For example, the 23332 is distinctively different from the 22272.
Q. And did you find any that had dissimilarities that were dissimilar, different from 23332 and 72?
A. I'm sorry.
Q. Did you find any --
A. Within those classifications? No, I would not have classified them as the circular if I found dissimilarities between them.

My classification confirms that I have examined all

of the characteristics and I affirm that they are consistent with each other.

MR. GREENSPUN: Okay. Thank you, Judge.

THE COURT: All right. All right, Mr. Amolsch, did you want to --

MR. AMOLSCH: I am fine, Your Honor, thank you.

THE COURT: Mr. Yamamoto, Mr. Andrews, did you have any questions?

MR. YAMAMOTO: No.

THE COURT: All right. Then Ms. Pedersen.

MS. PEDERSEN: I just have one or two questions for clarification.

REDIRECT EXAMINATION

BY MS. PEDERSEN:

Q. You indicated that you examined back notes, plates, transparencies, and computer files, correct?

A. Correct.

Q. Did you examine any other items from the warehouse in New Jersey?

A. Yes. I know I examined metal dies. The metal dies are known as hot stamping dies, they would be used to transfer foils, which is similar to the foil transfer that was seen between the two sheets of paper.

Q. What did these foils have, hot stamping foils have? Do they have an image on it?

A. They have an image of Benjamin Franklin or the likeness of Benjamin Franklin. As well as there were some metal dies with the text 100 USA.
Q. Did you see or examine any paper?
A. Yes.
Q. What kind of paper?
A. I examined both glued paper where it is two plies glued together, as well as separate sheets containing those foil transfers I mentioned of Benjamin Franklin's likeness and the text 100 USA.
Q. Did you see or examine any paper which was not a completed or cut counterfeit bill?
A. Correct, I did. I found some that were in whole sheets. There were also some that had an embedded, what I believe to be a 3-D ribbon simulation for the new $100 bill.
There were some uncut sheets of both glued and unglued bearing three vertical images of Benjamin Franklin and the text 100 USA running through them, the length of them.
Q. Did you notice any types of security features either on -- on any of the items, the physical items that you saw in the warehouse?
A. All of the bank -- sorry, are you everything to bank notes or the --
Q. The security features or simulated security features.
A. Yes. So there were the metal dies -- sorry, I'm not sure

what you're referring to.
Q. Like the 3-D ribbon.
A. I did find 3-D ribbon, uncut sheets of 3-D security ribbons. Sheets of paper with cut strips of 3-D security ribbon simulations woven into them.
There were various different types of inks that could have been potentially used to simulate optically variable ink. There were magnetic inks present which may have been used in machine readable features.
Q. Did you actually have occasion to go to the warehouse the day of the search warrant?
A. I did.
Q. So you were present --
A. I was present.
Q. -- at or near the time the agents were searching?
A. Yes.
Q. And did you also see machinery or equipment there as well?
A. Yes. Several offset printing presses. Hot foil stamping equipment on a three different letter press machines. There was an industrial paper cutter. A thermographic -- thermography machine. There was plate development equipment.
So image setters, for example, which would be used to make the films, which would then be used in a plate developing container.
So I concluded that the facility was used as a

counterfeit production facility.
Q. And that facility was in New Jersey, correct?
A. Correct.
Q. Did you have occasion to go to the storage unit in New York?
A. No, I did not.
Q. Are you aware of what, if anything, was seized from there?
A. I was supplied with -- on a 1544 I was supplied with some counterfeit notes that according to the 1544, it stated they were seized from that warehouse.
Q. And did you examine stacks from the New York storage facility?
A. Yes.
Q. Do you happen to remember what increments or how many were in each stack that you examined?
A. I believe they were in about 900 note increments, I'm --
Q. Could it be 999?
A. That's what I was inclined to say, 999.
Q. Do you recall how many separate stacks of 999 separate bills you examined?
A. There were three different stacks.
Q. And was that a representative sample from the bills from that storage unit?
A. That I am not aware of.
Q. But your recollection is 999?

A. What was submitted to me were three different stacks that became three different variations. I classified them as variations, I believe, K, L, and M of circular 23332. And the different variation letters indicate that they had different back plate numbers. However, the characteristics on them were consistent between them.

MS. PEDERSEN: Okay. I have no further questions.

THE COURT: Okay. All right, thank you, you may step.

MR. GREENSPUN: Judge, I'm sorry, could I ask just a couple questions in response to that?

THE COURT: Yes, go ahead.

RECROSS-EXAMINATION

BY MR. GREENSPUN:

Q. Do you recall when you issued your first report in this case after the end of May of last year?

A. I do not recall.

Q. Okay. Do you have that here?

A. Not on me. I'm not sure if Ms. Pedersen has it.

Q. So the three stacks that Ms. Pedersen just asked you about, was that only part of what you examined, or was that the totality of the bills that you examined?

A. As all of the evidence in this case? That was only a portion of all of the evidence.

Q. Where did the other bills come from?

A. Other bills? I've examined -- there were some that were at the warehouse itself, I believe.
Q. Were they in stacks, or were they loose, miscellaneous?
A. I don't know.
Q. Okay. They were provided to you -- well, you were there?
A. Yes, but I did not seize any of the evidence myself, that is not my role.
Q. Okay.
A. I was there to advise on what equipment was present because my specialized experience is in the printing equipment, whereas agents would not --
Q. I understand.
A. -- be able to identify that.
Q. Okay. And where else were the bills from that you examined, do you know?
A. I believe I was told that some were submitted, according to the 1544 forms, some were submitted from different buys that occurred or purchases between defendants. I believe some were submitted from Mr. Bangiyev and Mr. Lee's previous convictions, notes that had still been held at the Secret Service.
Q. And you believe that there were as many as 7,000 other bills beyond the three stacks of 999 that you went through, roughly?
A. I believe so, correct.
Q. Okay. Thank you.

A. As well as 4,000 computer images and plates.

MR. GREENSPUN: All right.

THE COURT: All right. Anybody else? I'm sorry.

All right, you may step down. Thank you.

NOTE: The witness stood down.

THE COURT: All right, Mr. Amolsch, you had questions you wanted to ask Special Agent Gaab, is that correct?

MR. AMOLSCH: I do, Your Honor. It could take probably a half an hour or so. Do you want to press on now or do you want to break for lunch?

THE COURT: I don't want to break for lunch.

Special Agent, let's come forward and be sworn, please.

And I can't imagine that you have a half an hour, but we'll see.

MR. AMOLSCH: Hopefully not, Judge.

NOTE: The witness is sworn.

ADAM GAAB, called by counsel for defendant Fakiro, first being duly sworn, testifies and states:

DIRECT EXAMINATION

BY MR. AMOLSCH:

Q. Good afternoon, Agent Gaab.

A. Good afternoon.

Q. Okay. Let's just jump right into it. The amount of money that was seized during the seizure of the storage unit and the

warehouse at the time you effectuated the arrests was the $2.5 million or $2.56 million that was found in the shoe box -- I mean, in the brown box?
A. Inside the storage shed was the brown box with $2.56 million.
Q. Okay. And I know there was a picture of the brown box at some point, but how big was it? About like this big?
A. About the normal cardboard size box. Like a liquor store box.
Q. All right. And I understand that Mr. Loz says that prior to the arrest being effectuated, that he had delivered money to Mr. Bangiyev? He had left the hotel where he was staying and had gone to meet the Bangiyevs to deliver another package of money?
A. Mr. Loz stated that he met Eduard Bangiyev and gave him an extra amount of counterfeit.
Q. All right. And Mr. Bangiyev -- and when he was interviewed, did he confirm that, that that meeting took place?
A. Mr. Bangiyev confirmed that he met Loz to receive -- Eduard Bangiyev stated he met Loz to receive $1.8 million.
Q. Mr. Loz said it was how much?
A. Mr. Loz said it was $2.8 million.
Q. Okay. So we have a difference of a million dollars in terms of currency, but assuming we add up 2.5 and 2.8, that comes out to $5.3 million?

A. Correct.

Q. Okay. Now, I have a few questions about Mr. -- well, before we get to that, the warehouse, as I understand it, was under surveillance from about February 14 until May 28, 2014, does that sound right?

A. That's correct.

Q. And I remember reading from the surveillance notes that the surveillance was, if not entirely around the clock, but largely around the clock? There were midnight shifts and mid-day shifts and morning shifts?

A. Typically the surveillance was for 16 hours a day. Typically we didn't have an agent at the warehouse during the midnight hours.

We would typically watch the defendants leave in the morning, follow them to the warehouse, and remain there while they're at the warehouse until they returned to the hotel for the night.

So it depended upon what time Mr. Loz or Mr. Fakiro or the Borohovs exited the warehouse and went back to their hotels.

Q. All right. So you would catch them as they left, go to the warehouse, watch what they did, catch them as they left to go back to the hotel, and then you would terminate surveillance?

A. That was the typical day.

Q. In that surveillance, were you aware of any counterfeit money coming out of the warehouse during that time?
A. I was not aware of any counterfeit money coming out of the warehouse as a final product until May 27, the day before they were arrested.
Q. Until the 2.5 --
A. Prior to that there were several piece of evidence that were found in the trash that were showing that counterfeit was being produced in the warehouse, but not a final.
Q. Was this the new bill or the old bill?
A. In the trash we found evidence of both the new bill and the old bill being produced.
Q. In terms of actual money, all that came out was the 4.3 or 5.3?
A. As a final product, yes.
Q. Got you. Okay. Now, Mr. Fakiro arrived in the U.S. in 2014, in January of 2014?
A. His last arrival to the U.S. was that time frame, correct.
Q. In 2014?
A. He was here previous.
Q. So his first arrival, maybe overall last arrival, but his first arrival in 2014 was in January?
A. Correct.
Q. Had you -- when he arrived, was there anybody surveilling his arrival? Or did the Secret Service have any idea who he

was?
A. We did not know who Mr. Fakiro was at that time. It was -- I don't recall the exact date, but it was several weeks later we identified -- let me rephrase.
So we were aware of Mr. Fakiro actually I think the following day because we had run a Facebook search on Mr. Loz' cell phone, and we identified him. And Mr. Fakiro was on the same travel itinerary with Mr. Loz.
So we were aware of the name. We weren't able to identify that Loz was present until later at the warehouse when surveillance started.
Q. Okay. But after his arrival, whether it was the next day or a couple weeks later?
A. That's correct.
Q. Okay. How long -- there were a bunch of wiretaps that had been authorized in this case. When was the first wiretap?
A. The first wiretap was initiated in June 2014.
Q. June of 2014?
A. Excuse me, 2013.
Q. 2013. So from June 2013 until Mr. Fakiro's arrival, you had never heard his name on any of those wiretaps?
A. That's correct.
Q. You had never heard anybody talking about Mr. Loz having any sort of business partner in this operation?
A. There was one intercepted phone call where Mr. Loz told

Arkadiy Bangiyev that they are preparing to glue it.
Q. Okay.
A. So I knew that there were multiple individuals involved in this printing of the counterfeit, but I did not specifically know that Ronen Fakiro was involved.
Q. All right. So there were people who were gluing and -- he had people working with him, for him, in the actual production of the notes?
A. Correct.
Q. How many hours, if you know, how many hours of wiretaps do you think that was?
A. With all the defendants?
Q. Yeah, from June 2013 --
A. I don't know the exact. I would say several hundred hours.
Q. Several hundred hours. Okay. Did you analyze the cell phone records of people within the conspiracy, like Eddie's cell phone, Alex's?
A. Yes.
Q. Did Mr. Fakiro's telephone number show up on any of those cell phone records or a number associated with him?
A. They showed up in Mr. Loz' pen register data.
Q. Mr. Loz, but not Mr. Fakiro?
A. Mr. Loz and Mr. Fakiro contacted each other.
Q. I understand. But other than communication between Mr.

Loz and Mr. Fakiro, was there any pen register information related to the Bangiyevs, or to Johnny Lee, or to Mr. Buchanan, or any of the other people involved?
A. I'm not aware of that.
Q. You also did, I think, fingerprint analysis of some of the bills?
A. I did not conduct it, but the Secret Service conducted fingerprint analysis.
Q. Did you find any fingerprints of Mr. Fakiro on any of the bills?
A. The Secret Service did not identify any fingerprints of Mr. Fakiro.
Q. Did you ask either Eddie or Alex Bangiyev if they were aware of Mr. Fakiro's involvement in the conspiracy?
A. Yes, I did.
Q. What did they say?
A. Alex had stated to us that in July of 2013 that an individual by the direction of Mr. Loz was -- Mr. Loz directed Alex to go to a hotel, the Lexington Inn in New York and meet somebody there to get a shipment of counterfeit.
Alex advised us that Mr. Loz was speaking in Hebrew on the phone with somebody that he didn't know. That at Loz' direction an unknown individual opened the trunk of a car, and inside of that was a black bag that consisted of the counterfeit.

Alex stated -- Arkadiy stated to us that he did not know the individual at that time, but Loz had told him after their arrest in jail that it was Ronen Fakiro.

Q. So just to cut through all of that, Mr. Bangiyev never saw Mr. Fakiro involved in any transfer of counterfeit currency?

A. Alex and Eddie did not advise me that they knew who Fakiro was prior to that.

Q. I am going to come back to that, so let's remember that.

Okay. Let's talk about just -- I don't think I need to burden the Court with this, but is it fair to say that Mr. Loz' ability to tell the truth is somewhat suspect?

MS. PEDERSEN: Objection, it's an improper question.

THE COURT: If you can answer the question, answer the question. You know, it is a very general question.

BY MR. AMOLSCH: (Continuing)

Q. Okay. How wide was --

THE COURT: I mean, you have -- you know.

Q. Okay. Tell me about the diamond fraud in Israel. Did Mr. Loz claim, falsely claim that a diamond had been stolen or somehow lost?

A. Mr. Loz stated to us that he had falsely submitted an affidavit claiming that a diamond from Israel was shipped by him.

Q. Okay. And that was not true, correct?

A. Mr. Loz says that is not true.

Q. Okay. Did he lie again -- how many times did he tell that lie, just the one time or several times, regarding the diamond?
A. I believe that we only asked him about that one time.
Q. Okay. I will move on, Judge. I think the point is made.
THE COURT: Thank you.
Q. Okay. So let me just get a brief understanding of the smuggling pattern of Mr. Loz. That he said he started printing and selling money in Israel in 2004, and that he was bringing it into the country using human couriers, is that correct?
A. Mr. Loz stated that he started producing the counterfeit a little bit before 2004 actually, 2003.
Q. Okay. And about 300 to $400,000 at a time?
A. In the very beginning, the first --
Q. Right. I am trying to start from the very beginning and then we are going to move up --
A. So let's say the very first order of counterfeit that he produced was 300 to $400,000.
Q. And that he was smuggling it into the country using people?
A. He didn't claim to smuggle that initial -- he claimed that he gave it to another individual in Israel.
Q. Okay. But, I'm sorry, maybe I'm being unclear.
The method by which he got it into the country was having somebody carry it across?
A. Into --

Q. Into the U.S.?
A. Mr. Loz stated that from 2004 on, that he smuggled the counterfeit in shipping containers that contained machine parts.
Q. Yeah, we're going to get to that in just a second. I'm not trying to be argumentative. I'm just trying to make sure I understand.
A. I might not understand your question.
Q. Okay. My understanding is that initially he was smuggling smaller amounts of money than he later on started to smuggle, produce. That it was -- I have it here in the Government's pleading --
A. I am not aware of Mr. Loz ever saying that he personally smuggled it on his person.
Q. That wasn't my question. Maybe that's a mistake.
Not that he personally smuggled it, but that he was using, I believe the Government's language is that he was using human couriers to bring the money into the United States.
A. At times there were human couriers being the counterfeit into the United States.
Q. Okay. This is what the Government's pleading says: That he began to print 300 to 400,000 in Israel for sale and distribution to others. That he had been using human couriers to smuggle the U.S. currency into the United States, but wanted to significantly increase the volume of the counterfeit sold

here.

Is that accurate?

A. Yes.

Q. Okay. So when he moves from the 3 to $400,000, he says in various places, it was either 4 to $5 million in a shipment or 3 to $4 million in a shipment. That he began to use it, smuggling it in the shrink wrapped inside these machines, is that correct?

A. What Mr. Loz stated was the first shipment was $1.2 million that he sent to Canada and drove across into the U.S. Then after that, the average shipment was 2 to 3 million, until 2011 it increased to 4 to 5 million, approximately.

Q. All right. There is not a huge argument there, but Loz said he typically manufactured $3 million of counterfeit money and currency in Israel four times --

THE COURT: Are you reading from the MOIs or are you reading from --

MS. PEDERSEN: From the Government's pleadings.

THE COURT: All right. It's a summary of what they think the MOIs state, but the MOIs are obviously the more accurate information. So if you have those, use those.

MR. AMOLSCH: Okay.

BY MR. AMOLSCH: (Continuing)

Q. Now, the person he was using, as I understand it, to -- he was using a company called Ventura, which is a printing company

in Israel?
A. AM Ventura.
Q. And that is owned or at least associated with Jacob Ventura?
A. Correct.
Q. And Jacob Ventura is the husband of Iris Ventura, correct?
A. Correct.
Q. And Iris Ventura's brother is Amir Porat, who owns United Auto Ship, the company in Los Angeles?
A. Universal Auto.
Q. Universal Auto, is that correct?
A. Correct.
Q. So the way it would work is that Mr. Fakiro would pack the money in Ventura printing presses, label them to be shipped to Universal Auto --
THE COURT: Mr. Fakiro did that?
MR. AMOLSCH: No, Mr. Loz did that, I'm sorry.
BY MR. AMOLSCH: (Continuing)
Q. Mr. Loz loaded them in the machines, had them to be delivered for Universal Auto, and then Mr. Loz would pick them up and take the money out?
A. Correct.
Q. Okay. Did you interview -- how many times do you think based on your chart, the Government's exhibit, I believe Mr. Greenspun estimated there was about 25 times that that

happened, is that correct?
A. I'm sorry?
Q. Mr. Greenspun, I believe, said he estimated there were about 25 different -- how many imports were there?
A. I believe it was approximately 17.
Q. So 17 imports. Okay. Did you speak to --
A. Can I clarify that?
Q. Sure.
A. Some of those imports were for printing machinery used to manufacture actual counterfeit in 2006. And that also includes the last import from January that included the machinery to produce the counterfeit in Cherry Hill, New Jersey.
So all 17 weren't smuggling counterfeit currency into the U.S.
Q. How many times did Mr. Loz say --
A. There were two times that Loz had imported counterfeit equipment to manufacture counterfeit inside the United States. The rest were to smuggle the counterfeit.
Q. So there is 17, two of which were machinery, 15 of which was counterfeit money?
A. That's my understanding.
Q. Okay. Did you interview Mr. Porat at Universal Auto about this once you discover that his company was being used?
A. I did not interview Mr. Porat in Las Angeles.
Q. Did anybody from the Secret Service or the FBI?

A. Yes.
Q. And did he claim to have no knowledge of what was going on?
A. He had knowledge that things were being imported under his business, but he did not claim that he knew it was for counterfeit -- to smuggle counterfeit currency.
Q. What did he say that Mr. Loz told him? Do you remember?
A. I don't recall the exact statements that he made.
Q. All right. My understanding is then -- and then would you ask -- I'm sorry. Did Mr. Porat claim to have ever heard of Mr. Fakiro, are you wary of that?
A. I don't recall that.
Q. My understanding is then that Mr. Loz was worried about being detected in Israel, and that he moved his operation from Israel to the United States to be more careful about being caught and to increase the likelihood that he could continue this without being detected.
A. Can you just clarify if you are talking about moving to America in 2006, or are you talking about moving in --
Q. 2011 when he -- my understanding was that he decided to move his operation from Israel to the United States.
A. To Cherry Hill, New Jersey?
Q. Yeah, eventually to Cherry Hill, New Jersey. When did he move his operation to the United States, the printing --
A. Mr. Loz first moved his operation to America in June of

2006. He came over and set up a printing operation in New York during that time, from June 2006 until March 2007. That's the first time that Mr. Loz came to America.

The second time that he came is the most recent where they came in January.

Q. Okay. So there was no "operation" between 2007 and December 2013, January?

A. No, that's not correct. After Mr. Bangiyev was arrested, Loz exported all the printing equipment from New York back to Israel, and he continued to produce counterfeit from 2008 until 2013 in Israel.

Q. Okay. Again, my mistake, I'm talking about a U.S. operation. I am not talking about his general operation.

A. Correct, from March of 2007 until January 2014, Mr. Loz does not say that the money was being made domestically in the U.S.

Q. Okay.

THE COURT: I need you to speak up just a little bit.

THE WITNESS: I'm sorry.

THE COURT: You are tailing off at the end of your answers.

THE WITNESS: I'm sorry.

BY MR. AMOLSCH: (Continuing)

Q. Did he tell you why in his interviews that he decided to move the operation again in January 2014?

A. Mr. Loz stated that he was concerned that law enforcement was aware of the counterfeit, and thought it would be better for them to move it to America so they don't have to worry about getting caught going through Customs.
Q. All right. When Mr. Loz was interviewed, he initially told you that Mr. Fakiro's involvement in the conspiracy happened much later, much nearer the end. That his involvement began around 2014, and that he had no prior involvement in the conspiracy prior to that?
A. Initially, correct.
Q. Okay. And then in a separate interview or separate series of interviews, he then changed that story to talk about Mr. Loz' and Mr. Fakiro's involvement with him beginning in 2011?
A. That is correct.
Q. And I believe he gave you two examples, I think he said, of his active participation in the conspiracy, one in 2011 when he, Mr. Loz says he delivered money to the Bangiyevs, and again this 2013 money transfer again to Alex Bangiyev as examples of his involvement in the conspiracy, is that correct?
A. Sorry, can you repeat the question?
Q. Mr. Loz gave you examples of what he said was Mr. Fakiro's involvement in the conspiracy prior to 2014 when he initially said Mr. Fakiro became involved?
A. That's correct.
Q. And he said that there was an incident in 2011, and this

is referenced in the Government's pleading, there is an incident in 2011 when Mr. Fakiro allegedly delivered counterfeit currency to Alex Bangiyev, and again in 2013, the July of 2013 incident we talked about earlier with the popping of the trunk?

A. Mr. Loz stated that he showed Mr. Fakiro a counterfeit bill in 2011. And that after a couple days -- and asked him if he would help him manufacture the counterfeit currency. Mr. Loz stated that after a couple days Fakiro agreed to join him in producing the counterfeit.

Early in 2011 Mr. Loz stated that Mr. Fakiro and the Borohovs helped him move machinery from one location where they were making counterfeit to another location.

Mr. Loz stated that Mr. Fakiro then helped manufacture counterfeit currency from 2011 all the way until their arrest. And then, yes, specifically in 2013 Mr. Loz stated that on his behalf Fakiro went to the U.S. and met Alex Bangiyev to give him a shipment of counterfeit.

Q. And to put this kindly, Agent, did you tell Mr. Loz that you did not believe his story about Mr. Fakiro prior to the second interview and encourage him to change his story?

A. I don't recall if those were the exact words that were said, but we did make it clear to Mr. Loz and his attorneys that we thought there was some untruthfulness in his first part.

Q. And he then changed his story to one more in line with your theory of the case?
A. He changed his story to what he told me. I never told him what my theory was as far as specifics.
Q. You told him that you didn't believe what he was saying?
A. Correct.
MR. AMOLSCH: Judge, can I ask Mr. Ruelas for a cup of water?
THE COURT: Yes, sir.
Q. So let's talk about the 2011 transfer of money which the Government references in their pleading to Alex Bangiyev.
Now, my understanding is that Mr. Loz was bringing in at this point $3 million, I believe you testified earlier, around 2011 he is bringing in $3 million at a shot and delivering it to the Bangiyevs, and he is doing that four times a year?
A. Correct. I believe that Mr. Loz said that from 2008 to 2011 it was approximately 2 to 3 million, and after 2011 it was approximately 4 to 5 million.
Q. Okay. So, 2 to $3 million at a time. Okay.
The MOI for Mr. Loz regarding this says the following: Loz stated he delivered a shipment of counterfeit currency in 2011. He stated during this transaction Ronen Fakiro was present.
So Mr. Fakiro was present with Mr. Loz and Mr.

Bangiyev at the time of this transaction, according to this.

That at the time the money was transported in a suitcase in the trunk of Mr. Loz' car. And Mr. Loz arrived at 64th Street around noon. So right in the middle of the day. And that Loz and Fakiro were there. Loz took the suitcase out of the trunk and gave it to Alex. According to Loz, most of the time they counted the packs of the counterfeit Treasuries later, but this time Alex counted the notes at the car to make sure the whole package was there.

Do you remember Mr. Loz saying that?

A. Yes.

Q. Okay. So if this is to be believed, at noon, in a wide open space, Mr. Bangiyev is counting out 30,000 $100 bills while Mr. Fakiro and theoretically anybody else who happens to be walking by is witnessing this?

A. It's my understanding that the defendants in the case did not -- when they counted the money, it was not counting every specific bill. They were packaged normally in quantities of $10,000 and rubber banded. They would count the stacks of counterfeit to figure out how much money was in the bag.

Q. According to the MOIs, it says: According to Loz, most of the time they counted the packs.

A. Correct, the packs.

Q. Most of the time. Loz said that Alex counted the notes this time to make sure the whole package was there.

So Mr. Loz, if he is to be believed, says that normally they would count the packs later, but this time to make sure it was there, he counted the notes at the trunk of the car at noon.

A. If that's what's in the MOI, then --

Q. That's what Mr. Loz said? If you were -- so there is $3 million we'll say, either 2 to 3, 4 to 5, depending upon when the transfer took place. We can agree there is 30,000 $100 notes in $3 million, correct? That's the math, right?

A. I believe so.

Q. All right.

THE COURT: Let me interrupt you for a second there.

Do the defendants' counsel want each of the defendants still to be able to hear this examination of the agent even though it concerns Mr. Fakiro who speaks English, I think, right?

Does your client speak English?

MR. AMOLSCH: I am sorry?

THE COURT: Mr. Fakiro, is he working through a translator?

MR. AMOLSCH: He is, Judge, but only for when he is speaking. He does not need the translator for the purposes of understanding what's going on.

THE COURT: So you have haven't been translating this for --

THE INTERPRETER: I've taken a break for about ten minutes.

THE COURT: Okay. And that's fine with everybody? I just want to make sure that the record reflects that everybody is fine. So the Borohovs aren't getting this translated, and that's okay with you, counsel?

MR. ANDREWS: It is, Your Honor.

THE COURT: Okay. All right. Thank you.

Go ahead, ask your next question.

BY MR. AMOLSCH: (Continuing)

Q. Do you have any idea how long it would take?

A. I have no idea how long that would take.

Q. You said this happened in 2011, right?

A. That's what Mr. Loz stated.

Q. There is a chart that you put together detailing Mr. Loz' arrivals, I think it is Government's Exhibit C -- I am sorry, Mr. Loz' arrivals, as well as various importations to Universal Auto, this is Government's Exhibit C.

Did you put this together, have you seen this?

A. Yes, I did.

Q. In 2011, this is what's listed. May 9, 2011, Loz enters the U.S. May 9, 2011, Universal Auto Imports, one shrink wrapped package comes in. May 12, 2011, Loz deports.

So there is a time when Mr. Loz comes in by himself, brings money, and departs like three days later.

Then we have Mr. Loz comes in June 8, and June 13 Loz departs.

And we have another shipment on August 17, 2011, where a shipment comes in. August 18 Mr. Loz enters by himself and departs August 29 by himself.

And then in 2011 we have Loz and Fakiro entering the U.S. at the same time with no import and departing October 30, 2011.

Do you agree with that --

THE COURT: And the question is?

Q. Do you agree that that's what that says?

A. What --

Q. I can show it. I can put it up here.

THE COURT: Who generated that?

MR. AMOLSCH: It is the Government's Exhibit C.

THE COURT: Are you familiar with that?

THE WITNESS: I generated it, Your Honor. I just don't know the exact dates off my head before I answer that that is correct what he just stated.

THE COURT: Okay.

BY MR. AMOLSCH: (Continuing)

Q. Can you see that okay?

A. Yes.

Q. Do you see the beginning May 9, 2011?

A. Yes.

Q. And ending October 30, 2011?
A. Yes.
Q. Okay. And you would agree with me that there is no importation of money that happens in that particular time?
A. From May until October?
Q. Well, when Mr. Fakiro and Mr. Loz are here together with Mr. Fakiro allegedly present with Mr. Loz while he hand delivers $3 million to Bangiyev, it looks to me that no money has come in corresponding to your entry --
THE COURT: You ask a question, and then you stop for a second, he starts to answer it, then you add to your question, and he has to rephrase.
MR. AMOLSCH: I apologize, Judge. I was trying to --
THE COURT: Let him answer the question.
Do you understand the question?
THE WITNESS: No.
BY MR. AMOLSCH: (Continuing)
Q. Let's start again. There is May 9, this lists the travel departure dates and entry dates of Mr. Loz and Mr. Fakiro and Universal Auto Import containers. This is what this shows starting in April 14, 2010, at the top --
THE COURT: Between the time they arrived together and they left, was there any evidence that a shipment of counterfeit money arrived?
THE WITNESS: There was no import during the time

period in October 2011 when Loz and Fakiro were here together.

In this Mr. Loz had stated that they had imported counterfeit -- or he had imported counterfeit previously, took it to the storage shed, and they would hold money at the storage shed. The exact date that Mr. Loz is saying Fakiro and Alex met was -- I don't have the exact date, he just said it was 2011. I'm not sure what month that was.

BY MR. AMOLSCH: (Continuing)

Q. Well, okay, let's talk about that for a second. Mr. Loz' MOI, MOIs, and the Government's pleading citing the MOI say that -- this is on page 21. That in 2011 Alex began giving shipments of 4 to $5 million worth of counterfeit bills to the Bangiyevs.

And I took from that that Mr. Fakiro -- I am sorry, Mr. Loz, when he brought them in, was then giving them directly to the Bangiyevs so they could resell it as part -- that's what they did, right? They were reselling the bills that he provided to them?

A. That's correct.

Q. Okay. So you're now saying that -- and this is not in the MOI that I could see, that Mr. Loz said this particular time when we came in either in June 2011 or August of 2011, I didn't give it to the Bangiyevs, I put it in the storage facility?

A. What I'm saying is that what Mr. Loz stated to us is that in 2011 he traveled with Ronen Fakiro to America for the

purpose of passing counterfeit -- excuse me, selling counterfeit U.S. currency to the Bangiyevs.

Mr. Loz stated that Fakiro was involved in Israel and was interested in what happens to America, and he came as a travel partner with Loz in 2011.

Q. We will talk about that in just a second, but I want to talk about other part you just talked about.

This is a chart that you prepared for me, thank you, showing, I will put it up on the screen, the times when -- it doesn't go back as far as I would like it to.

I will show you the chart, you can maybe use it for illustrative purposes. This is a chart that you prepared, and we have copies to provide to the Court, outlining the times that Mr. Loz and Mr. Fakiro came into the country, and when imports were also present, and when there were spikes in -- and I have one for the Court if you would like -- when there were spikes in counterfeit currency hitting the street. And that's what this is supposed to show.

For instance, there is -- let's see if I can move it up a little bit. Like look at, for instance, under Loz enters in 12/19/2012, departs on January 3, '13, and there is money that goes up.

There is 5/3/2013. May 2013 when there is an import and Mr. Loz enters and the currency goes up.

Do you agree with that? That basically the rise in

currency corresponds to -- I'm sorry, I didn't mean to take that down -- corresponds to the imports coming into the country?

A. The chart is describing that all 12 circulars that were found in the computers from the warehouse, including the 32 and 72 that we've discussed earlier today, the charts depicting the amount of counterfeit currency that the Secret Service was aware of that was domestically seized or passed either through financial institutions or seized by law enforcement, it is a weekly breakdown of it.

So the bottom line shows that every week it's broken down into the activity date, meaning that the bill was passed through the financial institutions or seized by law enforcement.

The arrows that I placed in the charts are showing the travel dates or imports of the AM Ventura's imports.

Q. All right. Now --

THE COURT: The travel of who?

THE WITNESS: So the arrows will show the travel of Loz when he arrived and departed separately, and it will also show that Loz and Fakiro traveled and departed together.

THE COURT: All right. I give up, maybe because I'm hungry, I'm getting impatient with you and the non-scissor like questioning, although I have allowed you cross-examination and leading.

So given that it must be me instead of you --

MR. AMOLSCH: Yes.

THE COURT: -- let's take our lunch break. And I know we have to get through the Borohovs as well.

MR. AMOLSCH: I understand. I have just two questions as it relates to this May 11 one and then I am done, or do you want to just pick that up --

THE COURT: Oh, no, please, if you have got two questions left then --

MR. AMOLSCH: Okay.

THE COURT: Can I hold you to that?

MR. AMOLSCH: Yes.

BY MR. AMOLSCH: (Continuing)

Q. According to this chart, the amount of currency seized by the U.S. Secret Service on October 30, 2011, when Loz and Fakiro allegedly made a delivery to Alex Bangiyev, the amount of currency on the street actually went down, am I reading that correctly, over the next two months?

A. I believe it's the one-month period, but, yes.

MR. AMOLSCH: Okay. Thank you, Judge. That was two.

THE COURT: All right. Thank you. Does anybody else have examination questions for the special agent? That would include the Borohovs.

MR. AMOLSCH: Well, Judge, I'm sorry, I don't mean to be rude, I have a sole series of questions about the 2013 one.

I was just trying to wrap up that one so we didn't come back to it, that's all.

THE COURT: We're not communicating at all then.

MR. AMOLSCH: Okay. I apologize then.

THE COURT: So definitely it is time for a break.

MR. AMOLSCH: Yes.

THE COURT: So let's take an hour, we will come back at 2 o'clock and we will continue the examination.

Special Agent Gaab, you are in the middle of your testimony, so don't discuss it with anyone during our break. All right?

THE WITNESS: Thank you.

THE COURT: All right, thank you all. We are in recess.

NOTE: At this point a lunch recess is taken; at the conclusion of which the case continues as follows:

THE COURT: All right, let's proceed.

MR. AMOLSCH: Thank you, Your Honor.

BY MR. AMOLSCH: (Continuing)

Q. Agent Gaab, when we last left we were talking about the 2011 money transfer that Mr. Loz described between Alex Bangiyev and Mr. Fakiro, do you remember that?

A. Yes.

Q. Okay. Did you ask Alex if he ever took money from Mr. Fakiro?

A. The only statement that Alex made was about the 2013 where Loz had told him that -- or, excuse me, Loz had told Alex that Fakiro was responsible for that transaction.
Q. Did you specifically or anybody you know ask Mr. Bangiyev in 2011, did you get money from Ronen Fakiro?
A. I did not ask that.
Q. Do you know if anybody did?
A. I don't believe so.
Q. Mr. Loz also said he wanted to bring Mr. Fakiro over to show him the operation.
A. Yes.
Q. Is that accurate? Okay. What operation was he showing him at that point?
A. I believe he was showing him -- he was explaining how the money got imported into the U.S., and then how it went to the storage facility, and then selling it to the Bangiyevs.
Q. Okay. So there was no production plant that he was showing him in 2011, correct?
A. Correct.
Q. Okay. Did Mr. Loz say he introduced Mr. Fakiro to anybody else other than the Bangiyevs?
A. No.
Q. And nobody you spoke to said they ever met him, Mr. Fakiro?
A. That I personally spoke with?

Q. As part of the investigation, whether you or anybody else, did anybody every claim to have met Mr. Fakiro?
A. Boaz and Ofra Borohov.
Q. Other than Boaz and Ofra Borohov?
A. No.
Q. In 2013 there is -- do you have a copy of the Government's -- I can put it on the screen, the exhibit again talking about the imports of money by Mr. Loz through Universal Auto?
A. I don't have a copy of that.
Q. Do you see --
THE COURT: Is that on anybody's screen? I don't think it is turned on.
MR. AMOLSCH: I have paper copies I can hand up.
THE COURT: I guess we will do it that way.
BY MR. AMOLSCH: (Continuing)
Q. There we go. Mr. Fakiro, Mr. Fakiro enters with Mr. Loz -- I am sorry, I will start over.
On July 9, 2013, Mr. Fakiro enters by himself, and departs again on July 13, 2013, also by himself, correct?
A. Correct.
Q. And there is no import from Universal Auto Import of currency that corresponds to the July date, is that correct?
A. Correct.
Q. The only one is back in May, two or three months earlier?
A. Correct, Mr. --

Q. Now, what did Mr. Loz tell you about where the money came from?
A. The money came from --
Q. That Mr. Fakiro delivered, allegedly delivered to Alex Bangiyev.
A. Mr. Loz stated that Fakiro went to the storage shed that we had searched, that location, and got the counterfeit money from the storage shed.
Q. Have you seen the lease for that storage unit that we're talking about?
A. Yes.
Q. Whose name was on the lease?
A. The lease was under the name of Itzhak Loz, with an alternate contact of Ronen Fakiro.
Q. I have the client registration form, which I will put up.
Is this what you are talking about in terms of the client, the emergency contact information?
A. Correct.
Q. Okay. The lease itself though for the storage unit is separate than the client registration form, correct?
A. Correct.
Q. On the lease for the storage unit, is Mr. Loz the only one listed on the lease?
A. Yes.
Q. Does anybody else have access to that storage unit other

than Mr. Loz pursuant to that lease?
A. Just the company would have access to it if there was an emergency and they had to open the storage shed.
Q. Did you interview anybody at the storage facility?
A. Yes.
Q. Okay. And what did they tell you about that? About whether Mr. -- about anybody coming to the storage unit around that time?
A. Around --
Q. July 9 to July 13, 2013.
A. They didn't provide any information that someone accessed it. They had switched systems recently, so they were unable to provide if someone accessed it in July 2013.
Q. When is the earliest they could go back to?
A. I don't recall.
Q. Now, as I heard you describe it earlier, Mr. Loz arranged for the money to be delivered to Mr. Bangiyev in such a way as he didn't know who was delivering the money, is that correct?
A. That Mr. Bangiyev would not know.
Q. Correct. As I understand it, the way I understand it was Mr. Bangiyev went to the trunk of a car, it popped open, he took the money out, is that correct?
A. Correct.
Q. And that he never saw who popped the trunk?
A. Correct.

Q. Now, did you ask Mr. Loz why it was necessary to keep Mr. Fakiro's identity secret?
A. I don't recall if I asked that specific question. He didn't make any statements -- all Mr. Loz stated was that he had an obligation in Israel and he was unable to come to the United States, so he asked Fakiro to do it on his on behalf.
Q. There was no -- sorry.
A. I don't recall Mr. Loz giving a statement of why he did not want Alex to know that it was Fakiro.
Q. But was that your impression, that he did not want Alex to know that it was Fakiro?
A. Yes.
Q. Now, in 2011 Mr. Loz told you that he brought Mr. Fakiro over here specifically to meet people with whom he was dealing in the counterfeit business, correct?
A. Correct.
Q. And one of those people allegedly was Alex Bangiyev?
A. Correct.
Q. And now Mr. Loz is telling you that it's necessary to keep Ronen's identity secret from Alex Bangiyev?
A. Correct.
Q. Did you ask Mr. Bangiyev if he ever received any money at all around this time period from Mr. Loz?
A. I can't recall. I recall that Alex told us that he had received money in a trunk in a bag, I recall that, as I

previously stated.

Can you say your question one more time? I am sorry.

Q. The incident that took place in July with the transfer of the money from the car, did you ask Mr. Bangiyev if that event took place at all?

A. I asked Mr. Bangiyev did he ever receive counterfeit in any sort of parking lot. And that's when Mr. Bangiyev had said is that, yes, he went to the Lexington Inn and someone opened the trunk of the car and he received counterfeit in a black bag.

Q. Did he tell you how much he received?

A. I don't recall the amount that he said.

Q. Mr. Loz then comes into the country about a month-and-a-half later on August 31, 2013, is that correct?

A. Correct.

Q. Did he tell you why he was unable to come in July?

A. I don't recall the reason.

MR. AMOLSCH: The Court's indulgence.

THE COURT: Yes, sir.

MR. AMOLSCH: I think that's it, Judge. Thank you.

THE COURT: All right, thank you.

Any of the other defense counsel like to cross-examine Special Agent Gaab at this time?

MS. GINSBERG: Your Honor, I would, briefly.

THE COURT: All right. Why don't we start with you.

Thank you.

MS. GINSBERG: Your Honor, could I ask the deputy to -- I am going to hand Agent Gaab a copy of this same image that we have on the board just because there are some highlighted -- I've highlighted some of the --

THE COURT: The same exhibit that is presently on the board?

MS. GINSBERG: Yes, with highlights.

THE COURT: Okay.

BY MS. GINSBERG:

Q. Agent Gaab, you specifically questioned Mr. Loz about the amounts of counterfeit money that he shipped into the United States, correct?

A. Correct.

Q. And you asked him how much he imported into the United States that he distributed to Alex and/or Eduard Bangiyev, correct?

A. Correct.

Q. All right. And he at different times told you two-and-a-half to 3 million, or 2 to 3 million, and other times he told you 4 to 5 million four times a year, quarterly, correct?

A. Correct.

Q. But he said that he was bringing those shipments in or arranging for those shipments four times a year?

A. Correct.
Q. And he had explained to you that the way from -- after the initial two first imports, that he came up with this scheme to put the counterfeit money inside shrink wrapped machines that he was sending from Israel to the United States?
A. Correct.
Q. And that was the way he did it, he hid the counterfeit money inside the shrink wrapping machines, and those shrink wrapping machines were sent by a company named Ventura in Israel to a company named Universal Auto or Auto Parts in California?
A. They weren't sent to California, but they were under the name Universal Auto.
Q. But they were shipped, they were shipped to Universal Auto Parts?
A. No. They were shipped to New York. Universal Auto was the company that they used to ship them. Universal Auto is located in California --
Q. But all of these shipments were addressed to Universal Auto Parts?
A. Correct.
Q. And that was the sum total of the money that he arranged to have sent from Israel to the United States that he claimed ended up in Alex and Eduard Bangiyev's hands?
A. Can you ask that question one more time?

THE COURT: That was the only channel that Loz used from 2011 on to transfer money from Israel to New York, right?

THE WITNESS: From 2011 on, yes.

THE COURT: Okay.

BY MS. GINSBERG: (Continuing)

Q. Didn't he also tell you that he sent these shipments from 2008 until 2014? That any shipment that he sent from Israel was sent in a shrink wrapping machine and that that was the method he used?

A. From 2008 to 2013.

Q. All right. Now, you have seen this Exhibit C, the chart, of the Customs and Border Patrol records?

A. Yes.

Q. This depicts all of the records of imports to Universal Auto Parts of containers of shrink wrapping machines?

A. Correct.

Q. It is also the same exhibit that has the travel for Mr. Loz and Mr. Fakiro?

A. Correct.

Q. So every record of a shrink wrapping machine that Universal -- that was sent from Israel to Universal Auto Parts is reflected in this exhibit?

A. Correct.

Q. And am I correct that there is actually no year in which there were four separate shipments?

A. Correct.
Q. And in fact, in 2004 there were three shipments, one in January, one in April, and one in October?
A. What year again, ma'am?
Q. 2004. And if you want to look at that -- I have highlighted -- I hopefully haven't mistaken any of them.
A. I see three imports.
Q. Three imports. In January, April, and October for the year 2004, correct?
A. Correct.
Q. And for the year -- there is nothing for 2005, 2006, or 2007, correct?
There are other shipments, but shipments of shrink wrapping machines to Universal Auto? If you would look, nothing for 2005, '6 or '7?
A. Correct.
Q. Okay. And there is one shipment for 2008 in December, December 11, 2008?
A. Correct.
Q. In 2009 there are two shipments, one in June and one in December?
A. Correct.
Q. 2010 there are three, one in April, one in September, and one in December?
A. Correct.

Q. 2011 there are also three, one in May, one in June, and one in August?
A. Correct.
Q. 2012 there are three, one in February, one in May, and one in October?
A. On October 4, 2012, it was two containers.
Q. Two containers.
A. Mr. Loz had stated that each container contained the counterfeit in it.
Q. But they were sent as part of one shipment?
A. Correct.
Q. But there were two containers, but there was just one shipment in 2012?
A. Correct.
Q. And then in 2013 there is one shipment on May 13, 2013?
A. Correct. And that was for four machines.
Q. And is it also not true that Mr. Loz told you that the largest amount of counterfeit currency that he ever provided to Alex Bangiyev was 12 to $13 million, and that that was provided in December of 2013?
A. Mr. Loz stated that in December 2013 he imported four machines with approximately $3 million in each machine. And that he didn't give that to Alex or Eddie Bangiyev in one quantity, one transaction. That that money was in the storage shed, and then multiple times went back to the storage shed and

gave a couple million dollars per counterfeit transaction.

Q. Okay. But according to the Custom and Board Patrol records, there is no shipment in December of 2013?

A. That's correct.

MS. GINSBERG: Okay. Your Honor, I'm not sure I understand why this is the case, but we don't have copies of Mr. Loz' MOIs. Mr. Amolsch seemed to have been provided copies. I didn't have copies. But as I said, I have notes. And I would like to ask some questions from my notes at least.

THE COURT: Go ahead, and we will see how we do.

BY MS. GINSBERG: (Continuing)

Q. These questions relate, Agent Gaab, relate to information that Mr. Loz provided to you concerning other individuals with whom he had counterfeit business dealings.

Do you remember having asked him questions about those things?

A. Yes.

Q. And the reports that were provided to us have redactions for the names of all the people who are not part of this -- charged in this conspiracy, is that correct?

A. Correct. The redacted parts are for subjects or suspects that are ongoing investigation.

Q. So if I say Loz said he had a meeting with R redacted, that would be somebody other than Eddie Bangiyev or Alex Bangiyev, correct? And somebody other than --

A. Anything redacted would not be with Eddie or Alex Bangiyev.
Q. Okay. So do you recall the interview that you had with Mr. Loz on January 28, 2015? There was an interview on that date.
A. Just to clarify, I believe it was on the 22nd, but I wrote the MOI on the 28th.
Q. Okay, my mistake. And do you recall that Mr. Loz told you during that interview that in 2011 he had a fight with redacted, and told that person he was shutting down the counterfeit operation?
A. Yes.
Q. Okay. And do you recall that Mr. Loz told you that this redacted individual stole 34 plates from their warehouse, and stole watermarks from him, and security threads from him?
A. I do.
Q. And that Mr. Loz believed that this individual might have been making the counterfeit money himself?
A. I do.
Q. And do you recall during that same interview Mr. Loz telling you that someone redacted, may or may not be the same individual, that redacted helps redacted when Alex Bangiyev isn't doing it?
A. I don't necessarily -- I'm getting confused with the multiple redactions.

Q. So was I.
A. Can you restate your question?
Q. Well, it may help if Ms. Pedersen has them here, but do you recall him -- Mr. Loz telling you that an individual has another individual who helps him with the counterfeit operation when Alex Bangiyev is not doing it? Meaning not being involved with --
A. I recall Mr. Loz saying that there is another individual that can help.

THE COURT: I'm sorry, I didn't hear the end of that.

THE WITNESS: I recall Mr. Loz saying that there is another individual that is involved that could help.

THE COURT: I'm sorry. The question related to somebody other than Mr. Bangiyev being provided counterfeit currency, as I understood, when Mr. Bangiyev wasn't available or --

MS. GINSBERG: Well, the language was "wasn't doing it." That's what I wrote. That may not be exactly what was written.

THE WITNESS: The redactions, I don't want to give false information --

THE COURT: As best as you can recall. And if we need to go to a different source of information, we can.

THE WITNESS: I'm sorry, Ms. Ginsberg, can you say that one more time?

BY MS. GINSBERG: (Continuing)

Q. Do you recall Mr. Loz telling you that redacted person A helps redacted person B when Alex Bangiyev isn't doing it?

A. Yes.

Q. Okay. And do you also recall that Mr. Loz said in 2011 that redacted person gave Loz the rest of the money that redacted person owed Loz for a counterfeit transaction between redacted and Loz?

A. Yes.

Q. All right. Now, as far as you remember, there was a subsequent, I may have the date of the report as opposed to the date of the interview, but on or about February 4, 2015, there was another interview with Mr. Loz. Okay.

And do you recall he described -- these MOIs, these were written by you, is that correct?

A. All of the ones for Mr. Loz, yes.

Q. Okay. And there is a section under the MOI for this February 4 interview where it says -- you have got like subheadings, and then you put information about the subheading, is that correct?

A. Yes.

Q. Okay. And do you recall that the beginning of the MOI for February 4 says: Describing first counterfeit import. And it has the date 2008 or 2009.

A. I believe I recall what you're speaking about. That title

is, what I'm referencing in that is describe the first counterfeit import from 2008 after the domestic location in '07.

So what I'm trying to discuss in that is what did Loz do once he went back to Israel in 2008, not the first import that he ever did.

Q. All right. So again, with respect to the same interview, do you recall Mr. Loz telling you that redacted's counterfeit also made it into the United States, but that he doesn't know how he did it?

A. Yes.

Q. And that redacted gave counterfeit currency to three different individuals that are not involved in this case?

A. Not the defendants.

Q. Not the defendants?

A. Correct.

Q. And do you recall that Mr. Loz said that Alex Bangiyev and Eddie Bangiyev didn't want Loz to be dealing with this redacted person at all?

A. I don't recall.

Q. All right. Do you recall Mr. Loz stating that his main customers of counterfeit currency were Alex Bangiyev and redacted?

A. Yes.

Q. Do you recall that Mr. Loz said that in either 2009 or

2011 he sent a shipment of approximately $3 million which he intended for the Bangiyevs, but that he gave $1 million of the shipment to redacted person?

A. Yes.

Q. And do you recall that he said in 2011 or 2012 a redacted person came to see him when he was in the United States, and that he came to see him to talk about the counterfeit business with him, and that Mr. Loz told this redacted person that they were no longer partners?

A. Yes.

Q. And do you recall that he also said that he and two other redacted individuals met at a restaurant on 108th Street to discuss cutting Alex Bangiyev and Eddie Bangiyev out of the counterfeit operation?

A. Yes.

Q. And that after that meeting, Mr. Loz gave one of these redacted individuals $2 million instead of giving it to the Bangiyevs?

A. Yes.

Q. And with respect to the interview that was conducted on or about February 12, do you recall Mr. Loz telling you that half of his first and second shipments to the United States were split between the Bangiyevs and a person who is identified, I believe he is identified because he is deceased, but Mr. Yusupov?

A. His first shipment?

Q. It says half of his first and second shipments to the United States were split between Alex Bangiyev and Mr. Yusupov.

A. I don't recall that.

Q. Do you recall that he said in 2011 he gave one -- and this may refer to the other -- one of the other statements. But he gave a redacted person $1.3 million without Alex Bangiyev knowing it?

A. In 2011?

Q. 2011.

A. I don't recall that.

Q. And do you recall him telling you that he didn't work well with the redacted individual because he couldn't believe what that individual told him?

A. Yes.

Q. And that the second time he opened a new line through a redacted person, Alex Bangiyev found out about it?

A. Yes.

Q. And lastly, with respect to the interview that took place on or around March 25, do you recall him telling you that redacted person has his own counterfeit customers, and that that redacted person sells counterfeit currency to another redacted person?

A. Yes.

Q. Not the Bangiyevs?

A. Correct.

MS. GINSBERG: That's all I have, Your Honor. Thank you.

THE COURT: All right. Thank you, Ms. Ginsberg.

Mr. Yamamoto.

MR. YAMAMOTO: Yes, Your Honor.

BY MR. YAMAMOTO:

Q. Is it Agent or Special Agent?

A. Special Agent.

Q. Special Agent Gaab, I am going to call on your memory. You don't have Mr. Loz' interviews in front of you, do you?

A. No.

Q. Okay. The Borohovs. Mr. Loz indicates in his January 22 interview that in 2011 somebody, who I presume was Boaz' uncle, suggests that Loz ask Boaz to help with the plant in Holon, is that where it is?

A. Correct.

Q. And later on it indicates that Boaz was there for the last day. Is that the right time frame?

A. What's the last day? The last day of what?

Q. The last day of doing something, setting up this factory or setting up this shop?

A. What Mr. Loz said is that someone recommended that Boaz help in 2011. And Loz stated that Boaz helped glue the paper together for the counterfeit from 2011 and was involved in the

counterfeit in Israel.
Q. Whoa, whoa, we'll get there.
A. Okay. I'm not sure of the exact part.
Q. Okay. My notes indicate that Boaz was helping set up this plant in Holon --
A. Correct.
Q. -- is that right?
A. Correct.
Q. Okay. Now, Ms. Borohov worked for Loz as a secretary?
A. Correct.
Q. And Boaz apparently did some work for the company that Loz owned?
A. I don't recall that.
Q. Okay. At some point Loz says that he had the Borohovs work in their home, he took a laminator or something to their home?
A. Correct.
Q. When was that?
A. I believe that was in 2011.
Q. For how long a period?
A. Mr. Loz stated that was their job the whole time in Israel.
Q. Did he say that it was for their whole time, or did he not say for what period?
A. Mr. Loz did not give a specific date. He said that they

helped glue the paper from 2011 until the day of their arrest in Israel and in the U.S.
Q. You don't know if it was continuously done at their home in Israel, or for a six-month period, or a year? He didn't say?
A. He didn't say it occurred every day. He said as he gave them the paper to be glued, they glued it.
Q. Okay. Did he say how often he gave them paper?
A. He didn't say how often. He said that he would give it in boxes at a time, and then they would get paid for every 3 million that they glued together.
Q. So they got paid basically piece work?
A. I'm sorry?
Q. They were paid piece work? They were paid for what they produced?
A. Correct.
Q. Did he say how much they were paid?
A. 16 to $17,000 per $3 million in counterfeit.
Q. American or Israeli?
A. American.
Q. 16 to $17,000 for every 3 million, is that what you said?
A. Yes.
Q. And then he would go pick up the paper after it was glued?
A. He would either pick it up or sometimes Boaz.
Q. Or Boaz would?

A. Yes.
Q. Now, he also indicates that he would give boxes to deliver to various places in Israel or various individuals in Israel?
A. Mr. Loz stated that when the counterfeit would be done, that on occasion Boaz would take the counterfeit to another individual on behalf of Loz.
Q. Do you know how many times that was?
A. I don't know.
Q. And that was delivery for use in Israel, as far as you know? Did he say?
A. It was a delivery for one of Mr. Loz' customers in Israel.
Q. So you indicated that as far as you understood, the Borohovs glued paper continuously from 2011 to 2013 until the shop was dismantled?
A. In Israel.
Q. In Israel, is that right?
A. Correct.
Q. But he didn't say that. He said that they did it from 2011 and then came here and did it?
A. No. He stated that they glued the money together for the counterfeit from 2011 for him until they were arrested.
Q. Okay. So arrested meaning here in the United States?
A. Correct.
Q. And that they were brought here for the purpose of gluing?
A. Correct.

Q. Now, he loaned them some money, did he indicate that?
A. Yes.
Q. Around $30,000?
A. I don't recall the amount.
Q. The money was -- the Borohovs were being paid approximately $5,000 a month, do you recall?
A. I don't recall the exact amount, but that sounds about right.
Q. Basically they were going to be paid $5,000 a month for six months to pay off the $30,000?
A. I don't recall if that was to pay off the 30,000.
THE COURT: Do you have any records that you recovered from Loz or the corporations indicating any salaries paid, either to the Borohovs or Fakiro that may have been Israeli or --
THE WITNESS: I am not aware of any evidence that suggests that.
THE COURT: Okay. Thank you.
Go ahead, Mr. Yamamoto.
BY MR. YAMAMOTO: (Continuing)
Q. Did you get records from his company in Israel?
A. From Loz' company in Israel?
Q. Yes.
A. Marker Systems?
Q. Yes.

A. I don't have any records with business transactions that I am aware of, at least that I personally --
Q. That you didn't get any of his Marker Systems records?
A. The only evidence that we would have is either the paper documents that were seized from the warehouse or any electronic documents found in their phones or computer. We did not receive anything from anyone in Israel.
Q. And you don't have anything with regard to any wire transfers from here to Israel?
A. We are aware of wires in Mr. Loz' Bank of America account to Israel.
Q. Anything to the Borohovs?
A. No.
Q. Any record of any payments to the Borohovs in Israel? You are saying you don't have any?
A. Mr. Loz stated that he paid them in cash. I don't have any records or bank --
MR. YAMAMOTO: Thank you, Your Honor. Nothing further, Your Honor.
THE COURT: All right, thank you.
Mr. Andrews.
MR. ANDREWS: Thank you, sir.
BY MR. ANDREWS:
Q. Following up on Mr. Yamamoto's questions. It's impossible -- would you agree with me that it's impossible to

put a figure on how much money the Borohovs were involved in, counterfeit money in Israel?
A. I don't agree with you on that.
Q. You think there is -- how would you do that?
A. Based off Mr. Loz' statements.
Q. And that's all?
A. And the data that the Secret Service has as far as the amount of counterfeit that has been seized or passed helps supports his statement.
Q. Again though, is there any way to tie what actually the Borohovs did in Israel to that money that you're talking about now?
A. A way to -- can you state that another way?
Q. Basically as I understand your testimony, Mr. Loz indicated that the only thing that the Borohovs did was glue paper together in Israel, is that correct?
A. Correct.
Q. But do you have any documents or documentation or knowledge of how much they did?
A. Other than just the data that the Secret Service is aware of, no.
MR. ANDREWS: That's all I have, Your Honor.
THE COURT: All right. Thank you, Mr. Andrews.
Government want to question the special agent?
MS. PEDERSEN: I do, just to follow up and some

clarification. Maybe I will just work backwards.

CROSS-EXAMINATION

BY MS. PEDERSEN:

Q. Mr. Yamamoto was asking you, had referenced somebody who recommended Mr. Boaz Borohov to Loz to help in the counterfeit operation in Israel, do you remember that question?

A. Yes.

Q. And the word that Mr. Yamamoto used was someone. Are you aware of who this someone is?

A. Yes, Mr. Loz said the name.

Q. Okay. Without getting into the name, is that same person the same person that Ms. Ginsberg referred to as redacted who was one of the main customers of Alex?

I'm sorry, that Alex and the redacted person -- is this the same person that we have been talking about?

A. Yes.

Q. Okay. And just for clarification, without identifying this person by name, was this person involved in the conspiracy?

A. Yes.

MR. GREENSPUN: Judge, I would object to that. It is just a bulk conclusion about somebody who is unidentified, unknown, not before the Court.

THE COURT: It goes to weight. Thank you.

MR. GREENSPUN: Yes, sir.

BY MS. PEDERSEN: (Continuing)
Q. Was the person's name redacted in the reports provided in discovery because that person is, along with others, the subject of an ongoing investigation?
A. Yes.
Q. And just for clarification, it's your testimony that that person was involved in the conspiracy, correct?
A. Correct.
Q. Without saying who it is, can you explain how that person was involved and their role in the conspiracy?
MS. GINSBERG: Objection.
THE COURT: Based on his investigation. I will allow it.
MS. PEDERSEN: If you can explain --
THE COURT: I may strike it all, but I will allow it and I will allow you to examine further on it. Go ahead.
A. This person is the one who had requested Mr. Loz' services to help start to manufacture the counterfeit U.S. currency in Israel.
BY MS. PEDERSEN: (Continuing)
Q. Did that person have any relation to the Bangiyevs?
A. Not that I recall.
Q. Maybe you are not understanding the questioning that I'm asking. What --
MR. GREENSPUN: Judge, I think he understood it

perfectly.

THE COURT: Is this the person that Loz referenced that he was going to stop dealing with the Bangiyevs and deal with this other person instead, or there was some meeting about that, or are we talking --

THE WITNESS: No, that's not the same person.

THE COURT: Okay. If you want to ask the question again, I have got to admit I am totally confused. There are so many -- I know there are ongoing co-conspirators, I know there are other people who are receiving counterfeit money from Loz, and I know that there was at some stage tension between the Bangiyevs and Loz as to who was going to be obtaining the money. And that counterfeit currency actually went to at least one other individual in the United States for distribution at some stage during the conspiracy.

That's what I got out of the testimony so far--

MS. PEDERSEN: Well, I'm not sure that is 100 percent accurate. Is that person -- and I think I refer to that person as unindicted co-conspirator number 3 in the Government's pleadings, wasn't so identified in the discovery.

BY MS. PEDERSEN: (Continuing)

Q. But is that person an American or an Israeli?

A. Israeli.

Q. Is that person -- did that person, I will call him unidentified co-conspirator number 3 just for clarity, is that

the person that recommended Boaz Borohov to work for Mr. Loz in Israel?
A. Yes.
Q. Okay. Did that person, unidentified co-conspirator number 3, did he introduce Loz to Alex Bangiyev for the purpose of selling counterfeit U.S. currency in American?
A. Yes.
Q. Okay. On the issue of the gluing. Did Mr. Loz explain in his interviews approximately how long it took for the gluing process for the counterfeit?
A. Couple weeks.
Q. I'm going back to questions that Mr. Amolsch asked you I guess on direct examination.
The New York storage unit that was rented by Mr. Loz, do you know the date that that lease was executed?
A. It was August 2011. I don't recall the exact date.
Q. If I show you a copy of it, would that refresh your memory?
A. Yes.
Q. Showing counsel, it is just a copy of the lease. I have marked it for identification as 4-23.
Does that refresh your recollection?
A. Yes.
Q. What's the date on that?
A. August 24, 2011.

Q. Okay. And during the investigation, were you able to review records in an attempt to corroborate what Mr. Loz told you about Mr. Fakiro meeting Alex Bangiyev outside the Lexington Hotel?
A. Yes.
Q. And you testified that there was a transaction where Mr. Fakiro wasn't present to physically meet Mr. Bangiyev, is that correct?
A. Correct.
Q. And you said there was a black bag with counterfeit, is that right?
A. Correct.
Q. Where did the bag come from, or where was it immediately before it was given to Mr. Bangiyev?
A. It was in the trunk of the vehicle.
Q. What kind of vehicle was this?
A. I believe Mr. Bangiyev stated it was possibly a Chevy or Chrysler.
Q. Did you try to get records to see if you could find out?
A. Yes.
Q. Okay. And what kind of records did you obtain?
MR. AMOLSCH: I am sorry, to find out what?
MS. PEDERSEN: To find out if it was a rental car or not.
MR. AMOLSCH: Find out what was a rental car?

MS. PEDERSEN: The car that the counterfeit was in.
MR. AMOLSCH: Did he say it was a Chrysler -- did he say he knew what it was?
THE COURT: He said it was a Chrysler or a Chevy.
THE WITNESS: That's what Mr. Bangiyev stated to me.
THE COURT: Right.
MR. GREENSPUN: Judge, may I --
THE COURT: Objection?
MR. GREENSPUN: Yes. This goes back to what Ms. Ginsberg and I brought up very early this morning, actually the Court brought it up first. We have real discomfort here -- Mr. Bangiyev's statements can't be used -- not that there is anything so terrible about this particular statement. But his debriefing statements can't be used directly against him.
And here we are using those same statements purportedly with regard to Mr. Fakiro. And understanding that Your Honor has the ability to --
MS. PEDERSEN: Your Honor --
MR. GREENSPUN: -- sort of partition one from the other, it is still a more than awkward proceeding.
And the Government should be very clear here about just the use of names, Alex Bangiyev told me, the witness says this and that. It's really awkward. And I guess it is an objection that none of the references to Alex Bangiyev that comes out of his debriefings are in any way being offered by

the Government to be used against him or to show inconsistencies or anything of that nature.

MS. PEDERSEN: Your Honor, it was a poorly worded question. What I am trying to get from the witness --

THE COURT: Objection sustained. Obviously we went through long collogues for each defendant saying that they could cooperate and then nothing that they said would be used to enhance their sentence, ergo our conversation this morning.

But this goes to weight, if any, that should be given to the testimony concerning Loz' testimony about Fakiro's involvement in picking up a package, so I will permit the question.

So we left off, it was one of two models of car. The next question was, did you investigate whether it was a rental or owned by anybody in particular.

And what's your answer to that?

THE WITNESS: Mr. Loz stated that it was a rental car that was at the Lexington Inn, that's where Alex Bangiyev went to get the counterfeit.

My investigation has revealed that Mr. Fakiro was in the country during that time from CBP records, and that there was a National Car Rental that was in Ronen Fakiro's name during the period that Mr. Fakiro was inside the U.S.

THE COURT: Did it identify the type of automobile that he rented?

THE WITNESS: I believe it was a Jetta, Volkswagen Jetta.

THE COURT: Okay. Next question.

MS. PEDERSEN: Your Honor, just for clarification, I am going to have the agent testify in terms of the identify of this person I referred to as unindicted co-conspirator number 3. I didn't name him in the pleadings because he has not been charged --

THE COURT: You don't have to do that if you don't want to. One of the issues, before I forget, is there is a lot that came out about the Secret Service's method of operation. And if any of the testimony of Ms. Dellibovi is somehow confidential, let me know that as well.

I don't see a need -- we're talking triple hearsay now, and I'm not sure that a name is going to help or hinder, and I just want to make sure it doesn't hinder any investigation going forward.

MS. PEDERSEN: I guess I am confident that this party has been named by the defendants in this case. I just don't want it necessarily part of the public record, that's why he wasn't named in the pleadings. The Department of Justice has a policy not to name unindicted co-conspirators.

THE COURT: It's a good one. So use the first name if you want.

BY MS. PEDERSEN: (Continuing)

Q. Does this person have a nickname?
A. Yes.
Q. Let's refer to him by his nickname.
A. Ambal.
Q. And that's the person that suggested that Mr. Borohov work for Mr. Loz in Israel?
THE INTERPRETER: The interpreter did not hear the name. Can you please spell the name.
THE WITNESS: Ambal.
THE INTERPRETER: Ambal?
THE WITNESS: A-m-b-a-l.
MS. PEDERSEN: Maybe it's our American pronunciation.
BY MS. PEDERSEN: (Continuing)
Q. And what was the relationship between Ambal, Loz, and the Bangiyevs in the context of this conspiracy?
A. Ambal introduced Loz and Alex Bangiyev together. Loz was supposed to manufacture the counterfeit currency. And Ambal wanted Alex Bangiyev to distribute it in the United States.
Q. Did Ambal himself get counterfeit from Loz during the course of the conspiracy?
A. Yes.
Q. And how do you know that?
A. Mr. Loz stated that.
MS. PEDERSEN: All right. I have no further questions.

THE COURT: All right. I don't have any questions. Any further redirect examination?

MR. GREENSPUN: Judge, can we just have a second, please?

THE COURT: Yes, sir.

MR. AMOLSCH: Excuse me, Your Honor, can I speak with Mr. Fakiro briefly?

THE COURT: Yes, absolutely.

MS. GINSBERG: Judge, could I ask one question?

REDIRECT EXAMINATION

BY MS. GINSBERG:

Q. All of your information about Ambal and his relationship to the Bangiyevs is based on what Mr. Loz told you, correct?

A. I have had a discussion with Alex Bangiyev about Ambal.

Q. But as far as the counterfeit currency is concerned?

A. Correct.

MS. GINSBERG: Thank you.

THE COURT: Mr. Amolsch, any other questions?

MR. AMOLSCH: No, Your Honor.

THE COURT: Anyone else?

MR. ANDREWS: No, Your Honor.

THE COURT: All right, please, you may resume your seat, Special Agent. Thank you.

NOTE: The witness stood down.

THE COURT: Any other witnesses that any of the

defendants' counsel want to call? All right.

Does the Government have any other witnesses?

MS. PEDERSEN: No, Your Honor, we do not.

THE COURT: All right. Then any other evidence that anyone wishes to introduce at this time? Any other evidence that you want to introduce at this time?

MS. PEDERSEN: Perhaps just to raise the issue, Your Honor, and -- no additional witnesses in terms of presentation. We could perhaps by way of proffer bring to the Court's attention or redirect the Court back to some of the statements that were made by Mr. and Mrs. Borohov at the time of their arrest. They were subject to motions to suppress before the Court. Perhaps the Court remembers some of that testimony.

THE COURT: I don't. And I haven't reviewed it. So if you want to highlight it, that's fine.

MS. PEDERSEN: Yes, sir.

MR. AMOLSCH: Your Honor, if I could, I apologize. Some of these statements are going to implicate, I believe, Mr. Fakiro, and I have questions about those. The Government hadn't introduced them, and I hadn't questioned the agent about them because they are not in the pleadings regarding Mr. Fakiro's involvement.

So I will have some questions or at least some things to point out to the Court as well in response as relates to the Borohovs.

THE COURT: Questions of the special agent? Do you want to put Ms. Pedersen on the stand?

MR. AMOLSCH: No. But the agent, again, I was going to ask the agent about some of the things the Borohovs said if the Government was offering that evidence as relates to Mr. Fakiro's involvement in the conspiracy.

THE COURT: Let's hear what Ms. Pedersen has to say.

MS. PEDERSEN: He could proceed by way of proffer, Your Honor.

The report of the interview indicates that Ofra Borohov said that she was working for Loz and Fakiro. She admitted to putting strips on the paper and to gluing papers.

She said that Loz called her husband and had him transfer things to other people. She said that Loz was the main boss and Ronen worked for Loz.

She admitted she started gluing in 2001 in Israel. She said she was gluing paper with the strip but not the face, and that Mr. Loz showed them--

THE INTERPRETER: A little slower, please.

THE COURT: I am sorry, hold on.

THE INTERPRETER: A little slower.

MS. PEDERSEN: Sorry, I forgot that I have an interpreter.

THE COURT: No, no, our interpreter has a question.

THE INTERPRETER: The interpreter is lost. Ms.

Pedersen, if you are reading, can you please read it a little slower.

THE COURT: So we need to slow down and I guess go back.

MS. PEDERSEN: Okay. From the beginning?

THE INTERPRETER: No, just the --

THE COURT: The last several statements.

MS. PEDERSEN: Okay. I will start with she said that Loz was the main boss. And Ronen worked for Loz. She said she started gluing in 2011 in Israel with the strip but no face.

That Loz showed them how to glue the sheets. They showed Boaz how to do it and Boaz showed her. She glued the paper at her home in Israel on a lamination machine. That Loz took the machine back when the work was done.

That Loz would call Boaz to say someone in Israel wanted money. That Loz came to their house with money already printed, $10,000 in a box, and asked Boaz to transfer it to someone.

She said that Boaz hand delivered the boxes three or four times. That he did it right before they came to the United States and realized it was illegal.

She said the day before the arrest, that Loz and Fakiro transferred boxes to their car. And two days before they gave Ofra and Boaz the warehouse keys. That Boaz saw the money and received the key.

She said she saw Loz print the new $100 bill. He showed her a sample and told her how to glue it. That she glued 100 pieces of the new bill and started the new bill two weeks ago. Previously she and Boaz worked on the old $100 bills.

She said Loz told them he needed $70,000 worth of the old bills, and said that they would have work for the next four years.

Ofra said she glued about $10,000 worth of counterfeit. She said that someone used to call Loz and place an order for the new bills. That she and Boaz heard Loz screaming in Hebrew on the phone to someone in New York. And Loz said someone needed to pick up money in New York. Ofra said that Loz and Fakiro put one box in the car for someone waiting in New York.

She said that she and Boaz were paid $5,000 a month in cash, and she got $4,000 yesterday and an additional $2,000 for shopping expenses.

She admitted to receiving an additional two payments of $15,000 each into their bank accounts as loans for their son's wedding, and that Loz paid their hotel, and car, and air fares.

Mr. Boaz Borohov separately made a statement. He said he knew Fakiro since before 2011. And in 2011 he got a loan from Fakiro to help his plumbing business.

Mr. Boaz said he was contacted by Fakiro and brought to the United States to help produce counterfeit, and expected to be here for five months. Mr. Boaz said that Fakiro paid for their plane tickets, lodging, and car rental. And that Fakiro paid them in installments and paid them $4,000 two days before their arrest.

He said that he and his wife placed security strips on the counterfeits by gluing two strips of paper together. And that Loz and Fakiro operated the printing presses, but that Boaz knew how to operate the smaller machines.

He said at the New Jersey warehouse Loz and Fakiro worked in the rear where the presses were located, and that Loz or Fakiro brought paper to the front of the warehouse. They attempted to produce the new $100 bill, but it wasn't right.

He admitted to working with Loz and Fakiro previously. In 2001 Fakiro showed him --

THE COURT: 2011?

MS. PEDERSEN: I keep saying 2001. But it is here in front of, it is 2011. I am reading that wrong.

Loz and Fakiro operated a counterfeit operation in Holon, Israel. The day before their arrest, he saw counterfeit $100 bills in shoe boxes in the warehouse in New Jersey that were later loaded into the car operated by Loz and Fakiro.

Mr. Boaz identified Ambal and indicated that was his uncle. And he said he delivered counterfeit between Loz and

his uncle while in Israel.

THE COURT: All right, thank you. Any other evidence that you want to --

MR. YAMAMOTO: Your Honor, I have a -- not a clarification, but in the statement the Government is making she said in 2011 Ofra stated she worked for Itzhak.

The complete statement is in 2011 Ofra stated she worked for Itzhak for a period of six months gluing paper --

THE COURT: I'm sorry, hold on one second.

MR. YAMAMOTO: Still too fast?

THE COURT: Yeah.

MR. YAMAMOTO: In 2011 Ofra stated she worked for Itzhak for a period of six months gluing paper in much the same way as the present gluing of the sheets. At the time she was gluing paper with the strip but no face. She did this twice while in Israel.

THE COURT: Okay. Thank you.

All right, Mr. Amolsch.

MR. AMOLSCH: Thank you, Judge. I will make this quick, my proffer.

Mr. Fakiro has always maintained that he largely agrees with Ofra Borohov's statements regarding his involvement in the conspiracy. The Government did read from her statement, but I would like to amplify things that I think they may have left out.

In her statement she said they had no prior relationship with Ronen at all prior to coming here. That Mr. Loz was the one that brought them to the U.S. Mr. Loz offered them the job. He promised --

THE COURT: You are paraphrasing now and this is part of the statement, or is this --

MR. AMOLSCH: This is part of her statement.

THE COURT: All right.

MR. AMOLSCH: That Loz promised them they would have work for four years. That Loz was her boss. And Ronen worked for Loz, she said that. That Loz showed them how to glue.

That Loz kept their passports and wouldn't return them while they were in the United States. That Loz paid for the hotel, the carfare, and the airfare, and that Loz gave them a copy of his credit card for use here.

Why that is important, Your Honor, is --

THE COURT: Okay, slow down a little bit.

MR. AMOLSCH: I am sorry. Why that is important is Mr. Borohov, Boaz, said some things that we have always maintained that he misplaced the names versus -- that he should have said Loz when he said Fakiro, or that the agents simply wrote the wrong name down. And the Government read off some things, and I just have some proffers about that.

THE COURT: Go ahead.

MR. AMOLSCH: Mr. Borohov said that the plane

tickets, the car, and the lodging were paid by Fakiro. Ofra said it was paid by Loz.

The evidence shows, I believe, that Mr. Loz paid for their plane tickets to come to Israel -- come from Israel. And that he actually sent them by text Iris Ventura's telephone number. She was the wife of Jacob Ventura -- sister of Universal Auto Imports who arranged the travel. And there is a text back and forth between Boaz and Loz regarding Iris Ventura's information for the purposes of the travel. And that was paid for in Israel, but not by Mr. Fakiro.

There are also texts going back and forth that the Government has that they have provided in discovery, texts going back and forth between Boaz and Loz regarding Boaz' arrival at the airport, that they cleared security, et cetera.

There is also evidence to show that Mr. Borohov initially planned to bring somebody else over other than his wife. That this person was not able to come. He communicated this to Mr. Loz. And then that's how Ms. Borohov unfortunately wound up in this thing, that she was not even supposed to be part of this to begin with.

That Mr. Borohov said Mr. Fakiro paid for their hotel. The hotel was actually paid for with Mr. Loz, by his credit card based on the evidence I have gotten from the Government.

When Mr. Boaz was arrested, the Government searched

him, and in his possession was Mr. Loz' credit card with his name on it.

Mr. Boaz -- I'm sorry, Mr. Borohov texted Mr. Loz a copy of his check with the routing information on it in order to facilitate the wire transfer of the 15,000 or the $30,000 in Israel, that that came from Boaz to Loz. And there is a text to that point.

And I believe he said Mr. Fakiro showed Mr. Boaz how to make the counterfeit Treasury. And I think Mr. Loz' statements and the Government's own investigation amply illustrate that Mr. Loz did this. That he showed them how to glue, he put a laminating machine in their house, all of the things that Mr. Yamamoto was talking about early in terms of how the Borohovs got involved in this.

Mr. Loz is very clear that he was the one who showed them how to do this, not Mr. Fakiro.

And again, lastly, Mr. Borohov claimed that Mr. Fakiro told them to stay behind and keep working, when in fact Mr. Loz is the one who said that because he is the one who had their passports for which they weren't able to actually leave.

So when you're looking at Mr. Borohov's statement, the evidence seems to suggest that the names somehow got confused, or he misspoke, or maybe there is a reason he said Fakiro and not Loz. But the documentary evidence seems to suggest otherwise.

THE COURT: All right. Thank you.

MR. AMOLSCH: That's all I have.

THE COURT: What else have you got?

MR. AMOLSCH: That's all I have, Judge.

THE COURT: Government want to respond to that?

MS. PEDERSEN: This is a factual matter. They both had their passports when they were arrested at the warehouse. And the keys to the warehouse. And the keys to the rental car.

THE COURT: All right. Okay. Any argument? And I will let defense counsel go first. I mean, I'm not inviting any, but I will give you an opportunity to close up now.

Yes, ma'am.

THE INTERPRETER: Ms. Borohov is calling the interpreter. May I approach?

THE COURT: Yes. Well, the Marshal Service, okay? Okay.

MR. AMOLSCH: Should I go over there, Judge? Is that all right?

THE COURT: Well, Mr. Yamamoto should go over there.

I ran into a little problem with co-defendants interviewing other -- or co-counsel interviewing other defendants in a conspiracy case recently.

MR. YAMAMOTO: Your Honor, a point of clarification. I am told that the money that was wired to them was 15,000 shekels, not U.S. dollars, which is a third or so of the value

of U.S. dollars.

THE COURT: A third of a U.S. dollar?

MR. YAMAMOTO: Yes.

THE COURT: Okay. All right, thank you.

All right. I think I was asking whether anybody had anything else to say? Not hearing anything, I will --

MS. GINSBERG: Judge, I have one request.

THE COURT: Yes.

MS. GINSBERG: I don't have any argument. But I would ask the Court to recommend to the Government that we be provided with copies of Mr. Loz' MOIs. I think that they will be at issue at the sentencing.

I know Ms. Pedersen was concerned about them getting spread around. We certainly would agree not to distribute them even to our clients, but at least review them with them. But whatever reasonable restrictions. But it is really difficult to function without them and meet their presentation.

THE COURT: All right. Ms. Pedersen, any objection to that, counsel only for the MOIs?

MS. PEDERSEN: I do have some concerns about that, Your Honor. Maybe as a compromise they could some see the unredacted ones in my office, but I am concerned about the other breadth of information that is in there that is sensitive.

And I understand their concerns that they want to see

that. They have all come to view it at my office. I have asked them if they need to know information in there that is redacted. I have verbally told them things that have been redacted. I do have a concern about these floating around.

THE COURT: Well, they are not going to float around. They are going to be specifically in the hands of counsel for co-defendants in this case. If you have sensitive information you want to redact, redact it. And if counsel needs it, then they will bring it to my attention.

But otherwise let's give the MOIs to counsel on a counsel's eyes only basis.

MS. PEDERSEN: Under the terms of the protective order in place in this case?

THE COURT: I don't know what that is. But if it is counsel's eyes only, that's pretty narrow use.

MS. GINSBERG: Judge, we have no problem with counsel's eyes only.

THE COURT: Okay. All right, let's produce those then.

MS. PEDERSEN: Sure.

THE COURT: All right, thank you.

MS. PEDERSEN: Your Honor, did you want to hear argument? I wasn't sure where we are in terms --

THE COURT: That's where I was. And that's why I said what I said a few moments ago, but maybe I wasn't clear,

which is not unusual.

MS. PEDERSEN: Okay.

THE COURT: But if you want argument, I will hear argument now.

MS. PEDERSEN: Yes, Your Honor. I would like to point the Courts attention to, I think the theme that has come through this afternoon and this morning is a lot of the evidence on the loss comes from Itzhak Loz and, to a lesser degree, Johnny Lee.

Itzhak Loz as the printer is in a unique position to know how much money he printed, where it went, what he got out of it, how he did it, the methods.

And he has been attacked here, understandably, because of perhaps the way that the information he provided during the interviews came out. For example, he initially told the Government that Mr. Fakiro didn't really know what he was doing. 2014 he came here, basically to assist, and didn't figure out until later.

Well, that story just doesn't make sense. And when pressed, he admitted that he is friends with Mr. Fakiro, and they are close, and they relied on one another, and they trusted one another. And he didn't want to get Mr. Fakiro in any more trouble than he already found himself. And he eventually came around and explained the role of Mr. Fakiro beginning in 2011.

That information the Government was able to corroborate through a review of text records, which shows the entries and exits of people to and from the United States for international travel. And lo and behold Mr. Fakiro is coming to the United States starting in 2011.

Mr. Loz said that he told Mr. Fakiro who the people in the conspiracy were. As makes sense, because as a member of the conspiracy, he needs to know with whom he can speak freely and with whom he has to be more guarded.

Mr. Loz said that Fakiro came here in 2011 and saw Alex Bangiyev. That makes sense. Alex Bangiyev was the person who was getting the counterfeit in America.

In 2013 Mr. Loz said Fakiro came here because Mr. Loz was unable to. And guess what? The text records support that in July. And the Government was able to get records from National Car Rental which show in a short time period in July that Mr. Fakiro did rent a car at JFK Airport during the time period that Mr. Loz says he was here.

And it is no coincidence that Mr. Loz said the deal happened at the Lexington Inn Hotel and Suites near JFK Airport, it is where he and Mr. Fakiro were arrested a year ago today with 100,000, 50,000 on one, 40,000 on the other.

Why should you believe Mr. Loz? There is a couple of reasons. He tells us about 13 Sylvester Street. Well, 13 Sylvester Street pops up first back in 2011. Mr. Loz rented

the New York storage facility where we found $2.56 million a year ago. The address that Mr. Loz used was 13 Sylvester Street.

13 Sylvester Street, when you pull the lease, was leased by Alex and Eddie Bangiyev for five years.

Now, we know that counterfeit was manufactured there according to Mr. Loz. We found a third party witness, Mr. Thomas Thompson, who had the business next door, he restored Volkswagens. And he identified a photograph of Alex Bangiyev recently during an interview and said that there were a couple of Russians occupying that place. He thought it was strange, there was no store front, didn't seem to be doing any business. They told them that they were printers. He didn't really see anything that appeared to be legitimate.

He also described the magnesium etching machine that was delivered to that facility. How do we know that happened? We have the invoice for the delivery which was to Eddie and Alex's house.

Mr. Thompson said he went into 13 Sylvester Street after the Russian occupants disappeared suddenly, and saw it was equipped for heavy wiring. Well, that is what you need when you're using industrial Heidelberg printing presses to print millions of counterfeit $50 bills.

What else did Mr. Lox tell us? He said that Eddie bought equipment on his eBay account. So what did we try to

do? We tried to see if that was accurate. We subpoenaed EBay records for Eddie Bangiyev, and we found purchase of a Heidelberg press and another piece of equipment on Eddie's credit card account and one on Alex's credit card account.

It corroborates from Mr. Loz said. We didn't know about that before the arrest, before the take-down or before the indictment. We learned that during the interviews of Mr. Loz, and we were able to corroborate that.

Now, 13 Sylvester Street is important in this case, it buttresses the credibility of Mr. Loz. Because he said, look, we were making $50 bills there, it was Alex's idea that he wanted to make the 50.

And we can corroborate that independently. The Secret Service seized $50 bills from Alex Bangiyev back in 2007 when he was arrested selling $100,000 in bills to Mr. Bost. Fingerprints of Alex Bangiyev and Itzhak loss were found on portions of those counterfeit bills.

The Bangiyevs' story about Sylvester Street just doesn't make sense, Your Honor. They stood up here at their plea colloquy and told you that Loz unwittingly used their address to make deliveries of printing supplies. That they had no idea that was happening, they didn't consent to it, and they certainly didn't participate in it. That they were unwitting people and they know nothing about Sylvester Street.

That story changes over time. Because the next story

is that, well, yes, we did lease that building, but it was to cut raw diamonds that we were getting from Africa and shipping them to Israel. But there was no diamond cutting machinery that was ever sent there or shipped there.

And then the last story that Mr. Alex Bangiyev gives as well --

MR. KROMBERG: Excuse me, Your Honor.

MS. PEDERSEN: Your Honor, the point is, I am not referring to the inconsistent statements by Mr. Bangiyev to enhance the sentence, but to show the Court when you're evaluating the credibility --

THE COURT: Of Mr. Loz, right.

MS. PEDERSEN: Yes. This story that he tells is backed up by objective evidence. The story that the Bangiyevs tell is just not to be believed.

We're not asking you to use those statements to enhance their sentence. But we are asking you to consider it when you're making a credibility assessment in terms of what do you believe and what do you think is reliable.

We think at the end of the day, Your Honor, that the documentary evidence backs up the version of Mr. Loz and is to be believed. Of course he has interest in this case. He has a loyalty to some degree to Mr. Fakiro and to the Bangiyevs in the past, and he has his own self-interests. And the Court should consider that, he has got an interest in giving out

information that is negative and impacts negatively on his co-conspirators, at the same time trying to help himself. Of course the Court should consider that in weighing his information.

But at the end of the day, his story makes sense. It is verified in independent ways. And the Court should credit that.

The Court should also look at the data from the Secret Service which shows he says he was doing 10 to $12 million a year. The data that the Secret Service keeps of the counterfeit is consistent with that information.

And again, the statement of Johnny Lee, we didn't focus on Johnny Lee in the hearing today, but in the pleadings Johnny Lee said that he was getting between 250 and $300,000 from Eddie Bangiyev recently, from 2011 through 2014. And he identified another individual, the first unindicted co-conspirator, who was getting similar quantities from Alex Bangiyev during that same time period.

His information, Johnny Lee's information is corroborated through Tarell Johnson and Eric Buchanan. Eric Buchanan was the individual who was working with the Secret Service in May and September of 2013, and he purchased counterfeit from Johnson who had gotten it from Lee.

Those bills were taken, analyzed by Secret Service, and determined to be the same kind, the 22272, that was later

found in the storage shed in New York. And that is consistent with the plates and the transparencies and the computer images found in the warehouse in New Jersey.

And the common denominator for all the money, whether it be the $50 bills that Alex was caught with in 2007, or Johnny Lee's bills from Richmond in 2004, or the $100 bills later, they all have the same Treasury seal.

For ten years this was the same conspiracy. The information comes to you from the man with the expertise who printed it, who manufactured it. And for that reason, we believe that his testimony and the other information considered as a whole is more than sufficient at a hearing on the loss to make the findings at the amounts that we allege.

THE COURT: All right. Thank you, Ms. Pedersen.

MR. AGNIFILO: Judge, can I have literally two minutes?

THE COURT: Certainly.

MR. AGNIFILO: Thank you, Judge, I appreciate that.

I think we come back to the same problem that I was talking about before. Which is, it's good that the Government was able to get out a hidden modification of Mr. Loz to initially lie about Mr. Fakiro, and then have him admit that I lied about Mr. Fakiro because he's my friend. But that's exactly the type of thing that cross-examination was really created for.

I mean, for instance, if Mr. Loz was on the witness stand here today rather than the agent and the specialist, who are obviously wonderfully credible people, I don't know that Loz would carry the same credibility, I don't think he would, we would all ask him if he was angry at the Bangiyevs because they entered a guilty plea in this case when he wasn't expecting them to.

There are motivations here that we just can't explore by asking the agent questions because the agent is the agent. Mr. Loz is Mr. Loz. There are too many hidden modifications, we can't explore with what we've done.

And Your Honor has been wonderfully indulgent allowing the record to develop, and we really appreciate it. But the problem with relying on Loz is without examining the development of the story, without examining why he has a motive to do things -- one thing we know about him -- and the Government has been wonderfully candid about this. Is we know he is capable of lying about the involvement of a co-defendant when it suits his needs. We know that because the Government pointed that out to us.

And the prosecutors here are very experienced, we have all been doing this a long time, no one catches every lie. You are lucky if you catch one. But where there is one, sometimes there is five. Where there is one, sometimes there is ten.

So that's our concern with Loz. I think Your Honor has a very full record, there is a great amount of information. My personal ending word would just be, without cross-examination I just don't think that what Loz has said in these proffers is reliable enough to arrive at fair sentences.

Thank you, Your Honor.

THE COURT: All right, thank you.

MS. GINSBERG: Judge, could I make three really quick points?

THE COURT: Yes, of course.

MS. GINSBERG: Just to reiterate what Mr. Greenspun said before. We are conceding at this point that the range for purposes of calculating the Guidelines, that this Court could reasonably conclude that the range, the proper loss range for the Bangiyevs is between 7 and 20 million.

But to the extent -- when the Court comes around to considering the extent of their involvement and their degree of culpability, I just think even taking aside Mr. Loz' statements, which may or may not be true, one thing -- we know three things. We know that Johnny Lee ultimately said that his best estimate, his highest estimate was if you add together what he was getting from Eddie Bangiyev and double that amount for this other person who Mr. Bangiyev was distributing to, over the whole time, or at least the largest portion of the conspiracy, that the range of money he believes he would have

received from Mr. Bangiyev is between 2.5 and $6.2 million.

That's considerably lower than the $500,000 every -- the 300 to $500,000 every quarter that Mr. Loz said he was bringing here.

We know that Mr. Loz said he was shipping money here every three months, every quarter. It's just not true. The records from CBP just establish that. So he has overestimated. Forget about the motive for it, but he has overestimated the amount of money that he was bringing into the country and giving to Alex Bangiyev.

And third, we know that he had another outlet. Whether these people were introduced by the same people or not, but he had another outlet for the money.

So reasonably the Court could conclude that there is at least $7 million, I think the point also should be made that how much more than $7 million is really questionable.

Thank you.

THE COURT: Thank you, Ms. Ginsberg.

Anyone else want to be heard?

MR. AMOLSCH: Just briefly, Your Honor, thank you.

I won't reiterate what everyone has said about Mr. Loz.

Mr. Fakiro has always agreed, Judge, with how Ms. Borohov describes her involvement and how she describes his involvement. The question has always been a dispute that I

have always had with the Government in this case, Judge, which has been what Mr. Fakiro's role was in the conspiracy and when it began. And that has really been the entirety of this.

If you take Ms. Borohov's statements, they are really the only ones that -- well, there is no motivation. She doesn't have any relationship with Mr. Fakiro. There is no reason for her to lie. She is not protecting him. There is none of those things that go along with it.

And she illustrates I think what we agree was his role in the conspiracy, that he worked for Loz. And he came over and worked in the warehouse all of those things we have always acknowledged.

The Government has asserted that Mr. Fakiro has a larger role in this, that his involvement came much earlier, and that has primarily revolved around the testimony or the statements of Mr. Loz. I won't go over those again with Your Honor in terms of whether those are credible or not, but I will just suggest to you that when Mr. Loz tells the agents that he brought Mr. Fakiro along to meet Mr. Bangiyev, to watch him count $3 million in open daylight, that's not believable.

That later on in July of 2013, after he has already gone to the trouble of introducing Mr. Fakiro to Mr. Bangiyev, he then goes to all this effort to keep Mr. Bangiyev from knowing who Mr. Fakiro is. Those things don't even internally make sense. There is no reason for any of that.

The car that Mr. Bangiyev describes, they described as a different car than Mr. Fakiro had.

There is no doubt that Mr. Fakiro was in the country. I mean, those are the records, we have never strayed away from that, just what has been his involvement and when it did start.

The last thing I will leave the Court with in terms of Mr. Loz being demonstrably false is he has told the agents in December of 2013 he imported the largest amount of counterfeit currency he had brought in, which was 12 to $13 million, and he did it through four machines through Ventura and through Universal. And there is absolutely no record of any of that happening anywhere. That is demonstrably false.

When Your Honor is looking at how Mr. Fakiro fits into all of this, we've never disputed that it is two-and-a-half to 7. He is responsible for what was found at the time of his arrest. The 1.8 or the 2.8 that Mr. Bangiyev is alleged to have gotten, which brings it to 5.3 or 4.3, but there is really nothing the Court can put its hands on to talk about Mr. Fakiro's involvement in this conspiracy going back to 2011.

THE COURT: Okay. Thank you. Anyone else?

All right. Well, this isn't difficult to resolve at this stage. And we have some issues moving forward.

I think the evidence establishes that the Bangiyevs

were reasonably aware of between 7 and $20 million. I think that the seizure of 2.6, of course, is significant in that, but also the evidence that Ms. Dellibovi testified about and the quantity of the counterfeit currency that was recovered, all are consistent with more than $7 million.

Even if you discount much of what Johnny Lee said, there is significant amounts of counterfeit currency. And I focus just on the 3332 and 2272 currency. That it's very consistent with over $7 million having been distributed and/or manufactured over a multiyear period of time.

As I indicated, I looked at the printing presses. The equipment that is ordered and used. The amount of time, as I said, that this was ongoing. Of course, the seizures and the evidence recovered from the seizures are all consistent with the amount being above the $7 million range.

But news to me today was that there are other sources here in the United States, which I have factored in as well, others who were receiving currency from Loz, counterfeit currency. And that is something which I don't think has been completely developed, and it may or may not be relevant at sentencing time, but I will leave it to the parties to make that decision.

On the record before me, I think that the Borohovs and Mr. Fakiro are under the legal standard of reasonably foreseeable, that they are all in the 2.5 to $7 million range.

The testimony, even if you look at Mr. Loz' testimony, it's not clear to me how much work they were doing in Israel, but clearly they were brought here to the United States having assisted Loz previously with his work, and then they were here for a period of weeks and were involved in and were reasonably aware of the generation of over 2.5 but less than $7 million.

Mr. Fakiro was here for four days in 2011. Mr. Loz' testimony is inconsistent as to Fakiro's role. And I am not going to cast any aspersions to Mr. Loz, but he did change his story in significant aspects, and some of it is inconsistent. I am sure his debriefings are ongoing, and they may be evaluated further in the future.

For purposes of today and for moving on as to this, as counsel has indicated, is just one part of the Sentencing Guideline calculation, I think that his statements should not be given sufficient weight to change the statement regarding Fakiro's involvement and when it started. And I think it reflects presently that he was involved for a shorter period of time and for a lesser quantity.

So I will make those findings. I will notify the Probation Office as to those findings.

And we'll move on to the more important end of the game, end of this -- it's certainly not a game. End of this proceeding, which is we're going to get to some sentencings.

And if you don't mind my addressing the defendants, you all have been cooperating and all have been providing information to the Government, and that may be ongoing. The Government will reach a decision, and it is of course reviewable by me, as to whether you have provided credible information or not and why.

And as one of your counsel referenced, it is not easy to compartmentalize different stages of a sentencing, but I think that much more goes into a decision as to your credibility than just what we have addressed here today. And the overall cooperation that you provide will be the real deciding evidence that I look at as to whether there is cooperation, there is acceptance of responsibility, and how I should factor that into the appropriate sentence on your sentencing date.

So it's my way of saying to you, if there are inconsistencies present in what you have told the law enforcement to date and you want to correct any of that information based on what you have heard today and what you may have learned today that causes to you reflect on that, talk to your attorneys about what you want -- how you may want to amend, add, delete information that you have already provided.

So that when we get to the sentencing day, we're not squabbling about minor issues, and I get a better sense of the level of your candor and honesty in terms of what has happened

during the course of this conspiracy.

You, of course, are free to advise your clients the way you believe, but this is an evolving set of information, and the Government has evidence coming from different sources that they have weighed. Continue to work on that so that at sentencing I have a complete picture of what cooperation has been provided and why and the acceptance issues, and they are worked out before we get to the hearing, to the extent they can be.

And if they can't be, then at least I get -- in your sentencing memorandum I get statements as to where you are and why you are there.

So I will make -- I will issue an order as I have identified the loss factors, and the Probation Office will amend their reports to reflect that, and we will go forward.

Anything else that we need to address today?

MR. AMOLSCH: Are we going to set sentencing hearings, Judge, or do you want --

THE COURT: Are they open? I am sorry, I know --

MR. AMOLSCH: I know we --

THE COURT: I know I had continued them. I wasn't sure whether they have been continued generally or set off on specific dates.

MS. PEDERSEN: I think you have taken them all off the docket pending what happens today. And I guess I assumed

or inferred that you would set a hearing date today, a sentencing date at today's hearing.

MR. KROMBERG: Except --

THE COURT: Yes, sir.

MR. KROMBERG: Sorry, Judge.

MR. GREENSPUN: Judge, I thought we were going to make it through an entire hearing without hearing from Mr. Kromberg. It just couldn't happen.

THE COURT: It's impossible. And wait until you hear what he says.

MR. KROMBERG: There is another issue that I suspect may take some significant amount of hearing time, and that is the entry of forfeiture orders for the individual defendants.

We submitted one motion for one forfeiture order that probably was not the best practice, and we plan to submit individualized motions for individualized forfeiture orders.

But I suspect that at least with respect to the Bangiyev defendants, that there will be contested matters involving those forfeitures. And I suspect that the Court does not want to deal with those issues on a Friday morning at 9. So it may be appropriate to have another hearing somewhat like this about those issues after we submit our proposed individualized forfeiture orders and the defendants submit their responses.

THE COURT: I think they would be specific to -- I

mean, there may be substitute asset -- money judgment forfeiture orders --

MR. KROMBERG: Money judgment forfeiture I think is going to be the relatively easy part because Your Honor has been making or is in a position to make a finding about the appropriate money judgment for each of the defendants.

I think where the disagreement is going to be is the Government's position is that certain properties are in fact owned or controlled by the defendants, and I think the defendants are going to say that oh, no, that's not our property.

In one sense, it doesn't matter because the third parties can come in and contest the forfeiture. But I think this Court is first required to make a finding that yes or no -- actually, before entering a forfeiture order with respect to specific property, I think this Court is required to make a finding that the defendants were connected to that property as required by the statute.

THE COURT: I think 853 says exactly that. So I think that just applies to the Bangiyevs, right?

MR. KROMBERG: I think that is correct, Judge. I don't think there are any forfeiture issues with respect to the Borohovs, other than the amount of money judgment for the Borohovs and Fakiro and Loz.

MS. PEDERSEN: There is the New Jersey warehouses.

MR. KROMBERG: And the property that I don't think there is any dispute about, such as the New Jersey warehouse and various machinery that was there.

So I think the only difficult issues are -- well, moderately difficult issue is the amount of the money judgments, but the more contested issue and difficult complicated issue is particular individual properties that we say are controlled by the Bangiyev defendants and the Bangiyevs says are not, I think.

THE COURT: All right. Why don't we set these on my docket at 2 o'clock on calendar days when you all are available. I don't want to hear them all at once. I want to hear no more than two on any given Friday because I want to give them individual attention as I think they are all deserving. And that will overwhelm my brain if I have more than two that are related.

And we set them at 2 o'clock so that you will brief the issues on ownership, and then we can take testimony if necessary, and I'll make a decision based on the pleadings and any testimony I get on that day. Does that work or not?

Ms. Ginsberg?

MS. GINSBERG: Judge, I think that probably works.

The issue that I had was the question of joint and several liability. I think original ly the Government didn't believe that it could get control of Mr. Loz' assets that are

out of the country. I have talked about that with Ms. Pedersen. Obviously, we have an interest in that because to the extent that Mr. Loz, his assets can be used towards the joint liability, that's in our clients' best interests. And he certainly is the person who was in the position of having the largest amount of proceeds.

It's my understanding that the Government has informed Mr. Loz' counsel that they expect him to identify his assets. I expect if that happens, that since I believe that the United States government is getting control of assets all over the world, that that is possible.

And I think to the extent that the Court credits any of Mr. Los' representations about relative roles and relative responsibilities in this conspiracy, I certainly would want to know if he was forthcoming about his assets and whether that was information that he provides the Government with as the Government expects him to do.

And if, frankly, he is setting back here thinking he can hide his assets that he has under other people's names here and in other countries, I would certainly want to know that. And I think the Court would probably want to know that in making its decisions.

But in terms of -- the Court will make its individual assessment as to Eddie Bangiyev's forfeiture responsibility. Whether he owns certain specific assets, I still think that the

whole issue of the joint and several liability is crucial because this is something that is going to follow them around the rest of their lives.

THE COURT: Do you think this is something that needs to be made before or after the individual forfeiture issues are addressed at sentencing? How am I going to know until sentencing --

MS. GINSBERG: I certainly would want to know at the time that Mr. Bangiyev gets sentenced whether Mr. Loz has been, in the Government's estimation, been totally forthcoming about the amount of his assets and where they are.

THE COURT: All right. Well, let's schedule the Bangiyevs after Loz' sentencing. And if you need a hearing date to explore that further before your sentencing date, then just let me know. Let's leave a little time in between those so that that is something you can explore.

And I think you can certainly explore that even after a sentencing hearing. I mean, I just finished a mortgage fraud case where I dealt with culpability in a conspiracy, reasonable foreseeability, and multiple/single conspiracies, substitute assets, and just issued a bunch of -- it was United States versus Chittenden, and I think my last order just went out yesterday. It may be something that you want to reference.

I think, frankly, the short answer to how broad the Government's net is that it is broad, but you may want to look

at that. And especially for purposes of substitute assets with a money judgment because you have got forfeiture issues, and then you get a money judgment, and then they go looking for other assets to support the money judgment that are outside of the specific forfeiture. And so, it addresses multiple issues.

But for our purposes now, let's set --

MS. GINSBERG: Are you talking about setting a hearing specifically for the forfeiture, or doing that as part of the sentencing?

THE COURT: No, I want to do it as part of the sentencing. I think we can handle that.

MS. GINSBERG: I, unfortunately, don't have my calendar with me.

THE COURT: Let's call chambers tomorrow or next week and set good dates on your individual calendars for the sentencings. And let's have the Loz sentencing before the Bangiyevs so that Loz will be resolved and you will know one way or the other.

Mr. Kromberg.

MR. KROMBERG: I certainly understand Ms. Ginsberg's concern about joint and several liability. I think it's probably a moot issue because I don't think that the Bangiyevs have the kind of property that is going to reach beyond the amount of the forfeiture that is going to be imposed merely against Alex Bangiyev and Eduard Bangiyev. And pick whatever

that number might be, unless they have more property than that, it doesn't matter if Itzhak Loz has even more property somewhere else in the world.

I think we may be worried about an issue that is very unlikely to arise, to actually arise.

THE COURT: Well, I won't know that until it arises, will we? So let's work together so that we can frame it so that it's ready for disposition on the various dates of sentencings for the defendants.

Okay. Anything else?

MR. GREENSPUN: No, sir.

THE COURT: All right. Thank you all for your contributions before the hearing and at the hearing today, they helped me significantly further understand, better understand the issues and the loss amount. Good day to each of you today.

Thank you to the Marshals Service for your time and effort as well.

We are in recess.

MS. GINSBURG: Thank you, Your Honor.

---

HEARING CONCLUDED

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

/s/ Norman B. Linnell

Norman B. Linnell, RPR, CM, VCE, FCRR