# EXHIBIT A

So an individual would need to edit the image in order to create the file that would be used to then create a transparency or a film of sorts.

That film would then be placed over a coated plate, exposed to light, which would develop the plate. And then that plate would be used to produce currency.

Those plates may wear out in time, but typically the same file or transparency is used in those. That's what we're referring to with the consistent characteristics.

Q. And the file, the digital file, that you said that can be acquired either on the Internet or on a CD presumably?

A. Possibly, yes.

Q. So you don't know how many copies of this original file exist?

A. No.

Q. So 20 different people could be starting with the same original digital file and creating plates and transparencies and essentially creating the same --

A. It's possible.

Q. -- the same counterfeit notes? And there is nothing that in your --

A. It's possible. And we would continue to associate them as being the same because they would have those same characteristics.

Q. So there is nothing about what you do in your examination

that makes it possible to know how many other people may have the same digital image to start with?

A. No. My examinations are not intended to point a finger at any particular person, but rather state that the images are compared to each other.

Q. Okay. And you wouldn't know how many people have copies of the same plates either?

A. No, I would not.

MS. GINSBERG: I think that's all the questions I have.

THE COURT: All right, thank you.

Any other counsel have questions for Ms. Dellibovi?

MR. AMOLSCH: Can I consult with Ms. Ginsberg for a moment, Your Honor?

THE COURT: Sure.

MR. AMOLSCH: I have one question, Judge, but I don't need to go first.

MR. GREENSPUN: Just a couple, please.

THE COURT: Oh, certainly.

BY MR. GREENSPUN:

Q. So you said that you're not -- your examination does not point to any particular person, is that correct?

A. Correct.

Q. All right. And the counterfeit notes or suspected counterfeit notes that you received from the 160 field offices

A. Mr. Loz stated that he was concerned that law enforcement was aware of the counterfeit, and thought it would be better for them to move it to America so they don't have to worry about getting caught going through Customs.

Q. All right. When Mr. Loz was interviewed, he initially told you that Mr. Fakiro's involvement in the conspiracy happened much later, much nearer the end. That his involvement began around 2014, and that he had no prior involvement in the conspiracy prior to that?

A. Initially, correct.

Q. Okay. And then in a separate interview or separate series of interviews, he then changed that story to talk about Mr. Loz' and Mr. Fakiro's involvement with him beginning in 2011?

A. That is correct.

Q. And I believe he gave you two examples, I think he said, of his active participation in the conspiracy, one in 2011 when he, Mr. Loz says he delivered money to the Bangiyevs, and again this 2013 money transfer again to Alex Bangiyev as examples of his involvement in the conspiracy, is that correct?

A. Sorry, can you repeat the question?

Q. Mr. Loz gave you examples of what he said was Mr. Fakiro's involvement in the conspiracy prior to 2014 when he initially said Mr. Fakiro became involved?

A. That's correct.

Q. And he said that there was an incident in 2011, and this

is referenced in the Government's pleading, there is an incident in 2011 when Mr. Fakiro allegedly delivered counterfeit currency to Alex Bangiyev, and again in 2013, the July of 2013 incident we talked about earlier with the popping of the trunk?

A. Mr. Loz stated that he showed Mr. Fakiro a counterfeit bill in 2011. And that after a couple days -- and asked him if he would help him manufacture the counterfeit currency. Mr. Loz stated that after a couple days Fakiro agreed to join him in producing the counterfeit.

Early in 2011 Mr. Loz stated that Mr. Fakiro and the Borohovs helped him move machinery from one location where they were making counterfeit to another location.

Mr. Loz stated that Mr. Fakiro then helped manufacture counterfeit currency from 2011 all the way until their arrest. And then, yes, specifically in 2013 Mr. Loz stated that on his behalf Fakiro went to the U.S. and met Alex Bangiyev to give him a shipment of counterfeit.

Q. And to put this kindly, Agent, did you tell Mr. Loz that you did not believe his story about Mr. Fakiro prior to the second interview and encourage him to change his story?

A. I don't recall if those were the exact words that were said, but we did make it clear to Mr. Loz and his attorneys that we thought there was some untruthfulness in his first part.

Q. And he then changed his story to one more in line with your theory of the case?
A. He changed his story to what he told me. I never told him what my theory was as far as specifics.
Q. You told him that you didn't believe what he was saying?
A. Correct.
MR. AMOLSCH: Judge, can I ask Mr. Ruelas for a cup of water?
THE COURT: Yes, sir.
Q. So let's talk about the 2011 transfer of money which the Government references in their pleading to Alex Bangiyev.
Now, my understanding is that Mr. Loz was bringing in at this point $3 million, I believe you testified earlier, around 2011 he is bringing in $3 million at a shot and delivering it to the Bangiyevs, and he is doing that four times a year?
A. Correct. I believe that Mr. Loz said that from 2008 to 2011 it was approximately 2 to 3 million, and after 2011 it was approximately 4 to 5 million.
Q. Okay. So, 2 to $3 million at a time. Okay.
The MOI for Mr. Loz regarding this says the following: Loz stated he delivered a shipment of counterfeit currency in 2011. He stated during this transaction Ronen Fakiro was present.
So Mr. Fakiro was present with Mr. Loz and Mr.

which is not unusual.

MS. PEDERSEN: Okay.

THE COURT: But if you want argument, I will hear argument now.

MS. PEDERSEN: Yes, Your Honor. I would like to point the Courts attention to, I think the theme that has come through this afternoon and this morning is a lot of the evidence on the loss comes from Itzhak Loz and, to a lesser degree, Johnny Lee.

Itzhak Loz as the printer is in a unique position to know how much money he printed, where it went, what he got out of it, how he did it, the methods.

And he has been attacked here, understandably, because of perhaps the way that the information he provided during the interviews came out. For example, he initially told the Government that Mr. Fakiro didn't really know what he was doing. 2014 he came here, basically to assist, and didn't figure out until later.

Well, that story just doesn't make sense. And when pressed, he admitted that he is friends with Mr. Fakiro, and they are close, and they relied on one another, and they trusted one another. And he didn't want to get Mr. Fakiro in any more trouble than he already found himself. And he eventually came around and explained the role of Mr. Fakiro beginning in 2011.

That information the Government was able to corroborate through a review of text records, which shows the entries and exits of people to and from the United States for international travel. And lo and behold Mr. Fakiro is coming to the United States starting in 2011.

Mr. Loz said that he told Mr. Fakiro who the people in the conspiracy were. As makes sense, because as a member of the conspiracy, he needs to know with whom he can speak freely and with whom he has to be more guarded.

Mr. Loz said that Fakiro came here in 2011 and saw Alex Bangiyev. That makes sense. Alex Bangiyev was the person who was getting the counterfeit in America.

In 2013 Mr. Loz said Fakiro came here because Mr. Loz was unable to. And guess what? The text records support that in July. And the Government was able to get records from National Car Rental which show in a short time period in July that Mr. Fakiro did rent a car at JFK Airport during the time period that Mr. Loz says he was here.

And it is no coincidence that Mr. Loz said the deal happened at the Lexington Inn Hotel and Suites near JFK Airport, it is where he and Mr. Fakiro were arrested a year ago today with 100,000, 50,000 on one, 40,000 on the other.

Why should you believe Mr. Loz? There is a couple of reasons. He tells us about 13 Sylvester Street. Well, 13 Sylvester Street pops up first back in 2011. Mr. Loz rented

the New York storage facility where we found $2.56 million a year ago. The address that Mr. Loz used was 13 Sylvester Street.

13 Sylvester Street, when you pull the lease, was leased by Alex and Eddie Bangiyev for five years.

Now, we know that counterfeit was manufactured there according to Mr. Loz. We found a third party witness, Mr. Thomas Thompson, who had the business next door, he restored Volkswagens. And he identified a photograph of Alex Bangiyev recently during an interview and said that there were a couple of Russians occupying that place. He thought it was strange, there was no store front, didn't seem to be doing any business. They told them that they were printers. He didn't really see anything that appeared to be legitimate.

He also described the magnesium etching machine that was delivered to that facility. How do we know that happened? We have the invoice for the delivery which was to Eddie and Alex's house.

Mr. Thompson said he went into 13 Sylvester Street after the Russian occupants disappeared suddenly, and saw it was equipped for heavy wiring. Well, that is what you need when you're using industrial Heidelberg printing presses to print millions of counterfeit $50 bills.

What else did Mr. Lox tell us? He said that Eddie bought equipment on his eBay account. So what did we try to

do? We tried to see if that was accurate. We subpoenaed EBay records for Eddie Bangiyev, and we found purchase of a Heidelberg press and another piece of equipment on Eddie's credit card account and one on Alex's credit card account.

It corroborates from Mr. Loz said. We didn't know about that before the arrest, before the take-down or before the indictment. We learned that during the interviews of Mr. Loz, and we were able to corroborate that.

Now, 13 Sylvester Street is important in this case, it buttresses the credibility of Mr. Loz. Because he said, look, we were making $50 bills there, it was Alex's idea that he wanted to make the 50.

And we can corroborate that independently. The Secret Service seized $50 bills from Alex Bangiyev back in 2007 when he was arrested selling $100,000 in bills to Mr. Bost. Fingerprints of Alex Bangiyev and Itzhak loss were found on portions of those counterfeit bills.

The Bangiyevs' story about Sylvester Street just doesn't make sense, Your Honor. They stood up here at their plea colloquy and told you that Loz unwittingly used their address to make deliveries of printing supplies. That they had no idea that was happening, they didn't consent to it, and they certainly didn't participate in it. That they were unwitting people and they know nothing about Sylvester Street.

That story changes over time. Because the next story

is that, well, yes, we did lease that building, but it was to cut raw diamonds that we were getting from Africa and shipping them to Israel. But there was no diamond cutting machinery that was ever sent there or shipped there.

And then the last story that Mr. Alex Bangiyev gives as well --

MR. KROMBERG: Excuse me, Your Honor.

MS. PEDERSEN: Your Honor, the point is, I am not referring to the inconsistent statements by Mr. Bangiyev to enhance the sentence, but to show the Court when you're evaluating the credibility --

THE COURT: Of Mr. Loz, right.

MS. PEDERSEN: Yes. This story that he tells is backed up by objective evidence. The story that the Bangiyevs tell is just not to be believed.

We're not asking you to use those statements to enhance their sentence. But we are asking you to consider it when you're making a credibility assessment in terms of what do you believe and what do you think is reliable.

We think at the end of the day, Your Honor, that the documentary evidence backs up the version of Mr. Loz and is to be believed. Of course he has interest in this case. He has a loyalty to some degree to Mr. Fakiro and to the Bangiyevs in the past, and he has his own self-interests. And the Court should consider that, he has got an interest in giving out

information that is negative and impacts negatively on his co-conspirators, at the same time trying to help himself. Of course the Court should consider that in weighing his information.

But at the end of the day, his story makes sense. It is verified in independent ways. And the Court should credit that.

The Court should also look at the data from the Secret Service which shows he says he was doing 10 to $12 million a year. The data that the Secret Service keeps of the counterfeit is consistent with that information.

And again, the statement of Johnny Lee, we didn't focus on Johnny Lee in the hearing today, but in the pleadings Johnny Lee said that he was getting between 250 and $300,000 from Eddie Bangiyev recently, from 2011 through 2014. And he identified another individual, the first unindicted co-conspirator, who was getting similar quantities from Alex Bangiyev during that same time period.

His information, Johnny Lee's information is corroborated through Tarell Johnson and Eric Buchanan. Eric Buchanan was the individual who was working with the Secret Service in May and September of 2013, and he purchased counterfeit from Johnson who had gotten it from Lee.

Those bills were taken, analyzed by Secret Service, and determined to be the same kind, the 22272, that was later