1

```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
                       Alexandria Division
```

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
      -vs-                    :    Case No. 1:14-cr-206
                              :
ITZHAK LOZ,                   :
                Defendant.    :
                              :
------------------------------:
```

SENTENCING HEARING

September 18, 2015

Before:   Liam O'Grady, USDC Judge

APPEARANCES:

Kimberly R. Pedersen and Gordon D. Kromberg,
Counsel for the United States

William R. Martin, Counsel for the Defendant

The defendant, Itzhak Loz, in person

2

1          THE CLERK:  Criminal case number 1:14-cr-206, the

2    United States of America versus Itzhak Loz.

3          MR. MARTIN:  Good morning, Your Honor.

4          THE COURT:  Good morning again, Mr. Martin.

5          MS. PEDERSEN:  Good morning, Your Honor.  Kim

6    Pedersen, Gordon Kromberg, and Special Agent Joseph Dobish from

7    the Secret Service on behalf of the Government.

8          THE COURT:  All right.  Good morning to you.

9          MR. MARTIN:  And for the record, William Martin,

10   Judge.

11         THE COURT:  Yes.  Ms. Ginsberg, I don't recognize the

12   guy sitting next to you because maybe he has got a tie and

13   jacket on?

14         MS. GINSBERG:  I was going to say, it was a little

15   bit of a shock, but the eyes adjust pretty quickly.

16         THE COURT:  I just wanted to know where he gets the

17   Hawaiian shirts.

18         All right.  This comes on for sentencing.  Are the

19   parties ready to proceed?  Ms. Pedersen, Mr. Kromberg, are you

20   ready to proceed?

21         MS. PEDERSEN:  Yes, Your Honor, we are.

22         THE COURT:  All right.  Mr. Martin, are you ready to

23   proceed?

24         MR. MARTIN:  Yes, Your Honor.

25         THE COURT:  All right.  Good morning, Mr. Loz.

3

1          THE DEFENDANT:  Good morning, Your Honor.

2          THE COURT:  There is a supplemental memorandum in aid

3     of sentencing that was received -- what's today?

4          MR. MARTIN:  I think it was yesterday, Your Honor.

5          THE COURT:  Yesterday.  Where in further counsel with

6     Mr. Loz you are submitting that the loss amount, which was

7     greater than $50 million, should be -- and results in a Level

8     24, should be reduced to between 7 and $20 million, which would

9     result in a change to a Level 20.

10          Also, that there is objection to the role in the

11     offense where Mr. Loz has received four points for being the

12     supervisor/manager, and believing that he should not receive

13     any adjustment.

14          And that also an objection to the two-point

15     enhancement for part of the offense having occurred outside the

16     United States.

17          Obviously, the Government hasn't had a chance to

18     reply in writing to that.  My first question would be -- and my

19     concern in particular is whether or not the Government has used

20     any of the information that Mr. Loz provided, especially with

21     regard to the $50 bills, and perhaps the

22     nine-and-a-half million dollar figure, in calculating that

23     $50 million-plus Guideline range -- in forming that range.

24          So, I mean, I have my own thoughts on it, but Ms.

25     Pedersen -- well, first, Mr. Martin, is there anything in

4

1     addition to what you placed in your memorandum that you want to

2     point to as reasons why the Guideline range should reflect the

3     lower numbers that you've advanced?

4            MR. MARTIN:  Yes, Your Honor.  May I proceed at this

5     time?

6            THE COURT:  Yes, proceed.

7            MR. MARTIN:  Your Honor, we would submit that in

8     reviewing the May 28 -- and the Court I know recalls the

9     hearing that you held on the loss amount on May 28, 2015.  And

10     in reviewing the transcript of that May 28 hearing, it was

11     clear to me in just reviewing that that the bulk of the

12     evidence regarding the loss amount came from Mr. Loz.

13            We also would submit that the entire -- on page

14     number 16 of the presentence report, the 50 to $100 million as

15     noted by the Probation writer -- and the Probation writer, I

16     was a little shocked to learn that the memorandum of interviews

17     of Mr. Loz during a debriefing was turned over to Probation,

18     and Probation used -- it's the first time I've ever seen that.

19     And Probation used that in its offense -- in determining the

20     loss amount.

21            And, Your Honor, as the Court -- I did not pass up to

22     the Court, but I don't believe the Government would dispute

23     that prior to the debriefings of Mr. Loz, we had an agreement,

24     written agreement with the Government that the Government would

25     not use Mr. Loz's statements against him with the loss amount

5

1    or any other issue.

2            And in reviewing the transcript, both the testimony

3    of Agent Gaab when he testified and the presentence writer,

4    they refer to Mr. Loz.  Mr. Loz, without going into the details

5    of those debriefings, did provide the Government with

6    information.  Without that information, the Government could

7    not have established a loss amount in excess of that 20 -- of

8    $50 million or more.

9            THE COURT:  What about the Secret Service agent's

10   testimony at another hearing, or maybe the same hearing --

11           MR. MARTIN:  The same hearing.

12           THE COURT:  -- and coupled with the fact that the

13   plates were recovered from the computer of Mr. Loz?  What's

14   your position on whether that independently establishes that

15   loss amount?

16           MR. MARTIN:  Your Honor, one of the factors I think

17   the Government now knows is in this counterfeit conspiracy in

18   this case, that there were computers used.  And there were

19   computer images which were used to create a plate.  I believe

20   the Government has information that there is more than one

21   plate.  They have information that was provided by Mr. Loz of a

22   plate was removed by someone with somebody else.

23           And with regard to the Secret Service agent, when she

24   testified at page 54 of that hearing, Your Honor, beginning on

25   line 25, the following question was asked:  So there is nothing

6

1    about what you do in your examination that makes it possible to

2    know how many other people may have the same digital image to

3    start with?  Answer:  No.  My examination is not intended to

4    point a finger at any particular person, but rather state that

5    the images are compared to each other.

6            Question:  Okay.  And you wouldn't know how many

7    people have copies of the same plates either?  No, I would not.

8            So we would submit to Your Honor that it's impossible

9    for the Government -- there may be images out there, but

10   without Mr. Loz indicating the amounts, the dates, and the

11   locations, they could not reach the amount of 50 to

12   $100 million without his testimony.

13           Your Honor, I would submit the same argument applies

14   with respect to the two-point enhancement for parts of the

15   conspiracy occurring outside of the United States.

16           And again, I would go back to the same transcript and

17   the same memorandum of interviews.  And I have reviewed those

18   exhaustively.  And in those interviews and in the testimony of

19   Agent Gaab, he describes how the money was brought from Israel

20   to the United States.  The Government did not know where the

21   money was coming from, how it was entering the United States

22   until Mr. Loz provided that information.

23           THE COURT:  Does the Government need anything more

24   than the fact that Mr. Loz transported or had transported

25   machinery to the warehouse to assist in the manufacturing of

7

1    the currency to demonstrate that part of this occurred outside

2    of the United States?

3           MR. MARTIN:  Your Honor, I believe they do.  If we

4    pull up the Guideline, I don't have that section cited, but it

5    does not -- my initial thought was that that may be sufficient.

6    That if one, I think it's the Heidelberg press, was shipped

7    into the United States from outside of the United States, but

8    the wording of the two-point enhancement is that the activity

9    occurred outside the United States.  And it was not the

10   importation of the printing press.

11          I would agree with you that a printing press was

12   used, but if the Court refers, looks at the section -- if I may

13   have a moment, I will put that up also, Your Honor.

14          I did not cite that section, Judge, it may take me a

15   moment, but it does refer to activities occurring outside of

16   the United States and not the equipment.  And when I take a

17   moment, I will pull that section up, but I believe I'm

18   reasonable confident, Your Honor, that the statute -- the

19   provision of the Guideline indicates that the activity occurred

20   outside of the United States.

21          THE COURT:  Okay.  Let's go then to the enhancement

22   for the role in the offense.

23          MR. MARTIN:  And with regard to that argument, Your

24   Honor, again at that same hearing on page 124 of the

25   transcript -- well, first, the proposition that I would submit

8

1    to the Court is that at some point Mr. Loz was approached by a

2    person, and I think Your Honor addressed part of this on the

3    hearing on the 28th, at page 124 he was addressed by a third

4    person.  And Your Honor said we would refer to that person as I

5    believe co-conspirator number 3.

6            Again on page 123, line 24 and line 25, Judge.  The

7    question from you is:  Is that person -- did that person, I

8    will call him unidentified co-conspirator number 3 just for

9    clarity, is that the person that recommended Mr. Borohov to

10   work for Mr. Loz in Israel?  You're asking Agent Gaab that.  He

11   answered:  Yes.

12           Okay.  You ask a follow-up question:  Did that

13   person, unidentified co-conspirator number 3, did he introduce

14   Loz to Alex Bangiyev for the purpose of selling counterfeit

15   currency in America?  And the answer from the agent was:  Yes.

16           So I would submit, Your Honor, that Mr. Loz was

17   recruited as a printer.  He is not the organizer of this

18   conspiracy.  He played a substantial role, and the Guidelines

19   provide for punishment and a sentence for that role.  But to

20   enhance his sentence by four points, four levels or two levels,

21   I think is not supported by the evidence here.

22           I think Mr. Loz was one of many co-conspirators.

23   They are joint operatives here.  And there is no evidence that

24   would show this Court by a preponderance of the evidence that

25   Mr. Loz was the leader or the organizer to support a two or a

9

1    four-point enhancement.

2              And if Your Honor doesn't have any other specific

3    questions, if the Government is going to speak, I will pull up

4    that code section so I can cite the exact section that I was

5    reading to you about occurring outside the country.

6              THE COURT:  Yes, please.  Thank you, Mr. Martin.

7              MR. MARTIN:  Thank you, Your Honor.

8              THE COURT:  Ms. Pedersen.

9              MR. PEDERSEN:  Your Honor, in terms of the loss

10   amount, the loss amount in this case is derived from material

11   other than from the defendant's statements, and they preceded

12   the defendant's information to the Government.

13             First of all, the Secret Service tracks the

14   counterfeit in this case.  The Court has heard testimony

15   concerning that and how it's tracked and how it's identified.

16   And the most prolific notes in this case were the 23332 and

17   22272, the hundred dollar notes.

18             The Secret Service data tracks it on a weekly basis,

19   and they maintain records of what the amounts are and where

20   these notes are found and things like that.

21             The past cases that the Secret Service investigated,

22   including Johnny Lee back in 2004, the amounts involved in

23   those cases, 50,000, $100,000, are consistent with the amounts

24   that were investigated in the most recent case.

25             Johnny Lee gave information that he was getting

1  between one million and $3 million per year.  That is

2  information that is independent of Mr. Loz.

3         Mr. Loz's fingerprints were found on bills back from

4  2007.  CBP had records of import from Universal Auto, which

5  showed quarterly imports to -- I am sorry, AM Ventura,

6  quarterly imports to Universal Auto.  There 2.56 million ceased

7  from Mr. Loz's warehouse in New York.  It corroborated the

8  amounts of money that were being generated quarterly.

9         At the New Jersey warehouse there was a handful of

10 bills there that were counterfeit.  But more importantly, the

11 offset printing plates, the transparencies, the dyes, and

12 really most damningly to the defendant were the computer images

13 found in two separate computer towers.

14        The images from those computer towers went back to

15 2004.  And I think as we have pointed out in our pleadings, the

16 Treasury seal is the common denominator.  And that information

17 doesn't come from Mr. Loz.  It comes from a forensic review of

18 physical evidence that is seized from the warehouse, from the

19 domestic printing plan.  The Treasury seal is the same from

20 2004 and Johnny Lee in Richmond through 2007 with Alex in New

21 York.  It's the same in 2013 with Tarell Johnson and Johnny

22 Lee, it's the common denominator.

23        What else do we find in the warehouse?  It's the

24 paper that the Borohovs were gluing in various stages with the

25 security features.

1          The Borohovs lead me to the next issue, really the

2     next two issues that are I guess in dispute at this point, are

3     the offense taking place outside the United States.  When the

4     Borohovs were arrested inside the warehouse at the heat

5     presses, they both independently gave statements that they were

6     doing this work in Israel from 2011 onward.

7          I mean, I think that's clear, that information was

8     derived before the defendant was interviewed by the United

9     States, before he provided that information.  And that was

10    derived from them.

11         That information was corroborated by records that we

12    saw the Borohovs come into this country.  They said that they

13    were recruited by the defendant.  That they had done this work

14    in Israel, that he showed how to glue in their own house inside

15    Israel, and that they were doing this for quite sometime.

16         Other evidence that the offense took place outside

17    the U.S. which was not provided by Mr. Loz was that printing

18    presses, there was a printing press that was purchased in

19    Canada and it was brokered by a dealer named Chase Nixon from

20    Minnesota.  The press was delivered to the New Jersey

21    warehouse.  Secret Service agents who were doing surveillance

22    observed that.

23         Mr. Nixon was interviewed and he corroborated that he

24    brokered the sale of this Canadian printing press.

25         Secret Service agents were also present when a

1    container -- when a container was delivered on a 16-wheeler to

2    the warehouse.  They tracked the serial number on the sea

3    container.  They went to CBP, they got records, and it was nine

4    printing presses and machines imported from Israel.

5              Addressing the supervisory role.  Again, the

6    Borohovs, as the Court heard last week at their sentencing,

7    were people who were gluing and using machines that the

8    defendant taught them how to use.  He supervised them.  He told

9    them what to do and when to do it.  And I think clearly that is

10   sufficient to show that he had a supervisory role in this case.

11             THE COURT:  Two questions.  One is, Mr. Martin has

12   raised the point that there may be evidence that other, one or

13   more other persons had the plate images, if not the plates

14   themselves, based on the Government's investigation.

15             The second is that the Bangiyevs have been found

16   responsible for between 7 and $20 million of counterfeit money.

17   And why the difference there?

18             MS. PEDERSEN:  Two things, Your Honor.  The first is

19   that the information that others had plates comes solely from

20   Mr. Loz.

21             THE COURT:  Okay.

22             MS. PEDERSEN:  At this point I can't corroborate that

23   or refute that.  What I can say is from the data that Secret

24   Service has is that there has been basically, almost -- I mean,

25   I don't want to say a complete cessation, but the amount of

13

1    counterfeit of this type of note has not increased, it has

2    decreased.  The amount is not getting greater.

3           So I would argue that it has been -- this plant has

4    been dismantled.  That the person responsible is in custody.

5    The person that was printing it is locked up and unable to

6    print.  And there is no one else currently who is in a position

7    to do that.

8           In terms of --

9           THE COURT:  I'm sorry.  So there is no new currency

10   flowing --

11          MS. PEDERSEN:  There is some that is dribbling in and

12   there are bills that are being accounted for, but it's

13   certainly not at the level before.  I would attribute that to

14   counterfeit that we were not able to seize last year at the

15   take-down that made it to the streets, but it's certainly not

16   at the $10 million level that the agency had seen previously.

17          And I am sorry, Your Honor, the second pointed

18   concerning the Bangiyevs, I didn't-hear entirely what --

19          THE COURT:  Haven't they been found -- have they been

20   found responsible for between 7 and $20 million of counterfeit

21   currency versus the 50 to 70, is that right?  Do I understand

22   that correctly?

23          MS. PEDERSEN:  That is correct, Your Honor made that

24   finding after a hearing.  I mean, I believe that is a very,

25   very conservative amount of money.  I believe that it's

14

1    foreseeable that an even greater amount of money should be

2    attributable to them, but that has been a precedent that has

3    already been set in this case.  We had a hearing, there was

4    evidence, the Court made a finding, and that's -- I don't think

5    has any bearing on this issue pending before the Court.

6              THE COURT:  Well, I mean, there is -- it has a

7    bearing, and I know that I made that finding based on a

8    specific hearing as to the Bangiyevs.  And whether I can

9    consider other information in forming what the proper loss

10   amount is at a sentencing, I'm not sure that the two are

11   100 percent bound to each other.  But I did make that finding

12   and there was evidence produced in that other case.

13             Okay.  I understand the Government's position.

14   Anything else?

15             MS. PEDERSEN:  Not at this time, Your Honor.

16             THE COURT:  Mr. Martin, do you want to address what

17   Ms. Pedersen has said?

18             MR. MARTIN:  I would, Judge.  Specifically when they

19   talk -- they trailed these nine printing presses that had been

20   shipped.  What they weren't able to find, even though they had

21   gone through Customs, they weren't able to figure out what was

22   in those.  The printing presses were not being brought here to

23   be used as printing presses.  The printing presses were being

24   brought here as a means of shipping the contraband.  And they

25   could not find the contraband.

15

1          Mr. Loz helped the Secret Service -- you know,

2     explained how to disassemble the printing presses to find the

3     contraband.  So it wasn't the nine printing presses that were

4     being brought here.

5          After Mr. Loz explained to --

6          THE COURT:  They were brought here.  And were they

7     stuck in the warehouse?

8          MR. MARTIN:  They were thrown away, essentially.

9     They were not the type of printing presses that were -- the

10    Heidelberg is kind of the state of the art.  These were devices

11    that were being shipped solely for the purpose of transporting

12    the contraband.  And the Government was not aware -- they

13    believed that, but they were not aware of how it could be done

14    or where it could be concealed.  And that was explained by Mr.

15    Loz.

16         Your Honor, I would submit that on the issue of the

17    role of Mr. Loz, clearly the Bangiyev brothers are -- if they

18    are not the leaders, they are clearly at the head of that

19    organization.  The money was brought here and given to the

20    Bangiyevs.  The person who was directing this introduced Alex

21    Bangiyev to -- Mr. Loz to Alex Bangiyev.  That person and Mr.

22    Alex Bangiyev had a prior relationship.  Mr. Bangiyev did not

23    have a means of -- I'm sorry, Mr. Loz did not have a means of

24    distributing the counterfeit money.  It was the Bangiyevs who

25    received it, who had the distribution network, that was the

1    supervision.

2            So we would submit, Judge, that there is not

3    sufficient evidence to show that Mr. Loz had a role.

4            And, Your Honor, we are not here trying to diminish

5    or downplay the significance of the criminal activity that

6    Itzhak Loz has engaged in.  He is, by entering a plea of

7    guilty, he accepts that.  What I did not get into my opening

8    portion, if I may talk a bit about his background, what I did

9    not get into -- may I, Judge?

10           THE COURT:  No, I will give you an opportunity.

11   We're still dealing with what the appropriate Guideline range

12   is, and I will give you time to allocute after that.

13           MR. MARTIN:  The reason I raise that, Judge, is that

14   there was a time that Mr. Loz was encountering severe financial

15   problems in Israel.  The introduction to these people occurred

16   and Mr. Bangiyev was part of that introduction.

17           So on the issue of leadership, there was already an

18   operation going.  I believe that the Government has already

19   been advised in some of those debriefings that during the early

20   days of that conspiracy, some of the printing that was

21   occurring was just being -- were not -- it was different than

22   what Mr. Loz was doing.  But there was already an operation

23   here that involved, we believe, the Bangiyevs and others.

24           Mr. Loz joined that operation, Your Honor.  And we

25   submit that with regard to the loss amount -- and, Judge, I'm

17

1    not trying to raise an issue of law of the case and that you

2    have previously found an amount, that is not my argument.

3            My argument is that with the evidence presented, the

4    Court could not find by a preponderance of the evidence that

5    more than $20 million could be attributable to Mr. Loz.

6            Your Honor, the last issue I would raise, and I did

7    not want the Court to think that we're appearing today having

8    withdrawn an objection to a loss amount and now trying to find

9    a bag door way in.  What we always assumed, Judge, in

10   debriefings, is that the Government had more information as we

11   were talking.  And we did not -- with the experience that I

12   have, if you're cooperating, if you're representing somebody

13   who is cooperating, I did not want to be in this courtroom with

14   Mr. Loz as he was cooperating when his words were going to be

15   used at that hearing against almost all of the other still

16   existing, pending criminal co-defendants.

17           So we thought that we would have an opportunity today

18   at sentencing to explain to you that while we withdraw that, we

19   always were preserving the right to argue that without his

20   words, they could not prove 50 to $100 million.

21           THE COURT:  All right.  Thank you, Mr. Martin.

22           Well, I talked to the Probation Office.  And the

23   Probation Office had available to them debriefings.  And the

24   Probation Office uses what they have appropriately to determine

25   all the facts that they raise in their presentence report.

18

1            I am concerned with the cross-pollination of

2     information.  I do not believe that the information that Mr.

3     Loz provided should be used to enhance his sentence in this

4     case.

5            You know, I looked at the loss amount earlier.  I

6     didn't have all of the information that I have today.  The

7     setting was a little different.

8            But I went back over the transcript of that hearing

9     and the information that was arrived at.  You know, the

10    limitations of the Secret Service agent's testimony concerning

11    the inability to rule out that anyone else had possessed at any

12    time these plates or the ability to make the 50 or $100

13    counterfeit money, I was I think conservative.  And I think I

14    should be conservative in looking at loss amounts, to be

15    completely satisfied and to err on the side of the defendant in

16    findings as guided by the law.

17           I am going to adjust the loss amount.  I was very

18    confident that 7 to $20 million had been proved.  And I

19    understand that without question there has been between 50 and

20    $70 million of these $50 bills and $100 bills.  And that, as

21    Ms. Pedersen as pointed out, was just the plates that we

22    focussed on at the earlier hearings.  So there is a significant

23    amount of money out there.

24           But for purposes of the Guideline calculation, I am

25    going to reduce it down to a Level 20 from the Level 24,

1    finding between 7 and $20 million in loss.

2           I find that the Guideline calculation appropriately

3    considered the part of this offense having occurred outside of

4    the United States.  The testimony of the Borohovs alone is

5    sufficient to get the two-point enhancement for part of this

6    conspiracy occurring outside of the United States.

7           Mr. Loz, the evidence is -- to me is absolutely clear

8    that Mr. Loz has been involved in this for ten years.  That his

9    fingerprints are on currency back many years ago.  He left the

10   country as soon as Mr. Bangiyev was arrested in the earlier

11   conspiracy concerning the $50 bills.  And that clearly the

12   activity continued in Israel.  And there is significant amounts

13   of independent evidence without using Mr. Loz's cooperation to

14   demonstrate that this offense was occurring outside the United

15   States.

16          And then the decision was made by Ms. Loz and Mr.

17   Fakiro to move the presses to the warehouse in New Jersey and

18   came back to the United States.

19          So I think the two-point enhancement is appropriate.

20          I also think the four-point enhancement is

21   appropriate for Mr. Loz's position in this offense.  I think

22   that the evidence, without considering anything that he has

23   said in his cooperation, demonstrates without question that he

24   was the leader of this conspiracy, not only in teaching the

25   Borohovs how to do their job in putting the paper -- gluing the

20

1    paper together and putting certain ingredients between the

2    paper.

3            But also the money trail, the role that he played in

4    the warehouse, the role that he played with the Bangiyevs.  As

5    I just said, the way the money flowed, when he was ultimately

6    identified over the wiretap, the activities of the -- the

7    actions of the Bangiyevs during their involvement in this

8    conspiracy all identifies Mr. Loz as the leader of the

9    organization.  He responsibly knew that there were five or more

10   participants in this conspiracy even if he didn't know just how

11   extensive the network of co-conspirators who were distributing

12   the money in the United States were.  He clearly is deserving

13   of the four-point enhancement.

14           So as I look at the Guideline range, then the

15   Government has withdrawn its one point for the -- the third

16   point for the acceptance of responsibility, and I think that

17   that is appropriate.  That's a matter that the Government

18   determines that is justified in this case, and the additional

19   point will be withdrawn.

20           So the base offense level then becomes a 33.

21   Adjusted to 39.  With two points for acceptance, becomes a 37.

22           And the -- I think.  Is that right?  The adjusted

23   offense level is a 37, I'm sorry.  Goes down to a 35 because

24   the one-point reduction is taken off.  And the Guideline range

25   then becomes 168 to 210 months.  And that is the Guideline

1    range that I will apply in the case.

2           I read the parties' submissions and the video

3    submission.  And, Ms. Pedersen --

4           MS. PEDERSEN:  Your Honor, I think there may be an

5    error in calculation.

6           THE COURT:  Okay.

7           MS. PEDERSEN:  Can we just go through it slowly

8    again?

9           THE COURT:  Yes.  Base offense level, if we find that

10   it is a 20 instead of a 24 --

11          MS. PEDERSEN:  Let's start, so --  base offense level

12   of 9, plus -- correct?  So if we are on paragraph 61 of the

13   presentence report --

14          THE COURT:  Yes.

15          MS. PEDERSEN:  It starts under 2B5.1, the base

16   offense level begins at 9.  And the Court has corrected the

17   loss amount to level 20.  So it would 9 plus 20.

18          And then we have a two-level increase for having

19   manufactured.  So that is 29 plus 2, is 31.

20          And then we have a two-level increase for having part

21   of the offense occurred outside the United States, that is 31

22   plus 2, is 33.

23          The base offense level is 33.  And then if you add

24   the four-level role adjustment, 33 plus 4, is 37.

25          And if you deduct 2 under acceptance under paragraph

1  68, you get down to 35.  So your total offense level should be

2  35.

3          THE COURT:  I thought that's what I said.  Which

4  results in 168 to 210 months.

5          MS. PEDERSEN:  Yes, Your Honor.  So let me just

6  double-check on 35.  168 to 210?  Yes, thank you.

7          THE COURT:  All right.  Okay.  Then I'll hear

8  anything else the Government would like to say in sentencing.

9  As I said, I've read the submission.

10          MS. PEDERSEN:  Yes, Your Honor.  Obviously you've

11 heard this case for a long time and know that the case here is

12 about money, real money and fake money, fake money that looks

13 as good as real money.

14          Mr. Loz, the defendant, is really a dangerous person,

15 Your Honor.  He possesses specific and unique knowledge, highly

16 technical expertise, and lengthy experience in counterfeiting.

17          The level of sophistication of printing in this case

18 sets it apart from many.  This has been a unique case for the

19 Secret Service for many years.

20          The criminal enterprise was of very large scale, it

21 was long-standing, and it was successful.  It relied, as

22 counsel said, on a close-knit distribution network run by the

23 Bangiyevs, and it was based on family ties, loyalty, and greed.

24          The defendant recruited others and supervised others,

25 including Mr. Fakiro and the Borohovs, while in Israel and also

23

1  to come to the United States to continue this very successful

2  counterfeiting operation.

3          The defendant has the knowledge from the beginning to

4  the end.  He has the knowledge, the computer experience.  He

5  has the technical knowledge to know how you take an image of a

6  bill.  How you manipulate that through Photoshop.  How you get

7  the image from a computer onto to a printing plate onto

8  transparency.  And then he knows how to get that onto a

9  printing press.  Not a laser printer, not a copier, but a

10  commercial grade, state-of-the-art printing press.  He knows

11  how to print them, how to mimic security features that the

12  Government works years to perfect to prevent counterfeiting.

13          He knows how to direct others how to use some of the

14  printing machines.  But he has all the operation from beginning

15  to end in his brain.  He relies on others to distribute it, but

16  he's also involved in gathering significant amounts of money to

17  finance the operation, to profit from this fraud, and to live

18  off the profits from his criminal activity.

19          The defendant has a prior counterfeiting conviction

20  from Israel from 1998.  He spent time in custody in Israel.

21  The sentence in this case, Your Honor, has to be a specific

22  deterrent to this defendant who really single-handedly was the

23  mastermind, if you will, from future counterfeiting activity

24  when he is released.

25          The Government believes that a sentence of 210 months

24

1    with credit for time served would be a significant sentence for

2    this particular defendant to deter him from future

3    counterfeiting activity, whether back in Israel, or the United

4    States, or any other place.

5            We also believe it would be a general deterrent to

6    other counterfeiting operations worldwide who are

7    counterfeiting or who may think to counterfeit in the United

8    States or overseas.

9            And, yes, it is a significant sentence that the

10   Government seeks; however, for over ten years this operation

11   has been printing significant quantities that has been

12   disruptive to our economy and that has had an impact on

13   people's belief in our currency, which is a worldwide symbol of

14   currency.

15           And we would ask that the Court consider all of those

16   factors in imposing a significant sentence in this case.

17           THE COURT:  All right.  Thank you.

18           Mr. Martin.  And let me ask you to address the

19   preliminary order of forfeiture that the Government has filed

20   as well.  Do you object to any of the contents of that

21   preliminary order of forfeiture, sir?

22           MR. MARTIN:  Your Honor, if I may tender to the

23   clerk -- I'm sorry, tender to you, which is a consent order of

24   forfeiture which has been signed by Mr. Loz, by the United

25   States, and by me, and it is a consent forfeiture of

25

1    $20 million.

2            THE COURT:  Okay.  Is that consistent with the

3    preliminary order, Mr. Kromberg, or that's the negotiated --

4            MR. KROMBERG:  Your Honor, this is a consent that we

5    have worked out the differences.  And this is not everything

6    that either party wanted, but I think this is something that is

7    supported by the facts and that can be entered on the basis of

8    the consent of the parties.

9            THE COURT:  All right, thank you.  All right.  Then

10   I'm happy to order that.

11           And then, Mr. Martin, go ahead on the sentencing.  As

12   I said, I've read the letters in support, and also watched the

13   video that was submitted of Mr. Loz's family and his autistic

14   son.

15           MR. MARTIN:  Your Honor, Mr. Loz stands before the

16   Court to be sentenced for a crime that is a very serious crime.

17   As I mentioned earlier in these proceedings, Mr. Loz does

18   understand how disruptive his conduct was to financial matters

19   here in the United States.

20           The background that I briefly mentioned earlier was

21   that Mr. Loz was incarcerated, and as Ms. -- let's go back to

22   his early days --

23           THE COURT:  In '98?

24           MR. MARTIN:  Prior, in '98.  But prior to 1998 Mr.

25   Loz joined the military, served his country in a very honorable

26

1    way.  When he resigned, retired, he went into the reserves for

2    almost 15 years continuing for the country -- for his country.

3    And he learned, got a certificate, a certificate in computer

4    sciences and started working around computers.

5              THE COURT:  He had his own business, right?

6              MR. MARTIN:  He had his own business for a while.

7    And he also worked for large companies.  But he had his own

8    business.

9              Mr. Loz has a family.  And the Court has seen the

10   e-mails, has seen the video of I think the group session where

11   his oldest daughter, Nofar, his son, his wife, and his twin

12   ten-year-old sons spoke.

13             Judge, I would submit to the court that Mr. Loz was

14   raised in a way -- and I am not here trying to justify, excuse

15   the counterfeiting plea.  But Mr. Loz, as the Court saw from

16   both the presentence writer and from the family, he was raised

17   in Israel by a mother and a father who both had suffered

18   tremendously in the Holocaust.  As a result of that, they

19   suffered severe psychological damage, his parents, psychology

20   damage, which resulted in a lot of abuse as a young person to

21   Mr. Loz as a background.

22             And the children, the's oldest daughter, Nofar, in

23   her letter to you explained some of the conduct that he went

24   through as a young person.

25             When he in the early 2000s, just before his twins --

1    just after his twins were born, he had severe, started

2    suffering severe financial problems.  The one son, the

3    autistic, severely autistic son, in addition to the autism, has

4    required several operations on his brain.  And I think Mr. Loz

5    started suffering financially and was recruited into this

6    criminal activity.

7           Does it justify it?  It does not, Your Honor, but I

8    am going to ask you today to sentence the man, Mr. Loz, and not

9    the crime per se.  And the reason I ask that, Judge, is that in

10   our request you saw that we had asked for a sentence of

11   between -- normally, Your Honor, I always say a less than

12   Guideline sentence.  And we're asking for a sentence, a less

13   than Guideline sentence here, and we're asking for a sentence

14   of in the range of between eight and ten years.

15          And the reason we ask that, Judge, is that we're

16   trying to impose -- have the Court impose a sentence that will

17   be sufficient, but not greater than is necessary and that may

18   allow Mr. Loz, he is a 48-year-old man, to return to his

19   country, to return to Israel and be there for the family.

20          I can submit to the Court, having spoken with his

21   wife, having spoken with his daughters, and having viewed

22   various videos, that without him the family is suffering.

23   Without him, Adir, A-d-i-r, the son who is autistic, is really

24   at a loss.  And his wife, Dina, is trying very hard to survive

25   and to care for the family without him, and is having a

28

1   difficult time.

2          Your Honor, I would submit to the Court that on the

3   facts of this case, a sentence of between eight to ten years

4   would be sufficient.  Mr. Loz is not going to engage in this

5   activity, clearly not in the United States.  And clearly,

6   having now been labeled and convicted as a counterfeit

7   specialist here in the U.S., will be under the eyes, watchful

8   eyes of I'm sure law enforcement in Israel.

9          Your Honor, we believe that a sentence, less than

10  Guideline sentence would punish Mr. Loz and would also, Your

11  Honor, be consistent with some of the 3553 factors that Your

12  Honor is going to consider, and specifically the provision

13  created -- when the Guidelines were created, they wanted to do

14  away with the unnecessary disparity in sentences for those who

15  were similarly engaged in this conduct.

16         And Your Honor knows that when we appeared before you

17  for a plea, that you were aware and we made the Court aware

18  that Mr. Loz had been attempting to come in to enter a plea

19  along where the Bangiyevs, all three walk in, all three admit

20  their conduct, the case was over.  We were anticipating that

21  may occur, and plea offers were given to the Bangiyevs, but not

22  to Mr. Loz.

23         We think Your Honor is going to be faced with a

24  possibility of a disparity in the sentencing.  While Mr. Loz

25  may have been the printer, this operation in New York and the

1    Eastern District of Virginia could not and it would not have

2    occurred without the Bangiyevs.

3          And we would ask the Court for a less than Guideline

4    sentence to avoid any disparity between a sentence which the

5    Court may impose on the Bangiyevs, and we respectively request

6    that that be in the range of eight to ten years.

7          THE COURT:  All right.  Thank you, Mr. Martin.

8          Mr. Loz, please come to the podium.  This is your

9    opportunity to tell me anything you would like to before I

10   sentence you.  And please remain there when you're done.

11         THE DEFENDANT:  Yes, Your Honor.

12         Well, Your Honor, basically I did a big mistake by

13   choosing the easy way out when I got in trouble many years ago.

14   I tried for a lot of years to cover all my losses, and I didn't

15   succeed.  I tried, my family tried to help me.  It was almost

16   impossible to cover all the debts I had from previous

17   businesses I had.

18         And I was in the wrong place and the wrong time with

19   the wrong people.  I have been approached, I got an offer.

20   Again, I chose the easy way out, and I didn't thought about the

21   consequences of my action.

22         I'm taking full responsibility for what I did and how

23   I did it.  And I am so ashamed to be here today to represent my

24   country, the State of Israel, who basically got so much help

25   from the United States of America, from the people of America

30

1   during the years when we was fighting.  And we got so much

2   help, I saw it, from many, many incidents of getting -- when we

3   was in conflict, we was getting help, help we need to protect

4   our country.

5           I am so ashamed to be here today in front of you,

6   Your Honor, and anticipating in such a horrible crime and

7   shaming my country.  I feel I'm representing my country as

8   well, and I am so ashamed to be here and to be a part of this

9   thing.

10          But whatever been done, been done, and I don't see

11  other way of trying to minimize my anticipating in this

12  crime -- I don't see other way of getting out of it so easily,

13  and I need to accept whatever Your Honor will impose on me

14  today.

15          Finally, I'm addressing Your Honor and asking for

16  mercy.  Not for myself, more for my family.  They are alone

17  over there.  I have my son over there.  He lost without me.  I

18  was the one who raised him for the last years when he start to

19  growing up and to be a man almost.  He is twice of his age by

20  size.  And he needs to be controlled.  And I was the one who

21  basically raised him.  Even though when I was traveling, on

22  daily basis we spoke, even twice a day over the Skype and he

23  saw me and he was calm and sure I will come and will be with

24  him.

25          For these kind of kids, they don't know to

31

1    distinguish why things are being changed.  They don't

2    understand changes.  They know what they know.

3            So again, the only thing I'm asking is mercy on my

4    family.  I did what I did, I know.  For years to come I will

5    not be able to anticipate in their life.

6            My mother passed away I never saw her, even though my

7    sister told me she was asking to see my face for the last time.

8    I didn't saw her.

9            I didn't saw my son getting married.  And I probably

10   will not see my grandchildren raising up -- will be raised up

11   in February, they are expecting a boy, and I will not be there

12   for them to celebrate this thing.

13           So again, I'm asking for forgiveness from the

14   American people, from the Government, and I hope for mercy from

15   Your Honor.

16           Thank you.

17           MR. MARTIN:  Thank you, Your Honor.

18           THE COURT:  Why, when Mr. Bangiyev was arrested and

19   charged and ultimately convicted, and you left the country as

20   soon as you heard about the arrest, and left the printing

21   presses, et cetera, to be delivered later, why didn't that

22   convince you that you needed to go back into the legitimate

23   businesses that you were involved in over the years with the

24   skills that you possessed?

25           THE DEFENDANT:  Your Honor, what happened is like I

32

1   been brought here, there was a big dispute between the

2   Bangiyevs and the people in Israel.  And I been brought here,

3   been convinced by the brothers to come over here and to work

4   with them.

5        And from being working with them, they will a full

6   control on me and on the production of everything.  And they

7   financing -- they was financing it.  I came over here.  I was

8   working.  Again, I never, never anticipated about in selling it

9   or offering it to anybody.  My job was to print it.  The minute

10  it's been printed, they took over, they took the money, and I

11  never saw the money again.

12       But what happened is, after he got arrested, I been

13  asked to help to remove from a concealed place the merchandise,

14  the counterfeit money.  Then I discovered like half of it being

15  disappeared.

16       MR. MARTIN:  May I have a moment, Your Honor?

17       NOTE:  A discussion is had between the defendant and

18  his counsel.

19       THE COURT:  Well, the question is, why didn't you

20  stop?

21       THE DEFENDANT:  Well, it was like a year and

22  something after he got arrested, I been approached again by the

23  uncle and been convinced again to anticipate and to start to

24  build it again.

25       And after the damages, the financial damages I

1    suffered in 2007 over here, it was being increased.  I never

2    got any money from the $50 bills, I never got paid.

3         So the time I spent here and the care -- I had my son

4    with me over here, and I spent all what I had and didn't have

5    for taking care of him in the States.  So my debts was

6    increased by -- almost by double.

7         And I been approached again in Israel a year and

8    something later, and been convinced again to proceed and

9    manufacture for them the money.

10        THE COURT:  Okay.  All right.  Well, the evidence

11   before me is -- as I indicated, I think that you are in fact a

12   leader of this enterprise.  The conspiracy is a large

13   conspiracy, most of it here in the United States.  It did a

14   significant amount of damage to the United States.

15        This is not just stealing.  This is potentially

16   destabilizing the currency here in the United States.  There

17   are the losses to the businesses.  This is a really serious

18   offense.  And you participated in it for a long time.

19        You know, you have not been given any criminal

20   history points because the prior offenses you committed were in

21   Israel.  And you went through the system, the criminal justice

22   system in Israel on several occasions.  You received suspended

23   sentencing for your involvement in those other crimes, and you

24   didn't learn from that.

25        Mr. Bangiyev was arrested, and you got out of the

34

1    country, you were never prosecuted, although you were part of

2    that conspiracy.  So you were really fortunate.

3            I feel terrible for your family situation.  I feel

4    terrible that you're not going to get to see your family and

5    that your family is not going to have your help in the future,

6    but that's a decision that you made and that I know you are

7    living with every day and regretting.

8            There is a need to deter you because you didn't learn

9    from your prior involvement in the criminal justice system, and

10   specifically in counterfeiting.  There is a need to deter

11   others who may see the significant amount of money which was

12   made from this enterprise and be tempted to do the same thing.

13           And I understand Mr. Martin's argument about

14   disparity, but I don't think that applies here to the

15   sentencing.  And I'll deal with the Bangiyevs based on their

16   own involvement in this offense shortly.  But ultimately a

17   significant length of incarceration is necessary.

18           I am going to sentence you to 180 months of

19   incarceration.  Three years of supervised release.

20           I'll give you credit for the time served awaiting

21   sentencing while here after you have been charged.

22           I will not impose a fine or costs of incarceration

23   because I find you can't afford them.  And you've entered into

24   the forfeiture arrangement with the Government.

25           I will order that you cooperate in your deportation

35

1    if you are deported, and not return unlawfully.

2            Do you have a designation in mind, Mr. Martin?  Is

3    that something you have had a chance to discuss with Mr. Loz?

4            MR. MARTIN:  May I have a moment, Your Honor?

5            NOTE:  A discussion is had between the defendant and

6    his counsel.

7            MR. MARTIN:  Your Honor, Mr. Loz had requested a

8    facility -- there is a nonresident facility in Pennsylvania.

9            THE COURT:  What kind of facility?

10           MR. MARTIN:  It's for nonresident -- may I have a

11   moment?

12           THE COURT:  Yes.

13           MR. MARTIN:  I was anticipating a different facility,

14   Your Honor.  May I provide that to the Court in the next couple

15   of hours?

16           THE COURT:  Certainly, if you can --

17           MR. MARTIN:  I can send it to your --

18           THE COURT:  Yes, if you can get it to us today or

19   Monday is fine.

20           MR. MARTIN:  I can send it to chambers.

21           THE COURT:  We will await that information.

22           MR. MARTIN:  I will send it to chambers.

23           THE COURT:  All right.  Anything else in this case,

24   Ms. Pedersen?

25           MS. PEDERSEN:  No, Your Honor.

36

1           THE COURT:  All right.  Thank you, counsel.

2           Good day, Mr. Loz.

3           MS. PEDERSEN:  Thank you, Your Honor.

4    ------------------------------------------------
                          HEARING CONCLUDED
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19           I certify that the foregoing is a true and

20    accurate transcription of my stenographic notes.

21

22

23
                    /s/  Norman B. Linnell
24           Norman B. Linnell, RPR, CM, VCE, FCRR

25